## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **THE SCHOOL OF THE OZARKS, INC., d/b/a COLLEGE OF THE OZARKS**, <br><br> *Plaintiff,* <br><br> v. <br><br> **JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States; **U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**; **MARCIA L. FUDGE**, in her official capacity as Secretary of the U.S. Department of Housing and Urban Development; **JEANINE M. WORDEN**, in her official capacity as Acting Assistant Secretary for Fair Housing & Equal Opportunity of the U.S. Department of Housing and Urban Development, <br><br> *Defendants.* | Civil Case No.: <br><br> **VERIFIED COMPLAINT** <br><br><br><br> **Jury Trial Demanded** |

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff The School of the Ozarks, d/b/a College of the Ozarks ("the College"), for the Verified Complaint against Defendants, states as follows:

### INTRODUCTION

1. This action challenges a federal agency directive that requires private religious colleges to place biological males into female dormitories and to assign them as females' roommates. *See* Exhibit A, U.S. Department of Housing & Urban Development, Directive, Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021) ("the Directive").

2. The U.S. Department of Housing and Urban Development hastily issued the Directive without notice or the opportunity for public comment, in obedience to an Executive Order that President Biden issued three weeks earlier upon taking office. Exhibit B, Executive Order 13,988, Preventing and Combating

1

Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021) ("the Executive Order").

3.     The Directive imposes an immediate and binding legislative rule under the Fair Housing Act, prohibiting all regulated entities, including the College, from discriminating on the basis of sexual orientation or gender identity both in occupancy of their dwellings and in policies governing those dwellings.

4.     The Directive also prohibits entities from making statements to the contrary, such as by telling students that they only qualify for access to dormitory and dormitory room placements based on their biological sex.

5.     For decades, the College has prohibited male students from living in female dormitories, and vice versa, regardless of whether those students identify with their biological sex. The College likewise separates intimate spaces such as showers and bathrooms in its dormitories. The College regularly makes statements communicating these same policies, including this month as it arranges student housing for the fall. But Defendants failed to take into consideration the College or other entities with similar student housing policies in promulgating the Directive.

6.     The College thus seeks an order setting aside the Directive under the Administrative Procedure Act (APA), 5 U.S.C. § 706, as it was issued without observance of procedure required by law, and is contrary to law, arbitrary, capricious, in excess of statutory jurisdiction, and contrary to constitutional rights. The College seeks parallel relief pending review under 5 U.S.C. § 705.

7.     The College also seeks injunctive relief, declaratory relief, and other relief under the First Amendment, Tenth Amendment, Appointments Clause, the Religious Freedom Restoration Act, and the Regulatory Flexibility Act to protect the College from the actions of the federal government Defendants.

8.     A temporary restraining order and preliminary injunction under the Administrative Procedure Act are needed, not only because the Directive creates

2

immediate upheaval within the College's continuing enforcement of its housing policies, but because the College is engaged in time-sensitive statements and planning right now—with current and incoming students—describing its housing policies for the fall semester, and the Directive threatens massive penalties on the College for maintaining its policies and making statements about them.

## JURISDICTION & VENUE

9.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

10.   This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

11.   Additionally, this Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

12.   The action arises under the U.S. Constitution (art. I, § 1, art. II, § 1), the APA, 5 U.S.C. §§ 702–703, and other federal statutes.

13.   This action is brought under the APA, 5 U.S.C. §§ 553, 701–706, and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611, for the Court to review Defendants' unlawful actions and enter appropriate relief under the APA and the RFA.

14.   The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702. Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id* § 706(2)(C), or "without observance of procedure required by law," *id*. § 706(2)(D).

3

15. This case is also brought as an equitable cause of action, for this Court to review and enjoin *ultra vires* or unconstitutional agency action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-91 (1949).

16. This case seeks declaratory and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, 5 U.S.C. § 705 & 706, Federal Rule of Civil Procedure 57, and the Court's inherent equitable powers.

17. This Court may award costs and attorneys' fees under the Religious Freedom Restoration Act, 42 U.S.C. 1988(b) and the Equal Access to Justice Act, 28 U.S.C. § 2412.

18. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district, and a substantial part of property that is the subject of the action is situated here, because this district is where the College is situated as a resident and is regulated by Defendants' actions. Defendants are United States agencies or officers sued in their official capacities. A substantial part of the events or omissions giving rise to the Complaint occurred within the Western District of Missouri.

19. Divisional venue is proper in the Southern Division under Local Rule 3.2 as the College is situated in Taney County, Missouri as a resident, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this division.

## PARTIES

20. The College is a four-year liberal arts co-educational college located at 100 Opportunity Avenue, Point Lookout, Taney County, Missouri. It is a non-profit corporation incorporated in the state of Missouri as The School of the Ozarks, and it does business as the College of the Ozarks. *See* Exhibit C, College of the Ozarks Viewbook (providing a college overview that the College give to prospective students).

21. Defendant Joseph R. Biden, Jr., is the President of the United States of America. President Biden issued Executive Order 13,988 on which HUD Defendants relied in issuing and enforcing the Directive. President Biden is sued in his official capacity.

22. Defendant the United States Department of Housing and Urban Development (HUD) is a federal cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 551 and 701(b)(1). *See* 42 U.S.C. § 3532(a). Its address is 451 7th Street S.W., Washington, DC 20410.

23. HUD is responsible for implementing and enforcing the Fair Housing Act, 42 U.S.C. § 3601, et seq. *See* 42 U.S.C. § 3608(a). The Fair Housing Act is the commonly cited name for Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. § 3601 et. seq.

24. HUD promulgated the Directive, in reliance on the Executive Order.

25. HUD is responsible for implementing and enforcing the Directive.

26. Defendant Marcia L. Fudge is the Secretary of HUD and is sued in her official capacity. Secretary Fudge is "at the head of the Department" and "exercise[s] leadership at the direction of the President in coordinating Federal activities affecting housing and urban development." 42 U.S.C. § 3532(b). Defendant Fudge was confirmed by the Senate and was appointed by the President to this role on March 10, 2021. She replaced an Acting Secretary, Matthew E. Ammon, who served as Acting Secretary at the time when the Directive was issued and who had previously served in various career roles, but who had never been confirmed by the Senate or appointed by the President to any role.

27. Defendant Jeanine M. Worden is the Acting Assistant Secretary for Fair Housing and Equal Opportunity of HUD. Acting Assistant Secretary Worden signed and issued the Directive. Under 42 U.S.C. § 3535, the Secretary has delegated to

5

the Assistant Secretary for Fair Housing and Equal Opportunity the "power and authority of the Secretary with respect to the Fair Housing Act." 76 Fed. Reg. 73984-01 (Nov. 29, 2011); *see* 42 U.S.C. § 3608.

28. Defendant Worden was not nominated by the President of the United States or confirmed by the United States Senate at the time she issued the directive, nor to any position of an officer before she assumed the role of Acting Assistant Secretary. Upon information and belief, Defendant Worden's prior positions, including as Associate General Counsel for Fair Housing in the U.S. Department of Housing and Urban Development's Office of General Counsel, were career positions.

29. Each of the HUD Defendants is directed by the Executive Order and the Directive to adopt as binding policy and to employ in agency actions the definition of sex outlined in the Executive Order and the Directive in their administration of federal regulatory programs, conduct of agency rulemakings, and other agency actions.

**FACTUAL ALLEGATIONS**

I. **The College of the Ozarks**

A. **The College's mission and faith**

30. In 1906, the Missouri Synod of the Presbyterian Church established The School of the Ozarks, and it was granted a charter by the State of Missouri for the purpose (still faithfully administered) of "provid[ing] the advantages of a Christian education for youth of both sexes, especially for those found worthy, but who are without sufficient means to procure such training . . . ."

31. In 2003, the College converted its corporate status into a not-for-profit corporation governed by Chapter 355 of the Revised Statutes of Missouri, with the stated purpose: "To provide the advantages of a Christian education for youth of both sexes, especially for those found worthy, but who are without sufficient means

6

to procure such education. To carry out this purpose, the following aims and objectives have been defined: academic growth, vocational growth, Christian growth, patriotic growth and cultural growth." *See also* Exhibit C at 4 (sharing this mission and vision in the viewbook for prospective students).

32. The College has a unique, five-fold emphasis—academic, vocational, Christian, patriotic, and cultural—that is designed to develop citizens of Christ-like character who are well-educated, hard-working, and patriotic.

33. The academic goal of the College is primarily fulfilled through the College's classes and degree programs. *See* Exhibit C at 7-10.

34. The student vocational program has long been an integral part of the overall program of the College. *See* Exhibit C at 11-16.

35. Through the College's vocational mission, the College offers its programs with no tuition, so that every student has the opportunity to graduate debt-free. No student loans are involved and no cash is due from students for the cost of education. *See* Exhibit C at 42.

36. All full-time students are required to work in the campus work education program to contribute to their cost of education, and all part-time, degree-seeking students are required to work at least two semesters.

37. The cost of education is covered by a combination of credits from participation in a student work education program, federal or state grants for which students qualify, and scholarships provided by the College which are funded through donors who believe in the College's mission.

38. Room and board in the College's student housing is provided for an additional cost, which for 2020-21 is $3,950 per semester ($7,900 annually). Students may pay for room and board through a scholarship, through personal resources on a payment schedule, or through earnings from the College's summer work education program.

7

39. The Christian faith is an integral part of life at College of the Ozarks. *See* Exhibit C at 17-20.

40. The vision for The School of the Ozarks (now College of the Ozarks) was created by the Reverend James Forsythe, a Presbyterian minister who wanted to establish a school that would integrate faith and learning.

41. The College stresses the Christian faith and makes no denominational emphasis.

42. Students are not required to belong to a particular faith or religion to attend the College, or to hold particular religious beliefs.

43. The College informs applicants that, once they accept an offer of admission to the College, the student makes a commitment to uphold the standards of the institution.

44. All members of the College community are expected to adhere to Christian values and expectations as a matter of its code of conduct.

45. All full-time students with less than 91 academic college hours are required to attend Sunday morning chapel a minimum of five times during each semester.

46. The patriotic goal of the College encourages "an understanding of American heritage, civic responsibility, love of country, and willingness to defend it." Exhibit C at 21.

47. The College proudly embraces the patriotic traditions of the United States of America and provides many programs and activities throughout the year that emphasize patriotism. *See* Exhibit C at 21-24.

48. The cultural goal of the College is "to cultivate an appreciation of the fine arts, an understanding of the world, and adherence to high personal standards." Exhibit C at 26.

8

49.  To augment learning in the classroom and help students develop broad based knowledge and understanding of culture, the College offers convocations, concerts, chapel programs, guest speakers and groups, mission trips, and other programming opportunities.

50.  The College's faculty members annually sign a "Notice of Appointment" for the upcoming academic year. This document states, "Your signature on this contract signifies your agreement to comply with and support the College's drug-free workplace policy, the provisions of the College's Faculty Handbook, including all amendments, and the Employee Commitments pamphlet." Appendix C in the Faculty Handbook includes the same information as the Employee Commitments pamphlet: a summary of faith and practice commitments, biblical references in support of the College's policies, the Apostles' and Nicene Creeds, and the College's Lifestyle/Sexuality Policy.

51.  The College operates a Christian K-12 school as a department of the College. Founded on the classical model, School of the Ozarks intentionally seeks to transfer the "way of life" mentioned so frequently in the book of Acts as "the Way," in reference to followers of Christ. School of the Ozarks is, above all else, a Christian school that seeks to transfer a Christian way of life to each of its students; a way of life that influences not only how one worships privately but lives publicly.

52.  As recipients of delegated parental authority, the school and its personnel, who are committed to the life and teachings of Christ, are the individuals who are spending time with the children as they "walk by the way." Consequently, lessons are planned not only with a focus on the academic curriculum, but teachers are challenged to develop each lesson while considering what that particular lesson teaches us about the character and nature of God. The College refers to this as "faithful education." At School of the Ozarks, the curriculum is not the end, but the means to the end of developing "citizens of Christ-like character who are well-

9

educated, hardworking, and patriotic" under the vision statement for College of the Ozarks and School of the Ozarks.

53. School of the Ozarks desires to graduate students who are prepared to engage the culture with the good news of Jesus Christ. The curriculum is enhanced with many opportunities to take part in community service projects, engage in, contribute to, and serve organized charities, and participate in mission trips. School of the Ozarks students learn and live the belief that this school is not a retreat from the world, but preparation to be poured out on it. Jesus instructed us to be salt and light, and in order to be effective, both need to be poured out into the world.

54. School of the Ozarks maintains and follows the original mission statement established in 1906, "to provide the advantages of a Christian education to youth of both sexes, especially those found worthy, but without sufficient means to procure such training." Every word of that mission is taken seriously, so in the tradition of College of the Ozarks, School of the Ozarks charges no tuition. Families are asked to pay modest fees which can be reduced based upon demonstrated financial need. Students in each grade work at age-appropriate custodial chores and are responsible for the general upkeep of the school building. Each year, admissions are granted based upon a target of 90% of our students qualifying for financial aid. The hope is that families who cannot afford a private Christian education for their children may have the opportunity to do so at a school that is fully funded, housed, and supported by College of the Ozarks.

55. By founding School of the Ozarks, College of the Ozarks seeks to partner with parents to start the process of showing students "the Way" at an earlier age. By the time young men and women arrive at college, many are already set in their own ways, and although transformation is possible, it is more difficult. School of the Ozarks desires to come alongside parents to raise up children who are not just taxpayers and consumers, but rather producers and influencers. The book of

10

Proverbs instructs us to "train up a child in the way he should go, and when he is old he will not depart from it" (Proverbs 22:6, ESV). School of the Ozarks seeks to train up children who know who they are in Christ, are skilled and hardworking, and articulate in defending their faith so they might be invited to "the table of influence" and then use that influence to impact the culture for Christ.

### B. The College's beliefs about sexuality

56. The College has long been guided by a Biblical worldview that all people should be treated with dignity, grace, and holy love, whatever their sexual beliefs.

57. The College teaches human sexuality is a gift from God. Exhibit D at 5, College of the Ozarks Excerpts from Student Handbook (Fall 2020), also available at https://www.cofo.edu/Portals/3/HandbookFa20.pdf?ver=kFcQi7hY360lP9WVS 4jqyQ%3D%3D.

58. The College teaches that sex as determined at birth is a person's God-given, objective gender, whether or not it differs from their internal sense of "gender identity," and it bases this teaching on such Biblical passages as Genesis 1:27, Leviticus 18:22, Matthew 19:4, Romans 1:26–27, and 1 Corinthians 6:9–10.

59. The College teaches that sexual relations are for the purpose of the procreation of human life and the uniting and strengthening of the marital bond in self-giving love, purposes that are to be achieved solely through relationships between one man and one woman in marriage, based on such Biblical passages as Genesis 1:28 and 2:24, Exodus 20:14, Proverbs 5:15–23, Matthew 19:5, 1 Corinthians 6:12–20 and 7:2–5, and 1 Thessalonians 4:3.

### C. The College's code of conduct for students

60. The College expects students to conduct themselves, both on and off campus, as ambassadors of the College, and their conduct must reflect the academic, vocational, Christian, patriotic, and cultural goals of the College. Exhibit D at 4.

61. Students must observe rules of courtesy, good manners, and good conduct.

62. Students must remove hats in classrooms, chapel, library, and the dining hall, and show respect for speakers at convocations and chapel services.

63. Students must stand respectfully facing the flag, place their right hand over the heart, and recognize the American flag during the national anthem and the Pledge of Allegiance.

64. Students are responsible for the cleanliness and beauty of the campus. The College expects students to walk on sidewalks, put trash in the trash barrels, and keep the dining hall clean and attractive.

65. The College prohibits sexual harassment within its educational programs and activities. Exhibit D at 6.

66. The College prohibits quid pro quo sexual harassment, hostile environment sexual harassment, sexual assault, domestic violence, dating violence, and stalking.

67. The College is committed to a policy of nondiscrimination on the basis of age, color, handicap, race, sex, and national origin in all of its programs and offerings. Exhibit D at 3.

68. The College expects employees and students at College of the Ozarks to conduct themselves at all times in accordance with the highest standards of Christian morality.

69. The College considers it particularly important that high standards of sexual morality be observed among its employees and students.

70. The College understands that misuses of God's gift of human sexuality, and therefore violations of its code of conduct, include, but are not limited to, gender expression inconsistent with sex determined at birth (transgender expression), gender transition, sexual abuse, sexual harassment, sexual assault, heterosexual misconduct, homosexual conduct, or possession of pornographic materials.

12

71.  As part of its code of conduct (see Exhibit D at 4–5), the College may subject to disciplinary action any employee or student who engages in or encourages:

a.  Gender expression inconsistent with sex determined at birth;

b.  Gender transition;

c.  Sexual relations with a person other than his/her spouse;

d.  Sexual relations with a person of the same sex;

e.  Touching, caressing, and other physical conduct of a sexual nature with a person of the same sex; and

f.  Touching, caressing, and other physical conduct of a sexual nature with a person of the opposite sex that is inappropriate to the time and place in which it occurs.

72.  The College requires students to agree to act consistent with the College's rules of conduct while they are a student, even if they do not personally agree with the rules.

73.  The College thus allows applications and enrollment from students who experience or have experienced same-sex attractions or have experienced feelings or taken actions contrary to their biological sex, so long as the students abide by the College's code of conduct while enrolled.

**D.  The College's student housing**

74.  About 1,500 students are enrolled in the College.

75.  Of those, the College houses about 1,300 students.

76.  The College houses those students in nine dormitories ("residence halls") owned and operated by the College.

77.  Housing in the College's residence halls is exclusively reserved for the College's students and the College's residence hall employees.

13

78. The College requires all unmarried students to live on campus, except that after the first year at the College students may be considered for off-campus status within forty miles of the College if they live with parents or guardians due to financial need, if they are married, or if they are a veteran of the armed services.

79. About 60% of the College's students are female, and about 40% are male.

80. Six of the College's residence halls are reserved for females, and three are reserved for males.

81. The College has intentionally arranged its student housing so that the male residence halls are in a different part of the campus than the female residence halls. *See* Exhibit C at 41 (showing a campus map in the viewbook provided to prospective students).

82. The College allows only biological females to occupy the female residence halls, it allows only biological males to occupy the male residence halls, and it has had this policy in place since before the Fair Housing Act was amended in 1974 to prohibit sex discrimination.

83. The College will not allow a biological male to occupy a female residence hall, nor vice versa, regardless of the student's "gender identity."

84. In the residence halls, security doors generally separate "living areas" (rooms, hallways, stairways, and landings) from lounges and lobbies.

85. Except for move in day, and for three monitored hours on one "open house" day each semester, the College prohibits persons of the opposite biological sex (regardless of gender identity) from visiting or entering the living areas of the residence halls. Exhibit D at 8.

86. The College requires overnight guests in the residence halls to be at least 18 years of age and of the same sex, and it allows guests to stay overnight only on Friday and Saturday nights.

14

87. Showers and restrooms in the residence hall living areas are restricted to use by only the biological sex associated with that residence hall.

88. Several residence halls, including Youngman, Foster, Memorial, and McDonald, have communal restrooms and showers.

89. Restrooms accessible to the lounge or lobby areas in residence halls are either single occupancy, or they are restricted to use by only one biological sex or the other.

90. Housing staff regularly conduct room checks and safety checks to ensure residence hall rules are being followed.

91. The College respects the privacy of students in the residence halls, but it reserves the right to enter student rooms in emergencies, or for the purpose of inspecting the premises when an authorized person has reasonable belief that an occupant may be physically endangered or harmed, or (if the Dean of Students or his representative so authorizes) if a reasonable belief exists that college policy is being violated.

**E. The College's statements about its residence hall policies**

92. The College regularly makes statements about its beliefs and policies as set forth above and statements that are materially similar, to students, prospective students, parents, and visitors, including statements asserting its student housing policies based on biological sex and marriage.

93. These communications include, but are not limited to, the College's Student Handbook (see Exhibit D), which it publishes online.

94. These communications also include the College's virtual tour, which it publishes online. *See* College of the Ozarks Virtual Tour, www.cofo.link/virtualtour.

95. The Residence Life section of the virtual tour states that "C of O is primarily a residential campus, including nine separate male and female residence halls across campus, and most rooms are double occupancy." "The women's

15

residence halls on campus include Ashcroft Hall, Foster Hall (pictured), Mabee Hall, Mann Hall, Memorial Hall." "The men's residence halls on campus include Barrett Hall, Kelce Hall - East, Kelce Hall -West, Youngman Hall (pictured)." *Id.*

96. The College makes the above statements about its beliefs and policies and statements concerning the admissions process throughout the year.

97. The College makes statements about its student housing policies that are the same as or materially similar to the statements described above, to prospective students and their parents or guardians during the admissions process, at college recruitment events, and in phone and email communications upon inquiry.

98. College admission officers will often play the virtual tour for students at high school events, and they will often cite the student handbook at events in response to student questions.

99. College admission officers share this information throughout the year at high school visits, college fairs, and other outreach events, as well as during on-campus visits with prospective students. The College has scheduled several upcoming recruitment events, including on April 16, 2021, April 27, 2021, and May 14, 2021, to speak about topics including residence hall policies.

100. Prospective students fill out applications for the College and for student housing through the admissions process based on statements the College makes to them about the residence hall policies described above.

101. Students may apply for admission in the fall or spring semester.

102. The College makes statements to existing students about residence hall policies as described above throughout the year.

103. The College makes statements to existing students to communicate residence hall policies that apply to those students while they are occupying, visiting, or using the residence halls.

16

104. The College requires existing students to submit responses to a housing intent survey each semester, during which they select preferences for placement in student housing for the next semester, including based on their biological sex.

105. The College makes statements to existing students about its residence hall policies in order to promulgate the surveys to them, and then to place students as occupants of residence halls for the following semester.

106. The College is currently making all of these ongoing communications about current housing and arranging future housing for the fall semester.

107. College housing employees use the pronouns associated with an individual's biological sex, not gender identity.

108. The College tells and intends to continue telling current and prospective students, parents, and the public that the College allows only biological females to occupy the female residence halls, visit the female residence hall living areas (except on moving day and open house day), and use the residence hall showers and restrooms designated for females.

109. The College tells and intends to continue telling current and prospective students, parents, and the public that the College excludes biological males from those female residence hall spaces whether or not the biological males have or assert a gender identity of female.

110. The College tells and intends to continue telling current and prospective students, parents, and the public that the College allows only biological males to occupy the male residence halls, visit the male residence hall living areas (except on specified days for moving or open houses), and use the residence hall showers and restrooms designated for males.

111. The College tells and intends to continue telling current and prospective students, parents, and the public that the College excludes biological females from

17

those male spaces in the residence halls whether or not the biological females have or assert a gender identity of female.

112. Many other public and private colleges, as well as primary and secondary schools have, and always have, separated student housing by biological sex and they have communicated such policies.

## II. The Fair Housing Act

### A. The Fair Housing Act's Statutory and Regulatory Structure

113. The Fair Housing Act (FHA) prohibits discrimination in dwellings on the basis of race, color, religion, sex, familial status, national origin, and disability. 42 U.S.C. § 3604, et seq.

114. The Fair Housing Act vests the "authority and responsibility for administering" its provisions in Defendant U.S. Department of Housing and Urban Development ("HUD"). 42 U.S.C. § 3608(a).

115. The Act applies to "dwellings" throughout the country, whether or not the housing provider receives federal funds. 42 U.S.C. § 3604.

116. Under the Act, a dwelling "means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b); *see also* 24 C.F.R. § 100.20 (same).

117. Under the Act, HUD "may make rules" to carry out the Act's discrimination prohibitions. 42 U.S.C. § 3614a.

118. HUD "shall give public notice and opportunity for comment with respect to all rules made under this section." 42 U.S.C. § 3614a.

119. Relying on its authority to make rules to enforce the Act, HUD has published many fair housing rules. 24 C.F.R. § 100.1 (authority); *e.g.*, 24 C.F.R. § 100.50 et seq. (discrimination provisions).

18

120. HUD's regulations provide "the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions." 24 C.F.R. § 100.5(b).

121. The federal government has applied the Act to student housing at colleges and universities, whether public or private. *See, e.g., United States v. Univ. of Nebraska at Kearney*, 940 F. Supp. 2d 974, 983 (D. Neb. 2013).

122. Recently, HUD described the scope of the Act by stating, "Courts have applied the [Fair Housing Act] to . . . state and local governments, colleges and universities, as well as others involved in the provision of housing, residential lending, and other real estate-related services." Exhibit E, HUD, FHEO Notice FHEO-2020001 at 3 (Jan. 28, 2020).

123. Under 24 C.F.R. § 100.201, dwellings include "dormitory rooms."

124. Defendants consider the College's residence halls, as described above, to be dwellings under 42 U.S.C. § 3602(b) and 24 C.F.R. § 100.20.

**B. The Fair Housing Act and HUD Regulations' Discrimination Bans**

125. The Act declares that it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin" 42 U.S.C. § 3604.

126. The Act declares that it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of religion, sex, or other protected characteristics. *Id.*

127. The Act declares that it is unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation,

or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." *Id.*

128. The Act declares that it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

129. HUD regulations declare that it is unlawful to "[r]efuse to sell or rent a dwelling after a bona fide offer has been made, or to refuse to negotiate for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate in the sale or rental of a dwelling because of handicap." 24 C.F.R. § 100.50(b)(1); 24 C.F.R. § 100.65.

130. HUD regulations likewise declare that it is unlawful to "[d]iscriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with sales or rentals, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.50(b)(2).

131. HUD regulations declare that it is unlawful to "[e]ngage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.50(b)(3); 24 C.F.R. § 100.70(b).

132. HUD regulations prohibit housing providers from using different application or leasing procedures on these bases. 24 C.F.R. §§ 100.60, 100.65.

133. HUD regulations declare it is unlawful to "[m]ake, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or

20

national origin, or an intention to make any such preference, limitation or discrimination." *Id.*

134. HUD regulations declare it is "unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65.

135. HUD regulations declare it is prohibited to "[l]imit[] the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person associated with him or her." *Id.*

136. HUD regulations prohibit steering practices with respect to housing, and they declare that it is unlawful "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a).

137. These unlawful steering practices include "[d]iscouraging any person from inspecting, purchasing or renting a dwelling" or "[c]ommunicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development" or "[a]ssigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building" because of race, color, religion, sex, handicap, familial status, or national origin. 24 C.F.R. § 100.70(c).

138. HUD regulations prohibit evictions based on religion or sex of the tenant or a tenant's guest. 24 C.F.R. § 100.60(b)(5).

21

139. HUD regulations state it "shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by these laws. 24 C.F.R. § 100.400.

140. HUD regulations prohibit harassment in housing because of a person's religion or sex, including "[s]ubjecting a person to harassment because of" religion, sex, or other characteristics "that causes the person to vacate a dwelling or abandon efforts to secure the dwelling," or "that has the effect of imposing different terms, conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.60; 24 C.F.R. § 100.65.

141. "Harassment can be written, verbal, or other conduct, and does not require physical contact." 24 C.F.R. § 100.600.

142. "A single incident of harassment" because of religion, sex, or other protected characteristics "may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences a quid pro quo." *Id.*

143. Under HUD regulations and judicial precedents interpreting the Act, disparate-impact liability for unlawful housing discrimination "may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent," if the provider lacks a legitimate rationale. 24 C.F.R. § 100.5(b); *see also* 24 C.F.R. § 100.500 (same); *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 525 (2015).

144. Under the Act, "testers" are "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of

22

collecting evidence of unlawful steering practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).

145. The Act treats testers like other persons who suffer housing discrimination. "A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Havens Realty Corp.*, 455 U.S. at 373–74.

146. The Act and HUD regulations create liability for unlawful practices directed toward testers, and so private actions may be brought as aggrieved persons both by parties seeking housing and also by testers. 42 U.S.C. § 3604(d); 24 C.F.R. § 100.80(b)(4).

147. HUD funds private nonprofit fair housing enforcement organizations to carry out testing and other investigative activities, including under the Fair Housing Initiatives Program ("FHIP"). *See, e.g.*, 42 U.S.C. § 3616a(b); 24 C.F.R. § 115.311; *see, e.g.,* Exhibit F, HUD, FHIP Education and Outreach Initiative (EOI) - Tester Training, https://www.hud.gov/program_offices/spm/gmomgmt/grantsinfo/fundingopps/fy20fhip_eoi.

148. HUD reports that at least one entity, the Metropolitan St. Louis Equal Housing and Opportunity Council, performs fair housing initiative work in the State of Missouri. Exhibit G, HUD, Contact FHIP Organizations, Missouri, https://www.hud.gov/program_offices/fair_housing_equal_opp/contact_fhip.

149. Other provisions of the Act and HUD regulations applicable to dwellings prohibit discrimination on the basis of sex.

**C.  The Fair Housing Act and HUD's Restrictions on Speech**

150. The Act makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or

discrimination" because of religion, sex, or other protected characteristics, "or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

151. HUD regulations likewise state that it is "unlawful to make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling" that "indicates any preference, limitation or discrimination" because of religion, sex, or other protected characteristics, "or an intention to make any such preference, limitation or discrimination." 24 C.F.R. §§ 100.50, 100.75.

152. This prohibition applies "to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75.

153. "Written notices and statements include any applications, flyers, brochures, deeds, signs, banners, posters, billboards or any documents used with respect to the sale or rental of a dwelling." *Id.*

154. These prohibited "notices, statements and advertisements" include "[u]sing words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons," or "[e]xpressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter," because of religion, sex, or other protected characteristics. *Id.*

155. The Act and HUD regulations also make it unlawful to "represent to any person" because of sex, religion, or other protected characteristics "that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d); 24 C.F.R. § 100.50(b)(5); 24 C.F.R. § 100.80(a).

156. This prohibition includes "[p]roviding false or inaccurate information" or "[l]imiting information, by word or conduct, regarding suitably priced dwellings

available for inspection, sale or rental" because of religion, sex, or other protected characteristics. 24 C.F.R. § 100.80(b).

157. HUD regulations require entities covered by the Fair Housing Act to post and maintain a Fair Housing Poster. 24 C.F.R. § 110.10–110.30.

**D. Enforcement of the Act and HUD's Regulations**

158. Several entities, including HUD, state and local agencies, and private parties, may enforce the Act through administrative complaints and investigations. 42 U.S.C. § 3614; 24 C.F.R. § 103.1 et seq.; 24 C.F.R. § 115.100, et seq.

159. A private party may bring a private cause of action in federal court. 42 U.S.C. § 3613.

160. The Attorney General of the United States may initiate civil or criminal proceedings in federal court to enforce the Act. 42 U.S.C. §§ 3614, 3631.

161. Upon information and belief, the Attorney General holds the position that he may do so based solely on the fact that the College has a policy separating its residence halls by biological sex.

162. HUD or any "aggrieved person" may file a complaint with HUD within one year of an alleged discriminatory housing practice. 42 U.S.C. § 3610(a)(1)(A)(i); 24 C.F.R. §§ 103.9 et seq.

163. A claim may be made by mail or telephone and in-person help is available. 24 C.F.R. § 103.30.

164. As part of its investigation, HUD has the power to "issue subpoenas and order discovery in aid of investigations and hearings" just as "if the subpoenas or discovery were ordered or served in aid of a civil action" in federal court. 42 U.S.C. §§ 3610(a)(1), 3611(a); 24 C.F.R. § 103.215.

165. If a person fails to comply with this discovery process, HUD has the power to request that the Attorney General enforce its administrative subpoenas in federal court. 42 U.S.C. § 3614(c).

166. The Act provides criminal penalties of $100,000 fines or up to one year in prison for failing to respond to subpoenas or administrative discovery requests, or for willfully misleading persons or destroying documents in these HUD proceedings. 42 U.S.C. § 3611(c).

167. A State or local public agency certified by HUD to provide "substantially equivalent" substantive rights, procedures, remedies, and judicial review as HUD may also enforce the Act and HUD's rules. 42 U.S.C. § 3610(f); 24 C.F.R. § 103.100; 24 C.F.R. § 115.100 et seq.

168. HUD may enter into cooperation agreements with State and local agencies, 42 U.S.C. § 3616, 24 C.F.R. § 103.220, as well as make grants through its Fair Housing Initiatives Program, 42 U.S.C. § 3616a(a), and through its Fair Housing Assistance Program, 24 C.F.R. § 115.300 et seq.

169. Many state laws are certified as substantially equivalent with the Federal Fair Housing Act by the federal government under this program. Exhibit H, U.S. Department of Housing and Urban Development, Fair Housing Assistance Program (FHAP) Agencies (March 31, 2021), https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHAP/agencies; Exhibit I, U.S. Department of Housing and Urban Development, Fair Housing Assistance Program (FHAP) (March 31, 2021), https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHAP.

170. HUD investigations can lead to extensive proceedings before an administrative law judge, and the proceedings may result in damages, civil penalties, and attorneys' fees and costs for the prevailing party. See 42 U.S.C. §§ 3610, 3612, 3614; 24 C.F.R. §§ 103.230, 103.510, 180.705; 24 C.F.R. pt.180.

171. Civil actions in federal court may also be filed, and are authorized to impose actual and punitive damages, a permanent or temporary injunction, temporary restraining order, other order, and attorney's fees and costs. 42 U.S.C.

26

§§ 3612, 3613; 24 C.F.R. § 180.410. HUD may "authorize a civil action for appropriate temporary or preliminary relief pending final disposition of the complaint." 42 U.S.C. § 3610(e)(1); 24 C.F.R. § 103.500.

172. Compensatory damages can include out-of-pocket expenses as well as damages "for emotional distress and humiliation." *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 236 (8th Cir. 1976).

173. The Act does not cap the amount of punitive damages that can be awarded. 42 U.S.C. §§ 3612.

174. The Attorney General through the Department of Justice may also, on its own initiative or on referral, civilly enforce the Fair Housing Act. 42 U.S.C. § 3614; 24 C.F.R. § 103.510.

175. Penalties may be assessed "for each separate and distinct discriminatory housing practice." "A separate and distinct discriminatory housing practice is a single, continuous uninterrupted transaction or occurrence." 24 C.F.R. § 180.671.

176. The regulations provide for fines of $21,410 for a first violation of the Fair Housing Act, $53,524 for a second violation, and $107,050 for a third or continuing violation. *Id.*

177. The Act provides for criminal penalties, including fines and prison time, where, through force or by threat of force, one denies or removes a person from housing. 42 U.S.C. § 3631.

178. The FHA is also enforced through grant conditions. Many federal housing programs require parties to comply with the Fair Housing Act or to affirmatively further fair housing as a condition of participation or for receipt of federal housing funds. *See, e.g.*, 42 U.S.C. §§ 1437c-1, 3608(e)(5), 5304(b)(2)), 5306, 12705(b)(15)).

179. The State of Missouri, for example, receives many federal housing grants. *See* Exhibit J, HUD Exchange, About Grantees, HUD Awards and Allocations (April 9, 2021) https://www.hudexchange.info/grantees/allocations-awards/ (download and

search by location State of Missouri and by recipients Missouri and Missouri Housing Development Corporation).

180. The federal government requires grant recipients like the State of Missouri to comply with or further the Fair Housing Act in many of these housing programs. *See, e.g.*, 42 U.S.C. § 1437a; 42 U.S.C. 5301 et seq; 42 U.S.C. 5308; 42 U.S.C. 12901 et seq.

### III. The President's and HUD's actions against the College

181. On January 20, 2021, immediately after taking office, President Biden signed Executive Order 13,988, "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation" (the "Executive Order), attached as Exhibit B, and available at 86 Fed. Reg. 7,023 (Jan. 25, 2021).

182. The Executive Order declares that "[i]t is the policy of my Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation. It is also the policy of my Administration to address overlapping forms of discrimination." *Id.*

183. The Executive Order declares that "laws that prohibit sex discrimination— including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), the Fair Housing Act, as amended (42 U.S.C. 3601 et seq.), and section 412 of the Immigration and Nationality Act, as amended (8 U.S.C. 1522), along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." *Id.*

184. The Executive Order declares that "[t]he head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy set forth in section 1 of this order. If an agency takes an action described in this subsection or subsection (b)

28

of this section, it shall seek to ensure that it is accounting for, and taking appropriate steps to combat, overlapping forms of discrimination, such as discrimination on the basis of race or disability." *Id.*

185. The White House thus began requiring every federal agency to implement the Executive Order in every civil rights law.

186. HUD is one of the agencies encompassed by the requirements of the Executive Order.

187. On February 11, 2021, HUD issued the document, "Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act" (Feb. 11, 2021) (attached as Exhibit A), available at https://www.hud.gov/sites/dfiles/PA/documents/HUD_Memo_EO13988.pdf (last visited March 13, 2021).

188. This document refers to itself as a "directive." *Id.*

189. On the same day, HUD issued a press release describing the Directive. Exhibit K, HUD, HUD to enforce Fair Housing Act to Prohibit Discrimination on the Basis of Sexual Orientation and Gender Identity: HUD directive begins implementation of the policy set forth in Biden executive order to prevent and combat sexual orientation and gender identity-based discrimination (Feb. 11, 2021) available at https://www.hud.gov/press/press_releases_media_advisories/HUD_No_21_021 (last visited April 14, 2021).

190. The press release describes the Directive as a "directive."

191. The press release declares that "HUD, under the Biden Administration, will fully enforce the Fair Housing Act to prohibit discrimination on the basis of gender identity or sexual orientation." *Id.*

192. In the Directive, Defendant Worden states "I am directing HUD's Office of Fair Housing and Equal Opportunity (FHEO) to take the actions outlined in this memo to administer and fully enforce the Fair Housing Act to prohibit discrimination because of sexual orientation and gender identity." Exhibit A at 1.

29

193. The Directive states, "In its 2016 harassment rule, HUD reaffirmed its legal interpretation that the Fair Housing Act's protection from discrimination because of sex included discrimination because of gender identity." *Id* at 2.

194. The Directive states that this interpretation also "urgently requires enforcement action." *Id* at 1.

195. The Directive states, "Effective immediately, FHEO shall accept for filing and investigate all complaints of sex discrimination, including discrimination because of gender identity or sexual orientation, that meet other jurisdictional requirements." *Id* at 2.

196. The Directive states, "FHEO shall conduct all other activities involving the application, interpretation, and enforcement of the Fair Housing Act's prohibition on sex discrimination to include discrimination because of sexual orientation and gender identity." *Id.*

197. The Directive states, "Where reasonable cause exists to believe that discrimination because of sexual orientation or gender identity has occurred, FHEO will refer a determination of cause for charge by HUD's Office of General Counsel." *Id*.

198. The Directive requires compliance by state and local agencies that enter into agreements with the Department under the Fair Housing Assistance Program (FHAP), and organizations and agencies that receive grants through HUD's Fair Housing Initiative Program (FHIP). *Id.*

199. Through the Fair Housing Assistance Program, the department funds state and local agencies that administer fair housing laws that HUD has determined to be substantially equivalent to the Fair Housing Act, including 37 current state recipients. Exhibits H & I.

200. In the Directive, Defendant Worden directs FHEO Regional Offices, Fair Housing Assistance Program agencies and Fair Housing Initiative Program

30

grantees "to review, within 30 days, all records of allegations of discrimination (inquiries, complaints, phone logs, etc.) received since January 20, 2020" and give notice that these "claims may be timely and jurisdictional for filing." Exhibit A at 3.

201. Defendant Worden declares that HUD officials and Fair Housing Assistance Program and Fair Housing Initiative Program entities "will forge a path to the eradication" of sexual orientation and gender identity discrimination. *Id.*

202. In compliance with the Directive, Fair Housing Initiative Program entities will send testers to entities covered by the Fair Housing Act, including entities such as the College, to determine if they discriminate on the basis of sexual orientation or gender identity.

203. Those testers' actions will result in liability for covered entities, such as the College, under the Fair Housing Act and HUD regulations, if they limit occupancy of or access to any of their dwellings to persons of the same biological sex regardless of gender identity.

204. The Directive is binding on entities that must comply with the Fair Housing Act.

205. Under the Directive, all the remedies available under the Act and HUD regulations that apply to sex discrimination will be applied to the same extent by HUD officials and Fair Housing Assistance Program and Fair Housing Initiative Program entities for sexual orientation and gender identity discrimination.

206. Defendants are responsible for the implementation and application of the Directive, including against the College.

207. HUD has treated the Directive as a final and binding statement of its interpretation of the Act and HUD regulations in the administration of the Fair Housing Assistance Program.

208. In reliance on the Directive, in mid-late February 2021, HUD sent blanket draft memoranda of understanding to be signed by states and other agencies that

31

assist with the enforcement of the Fair Housing Act through the Fair Housing Assistance Program. Exhibit L, HUD, "Addendum To The Memorandum Of Understanding With The U.S. Department Of Housing & Urban Development Fair Housing Assistance Program, Statement of Consistency with *Bostock v. Clayton County, GA*, 590 U.S. ___ (2020)" (sent Feb. 2021).

209. These memoranda recite that the "purpose of this Addendum is to ensure consistency in application" by cooperating agencies "so that the substantive rights protected" under state law "remain substantially equivalent to those protected by the federal Fair Housing Act, as required by 42 U.S.C. §§ 3610(f) and 3616." *Id.*

210. These memoranda cite the Directive and state that, "[b]ecause this finding relates to substantive rights protected by the Act, agencies participating in the Fair Housing Assistance Program must either administer a law that explicitly prohibits discrimination because of gender identity and sexual orientation or must apply its fair housing law in a manner consistent with *Bostock* and the FHEO Memorandum." *Id.*

211. These memoranda then provide for the states or other agencies to acknowledge "that its fair housing law either provides express protections for both sexual orientation and gender identity or that the Agency will apply its fair housing law such that discrimination because of sex includes sexual orientation and gender identity." *Id.*

212. On April 11, 2021, in a proclamation on Fair Housing Month, President Biden referred to the Fair Housing Act and stated, "We have also improved upon it through the years . . . just 2 months ago my Administration issued a rule change to ensure that the law finally guards against discrimination targeting LGBTQ+ Americans." Exhibit M, White House, A Proclamation on National Fair Housing Month, 2021 (April 11, 2021), available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/04/11/a-proclamation-on-national-fair-housing-

32

month-2021/ (scheduled for publication in the Federal Register on April 15, 2021). He added that this effort "cannot wait." *Id.*

213. In saying, "just 2 months ago my Administration issued a rule change to ensure that the law finally guards against discrimination targeting LGBTQ+ Americans," President Biden was referring to the Directive.

214. Outside the directive, Defendants have similarly shown that they require men to be placed in single-sex women's spaces and programs under their gender identity nondiscrimination theory.

215. In temporary shelters not subject to the FHA, including those for victims of domestic violence, the HUD Secretary issued rules in 2016 requiring the shelters to let men into women's facilities if the men identify as women. "Equal Access in Accordance With an Individual's Gender Identity in Community Planning and Development Programs," 81 Fed. Reg. 64,763, 64,766, (Sept. 21, 2016) ("in a facility providing temporary, short term shelter that is not covered by the Fair Housing Act and which is legally permitted to operate as a single-sex facility, the individual's own self-identified gender identity will govern").

216. Likewise under Title IX, in the Executive Order, President Biden applied his view that the statute bans gender identity discrimination to "school sports." Executive Order 14021, Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, 86 Fed. Reg. 13803 (March 8, 2021).

217. On February 23, 2021, citing the Executive Order, President Biden's Departments of Education and Justice explicitly withdrew the previous administration's position that Title IX does not allow schools to let biological men compete in women's sports. Exhibit N, Dep't of Ed. Office for Civil Rights, Letter to City of Hartford, et al. (Feb. 23, 2021), available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a5.pdf (last visited April 13,

33

2021); *see also* Exhibit O, Dep't of Ed., Letter to City of Hartford, et al. (Aug. 31, 2020), available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a2.pdf (last viewed April 13, 2021), at the top of which the Biden Administration posted a red-lettered disclaimer stating, "This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation."

218. And, on March 26, 2021, the Department of Justice's Civil Rights Division issued a memo under the Executive Order claiming that Title IX protects transgender students from discrimination on the basis of gender identity, and specifically in the context of single-sex restrooms. Exhibit P, Memorandum from Pamela Karlan, Application of B*ostock v. Clayton County* to Title IX of the Education Amendments of 1972 (March 26, 2021), available at https://www.justice.gov/crt/page/file/1383026/download (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), as amended (Aug. 28, 2020), reh'g en banc denied, 976 F.3d 399 (4th Cir. 2020), petition for cert. filed, No. 20-1163 (Feb. 24, 2021); *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), petition for reh'g en banc pending, No. 18-13592 (Aug. 28, 2020); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049–50 (7th Cir. 2017); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016) (per curiam).

219. The Directive is a rule made under Section 3614a of the Fair Housing Act.

220. It is a substantive rule because it affects eligibility for federal funding.

221. It is a substantive rule because it encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior.

222. Defendants did not give public notice and opportunity for comment with respect to the Directive.

223. The import of the Directive is to redefine the term discrimination because of sex from biological sex to encompass discrimination because of sexual orientation and gender identity.

224. The Directive prohibits single-sex spaces, such as single-sex dormitory rooms and single-sex communal shower rooms, as discrimination because of gender identity, unless access is allowed under a theory in which a person's sex is determined from their stated gender identity.

225. The Directive, by extending the Act's prohibitions on harassment and a hostile housing environment to gender identity, also requires a housing resident to be treated according to the person's stated gender identity, including use of the person's preferred pronouns, and it prohibits as discrimination because of gender identity using pronouns according to the person's biological sex.

226. The Directive prohibits, as discrimination because of sexual orientation, any code of conduct in housing that requires sexual relations to be limited to a marriage between one man and one woman.

227. The Directive prohibits, as discrimination because of sexual orientation, private religious colleges from providing student housing policy exceptions to married students, if the policy exceptions apply only to marriages that are between one biological man and one biological woman.

228. The Directive also prohibits making, printing, or publishing any notice, statement, or advertisement for student housing indicates any preference, limitation, or discrimination because of gender identity, transgender status, or sexual orientation.

## IV. Continuing impact of Defendants' actions on the College

### A. Effect on Student Dormitories

229. The Directive prohibits, as discrimination because of gender identity, the College's single-sex student housing policies, such as single-sex residence halls,

35

residential rooms therein, and single-sex communal shower rooms, unless access is allowed under a theory in which a person's sex is determined from their stated gender identity.

230. The Directive compels the College to let biological males, based on their gender identity, occupy residence halls the College reserves for biological females.

231. The Directive compels the College to let biological males, based on their gender identity, qualify to be placed as roommates of biological females in residence halls the College reserves for biological females.

232. The Directive compels the College to let biological males, based on their gender identity, use the shower and bathroom facilities in residence halls reserved for biological females.

233. The allegations set forth in the previous three paragraphs are also true with regard to biological females qualifying for access to residence halls and spaces limited to biological males.

234. The Directive compels the College to no longer condition access to its student housing on a commitment to abide by its student code of conduct, including the commitment to avoid all sexual relations outside of a marriage between one man and one woman.

235. The Directive compels the College to no longer maintain housing policy exceptions for married students, if the exception only applies to students in a marriage between one man and one woman.

## B. Effect on the College's Speech

236. The Directive prohibits, as involving statements or notices of discrimination because of gender identity, the College from making statements to current and prospective students expressing the fact that occupancy and access in the College's residence halls are or should be separated by biological sex, not gender identity.

237. The Directive also prohibits, as involving statements or notices of discrimination because of sexual orientation, the College from expressing the fact that occupancy and access in the College's residence halls depends or should depend on compliance with its code of conduct, including the commitment to avoid all sexual conduct outside of a marriage between one man and one woman.

238. The Directive censors the College from telling students that residence halls are or should be single-sex.

239. The Directive censors the College from using, or saying that it should use, no pronouns or only pronouns based on biological sex, in communications in connection with student housing, rather than pronouns based on stated gender identity.

240. The Directive compels the College to make affirmative statements to current and prospective students expressing the fact that occupancy and access in the College's residence halls is not separated by biological sex, sexual orientation, or gender identity.

241. The Directive requires the College and its employees treat occupants of College housing according to a person's stated gender identity, including use of the person's preferred pronouns, rather than according to the person's biological sex.

242. The Directive censors the College from putting a disclaimer on its website and in other communications, stating that the Directive requires compliance under coercion, and setting forth the College's religious and moral beliefs about sexual orientation and gender identity.

243. The Directive censors the College from expressing through its association with students in housing its religious-informed beliefs and polices.

244. The Directive compels the College to express through its association with students in housing messages contrary to its religious-informed beliefs and polices.

37

245. The Directive remains in place and serves both to compel and to deter the College's speech.

246. Immediately and in the future, the College desires to continue to make statements to students and prospective students expressing its residence hall policies, including that occupancy and access in the College's residence halls are separated by biological sex, not gender identity, and that residence in student housing depends on compliance with the student code of conduct, including the commitment to avoid all sexual relations outside of a marriage between one man and one woman.

### C. Effect of Threatened Enforcement

247. The Directive and its enforcement could lead to criminal penalties, including prison time, for the College and its employees, if an incident were to occur at the College involving the need to call security to enforce its residence hall policies concerning persons of the opposite biological sex who assert a different gender identity.

248. The Directive threatens the College with complaints, lawsuits, administrative proceedings, compensatory damages including emotional damages, and punitive damages, if it continues to maintain, and make statements affirming, its student housing policies.

249. The Directive has an adverse effect on the rights of the College's students and employees, including their privacy, religious, liberty, educational, professional, associational, and recreational interests.

250. Compliance with the directive will lead to harms to student and employee well-being, including causing extreme mental and emotional distress and anxiety.

251. Many students and employees will be deterred from their housing, studies, or employment with the College if the College cannot provide housing on the basis of biological sex that respects student privacy. This deterrence will lead to, among

38

other things, reduced housing and other revenue payments from students; reduced numbers of and diversity among students and employees; new housing costs for students off-campus; and a loss of goodwill for the College.

252. Compliance with the Directive would require the College to engage in outlays of time, money, and speech to change its policies, statements, notices, student handbook, housing procedures, schedules, and signage concerning residence halls; to renovate its buildings to provide any additionally necessary physical facilities or amenities; and to provide its students and employees trainings about the new obligations. These outlays would divert resources from the College's mission and provide budget uncertainty.

253. In other programs, HUD has recognized that requiring single-sex facilities to be opened to those of another sex creates an administrative and financial burden, from "policy adjustments, such as the use of schedules that provide equal access to bathing facilities, and modifications to facilities, such as the use of privacy screens and, where feasible, the installation of single occupant restrooms and bathing facilities." HUD, Equal Access in Accordance With an Individual's Gender Identity in Community Planning and Development Programs, 81 Fed. Reg. 64,763-01, 64,722 (Sept. 2, 2016).

254. The College's student housing policies, and its statements about them, are exercises of the College's religious beliefs and are imperative to the College's mission.

255. The Directive not only conflicts with the College's religious beliefs and practices: it seems designed to pressure the College to change them.

256. HUD has previously recognized that requiring single-sex facilities to be opened to those of another sex burdens housing providers "with deeply held religious convictions." HUD, Making Admission or Placement Determinations

39

Based on Sex in Facilities Under Community Planning and Development Housing Programs, 85 Fed. Reg. 44811-01, 44814 (July 24, 2020).

257. The Directive has required and will continue to require from the College outlays of time and resources in regulatory compliance analysis.

258. Federal enforcement of the Directive creates substantial confusion and uncertainty for the College in all areas of student housing.

259. Under the Directive, the College's failure to comply will result in investigations, enforcement actions and litigation that could imposes millions of dollars of in penalties and punitive damages, costly discovery, injunctions, and other orders, including orders prohibiting and mandating the College's speech, and could impose criminal penalties and imprisonment against the College and its employees.

260. The College takes seriously its obligation to comply with law, and it seeks to comply with all valid federal laws even in the absence of a direct enforcement action, investigation, or lawsuit.

261. Because the application of the Directive does not depend on receiving federal funds, the College has no option to avoid being subject to the Directive, other than to cease providing student housing.

262. Ceasing to provide student housing would interfere with the College's religious, educational, and other missions.

263. Ceasing to provide student housing would cause the College to suffer reduced diversity in its students and employees if a lack of housing deters students and employees from studies or employment at the College.

264. It would also cost the College untold thousands or millions of dollars in lost student housing payments, in lost value of its real property assets, and in reduced student attendance at the College.

265. The Directive is imposing a new legal duty or mandate on the College.

40

266. Under 5 U.S.C. § 701(a), no statute precludes judicial review of the Directive, and the Directive is not agency action committed to agency discretion by law.

267. The College has suffered a legal wrong under the Directive.

268. The College was deprived of an opportunity to have timely notice of the Directive and a chance to provide public comment on the effect of the Directive. Had HUD allowed for notice and comment, the College would have raised its many concerns about educational housing and religious institutions, including their liberty interests in freedom of speech, religion, and association, the privacy interests of students occupying residence halls of private religious universities and colleges, the reliance interests of private colleges and universities in not being subject to a prohibition on discrimination on the basis of sexual orientation or gender identity in student housing, and the reliance and structural interests of the States and other grant recipients, especially States accepting federal funds contingent on compliance with the Fair Housing Act and States in the Fair Housing Assistance Program, and the College would have suggested alternate policies, including (1) maintaining the status quo; (2) delaying compliance dates to allow for implementation time; (3) applying the policy prospectively instead of applying the policy retroactively for the past year; (4) grandfathering in existing categories of single-sex housing so they are not subject to sexual orientation and gender identity nondiscrimination requirements; (5) exempting institutions with religious, moral, or associational objections to Defendants' policies; or (6) crafting privacy exemptions for college students and employees.

269. The College has suffered adverse effects, including to its speech, under the Directive.

270. The College is suffering irreparable harm from the Directive and the conduct of the Defendants.

41

271. The College has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by the Defendants.

272. Unless the Directive is set aside and practice challenged herein are enjoined, the College will continue to suffer irreparable injury.

273. All of the acts of the Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

## CLAIMS FOR RELIEF
## CLAIM ONE
## ADMINISTRATIVE PROCEDURE ACT
## WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW
## (5 U.S.C. § 706)

274. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

275. HUD is a federal agency subject to of the APA. 5 U.S.C. § 701(b); 5 U.S.C. § 551(1).

276. Defendants have promulgated, and are enforcing nationwide, a new legislative rule, namely the Directive, that uses the Fair Housing Act and its implementing regulations and agencies to prohibit discrimination on the basis of sexual orientation and gender identity.

277. The Directive contradicts the text, structure, legislative history, and historical judicial interpretation of the Fair Housing Act and its implementing regulations, all of which confirm that "sex" means biological sex—that is, a person's status as male or female as determined by biology.

278. The Directive is a "rule" under the APA. 5 U.S.C. § 551(4).

279. Defendants have communicated the Directive to covered entities nationwide through their press release and public statements, and to state and local governments and implementing agencies nationwide.

280. The Directive announces a new rule that creates new law, rights, and obligations under the Fair Housing Act and its implementing regulations.

281. The Directive constitutes "final agency action" reviewable by this Court under 5 U.S.C. § 704.

282. The Directive is definitive in its declaration of what Defendants think that the law requires, and mandatory on entities covered by the Fair Housing Act and its implementing regulations and on entities subject to Defendants' enforcement.

283. The Directive purports to determine the rights of persons seeking access to the College's dwellings, including the College's own students.

284. Legal consequences are required in and already flowing from the Directive.

285. The Directive declares itself to be treated as if it has the full force of law, and Defendants have done so.

286. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

287. Legislative rules must comply with the APA's notice-and-comment requirements.

288. Notice-and-comment requirements mandate that an agency (1) provide notice to the public of the proposed rulemaking, typically by publishing notice in the Federal Register, (2) give interested parties an opportunity to submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received, and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553.

289. Notice-and-comment requirements also mandate that an agency consider all the relevant comments offered during the public-comment period before finally deciding whether to adopt a proposed rule.

290. The Administrative Procedure Act also requires that a rule not be made effective until at least 30 days after it was published. 5 U.S.C. § 553.

291. The Directive is a rule under 42 U.S.C. § 3614a.

292. Defendants are "agencies" under the APA, 5 U.S.C. § 551(1).

293. The new rule (or regulations, guidance and interpretations described herein) are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id*. § 704.

294. Rules implementing the prohibitions on discrimination under the Fair Housing Act that the Directive implements may only be issued after public notice and opportunity for comment. 42 U.S.C. § 3614a.

295. Defendants promulgated the Directive without satisfying these procedural requirements even though it is a rule.

296. In the alternative, the Directive was a guidance document required, prior to its publication, to be submitted for public notice and an opportunity for comment under 24 C.F.R. § 11.1(b) and 24 C.F.R. § 11.8, or to provide a statement of good cause for omitting these procedures.

297. The Appointments Clause of the U.S. Constitution requires significant actions, like the Directive and Defendants' enforcement of the Directive, to be made by a Senate-confirmed official, as discussed below in Claim Five.

298. Defendants promulgated the Directive without satisfying these procedural requirements.

299. Therefore, the Directive must be set aside under 5 U.S.C. § 706.

300. The Directive must also be enjoined and declared unenforceable under 5 U.S.C. § 705 pending review of this Court in order to preserve status and rights pending review of this Court.

## CLAIM TWO
## ADMINISTRATIVE PROCEDURE ACT
## CONTRARY TO LAW, *ULTRA VIRES*, ISSUED IN EXCESS OF STATUTORY AUTHORITY, AND CONTRARY TO CONSTITUTIONAL RIGHTS
## (5 U.S.C. § 706)

301. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

302. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

303. As a federal agency, HUD has no power to act unless Congress confers that power, and actions that are unauthorized by Congress are *ultra vires*.

304. The Fair Housing Act and its regulations do not prohibit discrimination on the basis of sexual orientation or gender identity.

305. The Directive's mandate to the contrary exceeds Defendants' authority under the Fair Housing Act and HUD regulations.

306. Congress has not delegated to the Executive Branch any authority to mandate the Directive.

307. This reading of the Act and HUD regulations is compelled by the U.S. Constitution's clear-notice rule, a substantive canon of statutory interpretation that applies because the displacement of traditional state police power authority, any implicit abrogation of state sovereign immunity, and the attachment of conditions under the Act and regulations to Spending Clause legislation.

45

308. Because the Directive exceeds Defendants' authority under the Fair Housing Act and its implementing regulations, the Directive is *ultra vires*, contrary to law, and issued in excess of HHS's authority.

309. The Directive goes so far beyond any reasonable reading of the relevant Congressional text and its implementing regulations such that the new rules, regulations, guidance, and interpretations functionally exercise lawmaking power reserved only to Congress. U.S. Const. art. I, § 1.

310. Under the Fair Housing Act and its implementing regulations, it is unlawful to discriminate against any person in connection with the terms, conditions, or privileges of sale or rental of a dwelling because of religion. 42 U.S.C. § 3604; 24 C.F.R. § 100.50.

311. The prohibition on religious discrimination in the Fair Housing Act and its implementing regulations includes actions that cause a disparate impact on religion even without specific intent.

312. The Directive, and Defendants' enforcement of it, impose disparate impact discrimination against private religious universities and colleges in violation of the Fair Housing Act and its implementing regulations.

313. The Fair Housing Act required HUD, its Acting Secretary at the time the Directive was issued, and Defendants Fudge and Worden in their official capacities not to issue the Directive unless it was first submitted to public notice and an opportunity to comment under 42 U.S.C. § 3614a.

314. Defendants HUD, its Acting Secretary at the time the Directive was issued, and Defendants Fudge and Worden in their official capacities issued the Directive in violation of 42 U.S.C. § 3614a.

315. The Directive, and Defendants' enforcement of it, violate the Appointments Clause of the U.S. Constitution, as discussed below in Claim Five.

46

316. The Directive, and Defendants' enforcement of it, impose mandates and restrictions on speech, association, and assembly, in violation of the First and Fifth Amendments of the U.S. Constitution, as discussed below in Claim Six.

317. Any application or enforcement of the Fair Housing Act, HUD regulations, or the Directive to discrimination because of sexual orientation or gender identity exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the State under the federal constitution's structural principles of federalism and the Tenth Amendment, as discussed below in Claim Seven.

318. The Directive, and Defendants' enforcement of it, substantially burdens the exercise of religion without being the least restrictive means of advancing a compelling government interest in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, as discussed below in Claim Eight.

319. The Directive, and Defendants' enforcement of it, impose impermissible burdens on the exercise of religion in violation of the First and Fifth Amendments of the U.S. Constitution, as discussed below in Claim Nine.

320. Therefore, the Directive must be set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

321. The Directive must also be enjoined and declared unenforceable under 5 U.S.C. § 705 pending review of this Court in order to preserve status and rights pending review of this Court.

## CLAIM THREE
## ADMINISTRATIVE PROCEDURE ACT
## ARBITRARY, CAPRICIOUS, AND ABUSE OF DISCRETION
## (5 U.S.C. § 706)

322. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

Case 6:21-cv-03089-RK   Document 1   Filed 04/15/21   Page 47 of 70

323. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

324. The Directive, and Defendants' enforcement of it, explicitly rely on an interpretation of the Fair Housing Act or its implementing regulations that is erroneous—that the Act prohibits discrimination on the basis of sexual orientation and gender identity.

325. Without reliance on this legal interpretation, including as set forth in the Executive Order, the Directive would not have been promulgated.

326. Defendants failed adequately to consider important aspects of the issue and to give due consideration to public comments.

327. In promulgating the Directive, Defendants failed to consider its impact on private religious universities and colleges in their student housing policies, including their liberty interests in freedom of speech, religion, and association.

328. In promulgating the Directive, Defendants failed to consider its impact on the privacy interests of students occupying residence halls of private religious universities and colleges.

329. In promulgating the Directive, Defendants failed to consider reliance interests of private colleges and universities in not being subject to a prohibition on discrimination on the basis of sexual orientation or gender identity in student housing.

330. HUD officials also failed to consider the reliance and structural interests of the States and other grant recipients, especially States accepting federal funds contingent on compliance with the Fair Housing Act and States in the Fair Housing Assistance Program, as discussed in claims two and seven.

331. The Directive did not separately consider each component of the policy, let alone articulate a reasoned decision that considers alternatives and that considers

48

legitimate liberty, privacy, and reliance interests, and therefore is inconsistent with the requirements of *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910–15 (2020).

332. Defendants failed to consider any alternative policies that respect the interests of private religious colleges, their students, and their employees. Defendants failed, in particular, to consider (1) maintaining the status quo; (2) delaying compliance dates to allow for implementation time; (3) applying the policy prospectively instead of applying the policy retroactively for the past year; (4) grandfathering in existing categories of single-sex housing so they are not subject to sexual orientation and gender identity nondiscrimination requirements; (5) exempting institutions with religious, moral, or associational objections to Defendants' policies; or (6) crafting privacy exemptions for college students and employees.

333. HUD officials issuing the Directive failed to offer, at the time, a rationale for the Directive that was more than an allegation than one part of the previous policy may be unlawful.

334. The rationale for the Directive also seems to be contrived for the President's policy convenience, rather than based on law, and therefore is inconsistent with *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

335. These failures render the Directive arbitrary, capricious, and an abuse of discretion.

336. Therefore, the Directive must be set aside under 5 U.S.C. § 706.

337. The Directive must also be enjoined and declared unenforceable under 5 U.S.C. § 705, pending review of this Court in order to preserve status and rights pending review of this Court.

## CLAIM FOUR
## REGULATORY FLEXIBILITY ACT
## (5 U.S.C. § 601, ET SEQ.)

338. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

339. The Regulatory Flexibility Act ("RFA") requires federal agencies to prepare and make available for public comment an initial and final regulatory flexibility analysis before issuing a new rule. 5 U.S.C. § 603(a).

340. The Directive is a rule subject to the RFA. 5 U.S.C. § 601.

341. Defendants failed to prepare and make available for public comment an initial and final regulatory flexibility analysis before issuing the Directive.

342. An agency can avoid performing a flexibility analysis if its top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605(b).

343. The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id*.

344. The agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration. *Id*.

345. Defendants did not comply with 5 U.S.C. § 605. in issuing the Directive.

346. The Directive would impose disproportionate and unnecessary burdens on small businesses and organizations.

347. Defendants' actions in promulgating and enforcing their new rule thus violate the RFA.

348. The College is a "small business" and a "small organization" under the RFA. 5 U.S.C. § 601.

349. The College is adversely affected and aggrieved by the Directive and is entitled to judicial review under 5 U.S.C. § 611.

350. Therefore, the Directive should be set aside and its enforcement enjoined. *Id*.

## CLAIM FIVE
## APPOINTMENTS CLAUSE
## (U.S. CONST. ART. II § 2.)

351. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

352. The Appointments Clause of Article II provides:

> [The President] shall have Power, by and with the Advice and Consent of the Senate, to . . . appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II § 2.

353. The Directive was signed and issued by Defendant Worden as the Acting Assistant Secretary for Fair Housing and Equal Opportunity.

354. In issuing the Directive, Defendant Worden sought to exercise powers that only a principal officer of the United States may exercise, including the signing and promulgation of the Directive, a legislative rule.

355. Other duties delegated to the Assistant Secretary for Fair Housing and Equal Opportunity render that office one that can only be held by a principal officer.

51

*See* "Consolidated Delegation of Authority for the Office of Fair Housing and Equal Opportunity," 76 Fed. Reg. 73,983 (Nov. 29, 2011); 24 C.F.R. § 115.101.

356. Those duties include to: "[e]xercise the power and authority of the Secretary" with respect to the Fair Housing Act, the Housing and Community Development Act of 1974, the Age Discrimination Act of 1975, the Federal Housing Enterprises Financial Safety and Soundness Act, and their implementing regulations; to exercise the power and authority to determine whether an applicant for or participant in a HUD program is complying with the civil rights related program requirements; to act as the "responsible Department official" for Title VI of the Civil Rights Act of 1964; to act as the responsible and reviewing civil rights official in HUD's implementing regulations for Section 504 of the Rehabilitation Act of 1973; and to exercise all authority and responsibility over the Fair Housing Assistance Program. 76 Fed. Reg. at 73,984; 24 C.F.R. § 115.101.

357. Defendant Worden was not nominated by the President of the United States or confirmed by the United States Senate at the time she issued the Directive.

358. If signing of the Directive, and other duties delegated to the Assistant Secretary for Fair Housing and Equal Opportunity, may be exercised by an inferior officer by the Appointments Clause, Defendant Worden was not an inferior officer placed in her position consistent with the Appointments Clause at the time she signed the Directive.

359. At the time she signed the Directive, Defendant Worden was not supervised by a person who had been appointed under the Appointments Clause as a principal officer.

360. At the time Defendant Worden signed the Directive, the role of Secretary or Acting Secretary was not held by a Senate-confirmed principal officer.

361. Any appointment of Defendant Worden or any of her supervising officials under the Federal Vacancies Reform Act of 1998 as of the time the Directive was insufficient to render Defendant Worden or her supervising officials "principal officers" under the Appointments Clause, because principal officers may only be appointed with the advice and consent of the Senate.

362. Therefore, the Directive, and Defendants' enforcement of it, violate the Appointments Clause of the U.S. Constitution.

363. This Court may review and enjoin *ultra vires* or unconstitutional agency action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-91 (1949).

364. Therefore, the Court should declare that the Directive is unconstitutional and unenforceable and enjoin its enforcement.

## CLAIM SIX
## FREEDOM OF SPEECH, ASSEMBLY, AND ASSOCIATION
### (FIRST AND FIFTH AMENDMENTS)

365. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

366. Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

367. Under the Fifth Amendment to the U.S. Constitution, "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

368. Defendants must comply with the First Amendment in engaging in the actions alleged herein.

53

369. The College's speech about its student housing, including statements, notices, signs, or advertisements to its students about its residence hall policies, and its religiously-informed student handbook governing student housing, are protected under the First Amendment.

370. The Directive prevents the College from expressing, in the context of its policies and practices concerning student housing, its religiously-based understanding of the nature of the human person and the characteristics of marriage and the family.

371. The Directive, and Defendants' enforcement of it, both facially and as-applied, restrict speech and impose mandates on speech in violation of the First Amendment of the U.S. Constitution.

372. Defendants mandate compelled speech by the College, requiring it to post notices expressing that in student housing it does not engage in discrimination on the basis of sexual orientation or gender identity.

373. The College wishes to communicate its student housing policies as described herein and not to post notices contradicting those policies.

374. Defendants intrude upon the right to expressive association (or freedom of assembly) of the College, its employees, and its students by requiring them to participate in facilities, programs, and other housing-related endeavors contrary to their religious beliefs and expressive identities.

375. The Directive restricts speech on the basis of its content and viewpoint.

376. Under the Directive, Defendants prohibit speech concerning housing that includes statements or notices affirming discrimination on the basis of sexual orientation or gender identity, including speech that affirms a policy that student housing occupancy and residence hall policies are separated by biological sex and not gender identity.

54

377. Under the Directive, Defendants prohibit speech that they deem to favor discrimination on the basis of sexual orientation or gender identity, but they allow speech that says the opposite. Thus, they prohibit speech that affirms a policy that student housing policies are applied based on biological sex, and that students are not placed in residence halls based on gender identity if it is inconsistent with biological sex, but Defendants allow (and require) speech saying the opposite.

378. The College's policies are protected by law, including under the Religious Freedom Restoration Act, and so its speech implements lawful policies.

379. If notwithstanding the Directive the College were deemed to be allowed to have residence hall policies based on biological sex, the Directive's application of the speech restrictions of the FHA and its regulations would still arguably prohibit the College from communicating those residence hall policies to current and prospective students.

380. The Directive is an overbroad restriction of speech, and sweeps within its ambit a substantial amount of First Amendment-protected speech and expression.

381. This overbreadth chills the speech of colleges who might seek to engage in private religious expression through statements, notices, housing applications, housing programs, and student handbooks governing campus housing on the basis of sex.

382. Defendants' restrictions on speech on the basis of viewpoint are presumptively unconstitutional.

383. Defendants' mandates of speech on the basis of viewpoint are presumptively unconstitutional.

384. Defendants have no compelling interest or legitimate justification for their restrictions on the speech or association/assembly of the College, or of other private universities, colleges, or secondary or primary schools that separate student housing on the basis of biological sex and not gender identity.

55

385. Defendants have not employed the least restrictive means of achieving any governmental interest to restrict speech or association/assembly as described herein.

386. The Fair Housing Act and its implementing regulations do not prohibit discrimination on the basis of sexual orientation or gender identity, and therefore do not support any governmental interest to sustain the restrictions on speech or association/assembly described herein.

387. In the alternative, to the extent that the Fair Housing Act itself or its implementing regulations are deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the Directive, the Act and the HUD regulations violate the First Amendment of the U.S. Constitution as applied to Plaintiff and all similarly-situated educational institutions or religious entities for the same reasons alleged against the Directive in this claim.

388. This Court may review and enjoin *ultra vires* or unconstitutional agency action. *Larson*, 337 U.S. at 689-91 .

389. The Court should therefore declare that the Directive, or in the alternative the Fair Housing Act and HUD's implementing regulations, are unconstitutional restrictions of speech and association/assembly and enjoin their application.

## CLAIM SEVEN
## STRUCTURAL PRINCIPLES OF FEDERALISM AND LACK OF ENUMERATED POWERS
## (CONSTITUTIONAL STRUCTURE, SPENDING CLAUSE AND TENTH AMENDMENT)

390. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

391. Any application or enforcement of the Fair Housing Act, HUD regulations, or the Directive to discrimination because of sexual orientation or gender identity exceeds Congress's Article I enumerated powers and transgresses on the reserved

powers of the State under the federal constitution's structural principles of federalism and the Tenth Amendment.

392. The federal government is one of limited, enumerated powers; all others—including a general police power—are reserved to the States. *United States v. Morrison*, 529 U.S. 598, 617–19 (2000).

393. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

394. Critically, although protecting the States, these structural principles serve to "protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). By providing protections for the sovereignty of the States, the Constitution secures "'the liberties that derive'" to individual citizens "'from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992) (internal quotation omitted).

395. Under the U.S. Constitution's structural principles of federalism and the Tenth Amendment, the U.S. Constitution's clear-notice rule governs any interpretation of federal law in this area. This substantive canon of statutory interpretation applies because of the displacement of traditional state police power authority, any implicit abrogation of state sovereign immunity, and the attachment of conditions under the Act and regulations to Spending Clause legislation.

396. Any application or enforcement of the Fair Housing Act, HUD regulations, or the Directive to discrimination because of sexual orientation or gender identity violates this substantive, structural rule from the U.S. Constitution.

397. A "clear and manifest" statement is necessary for a statute to preempt "the historic police powers of the States," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), or to permit an agency to regulate a matter in "areas of traditional state responsibility," *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).

57

398. The federal Constitution limits the States and the public's obligations to those requirements "unambiguously" set forth on the face of any Spending Clause statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

399. A clear statement is necessary both to make a statute apply to the States and to show that the statute applies in the particular manner claimed. *Gregory v. Ashcroft*, 501 U.S. 452, 460-70 (1991).

400. This canon resolves ambiguity in the substantive scope of many statutes that preempt traditional state regulation. *Bond*, 572 U.S. at 859.

401. This canon applies here because the federal officials seek to displace state authority over education, housing, and constitutional liberties, with a possible abrogation of state sovereignty from suit, and under a statute that is enacted under the Spending Clause, in order to extend federal law to the College's housing.

402. The Fair Housing Act and its implementing regulations do not prohibit discrimination on the basis of sexual orientation or gender identity, and therefore do not support any clear notice to justify the burden the Directive imposes on the College, the public, or the States.

403. The public and the States thus unconstitutionally lacked clear notice at the time when the Act was passed or the grants were made that the Act would apply in this way. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

404. The federal officials have violated these constitutional standards of clear notice, and so any application or enforcement of the Fair Housing Act, HUD regulations, or the Directive to discrimination because of sexual orientation or gender identity violate the structural principles of federalism, the Spending Clause, and the Tenth Amendment and effectively coerces or commandeers the States, including in grant conditions and in the States' historic and well-established regulation of housing and education law. *New York v. United States*, 505 U.S. 144, 162 (1992).

58

405. The Directive, or in the alternative, to the extent that the Fair Housing Act itself or HUD's implementing regulations are deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the Directive, the Act and the HUD regulations, violate the structural principles of federalism as applied to Plaintiff and all similarly-situated educational institutions or religious entities.

406. This Court may review and enjoin *ultra vires* or unconstitutional agency action. 5 U.S.C. §§ 702–705; *Larson*, 337 U.S. at 689-91.

407. The Court should therefore declare that the Directive, or in the alternative the Fair Housing Act and HUD's implementing regulations, are unconstitutional and enjoin their application.

## CLAIM EIGHT
## RELIGIOUS FREEDOM RESTORATION ACT
### (42 U.S.C. § 2000BB, ET SEQ.)

408. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

409. The Religious Freedom Restoration Act ("RFRA") prohibits the enforcement of federal law when such enforcement substantially burdens religious exercise, absent the government pursing the least restrictive means to achieve a compelling government interest. 42 U.S.C. § 2000bb-1(a).

410. HUD and the Defendants are government agencies and officials under 42 U.S.C. § 2000bb-2.

411. RFRA applies to the Directive, the Fair Housing Act, and HUD's implementing regulations under 42 U.S.C. § 2000bb-3.

412. The College's sincerely held religious beliefs, including its understanding of the nature of the human person and the characteristics of marriage and the family,

preclude it from complying with a federal mandate to place biological males into female residence halls and to place them as females' roommates, and vice versa.

413. The College's sincerely held religious beliefs preclude the College from telling students that they qualify for access to residence halls and roommate placements based on sexual orientation or gender identity, rather than on biological sex.

414. The College's sincerely-held religious beliefs cause it to prohibit male students from living in—or even visiting—female residence halls, and vice versa, regardless of whether those students identify their gender with the opposite sex.

415. The College likewise separates intimate spaces such as showers and bathrooms in its residence halls based on its sincerely-held religious beliefs.

416. The College's compliance with these beliefs is a religious exercise.

417. The College's speech about its residence hall policies is a religious exercise.

418. If the College continues to provide student housing, it will be required to violate either the Directive or its sincere religious beliefs.

419. The Directive creates government-imposed coercive pressure on the College to change or violate its religious beliefs in order to provide student housing.

420. The College's provision of student housing in accord with its religious beliefs does not prevent anyone from obtaining education and housing at a myriad of other colleges that operate in accord with the policies reflected in the Directive.

421. The Directive's burden on the College's exercise of religious beliefs furthers no compelling governmental interest.

422. The Directive's burden on the College's exercise of religious beliefs is not the least restrictive means of furthering Defendants' alleged interests.

423. The Fair Housing Act and its implementing regulations do not prohibit discrimination on the basis of sexual orientation or gender identity, and therefore

do not support any interest on which Defendants may rely to justify the burden the Directive imposes on the College.

424. In the alternative, to the extent that the Fair Housing Act itself or its implementing regulations are deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the Directive, the Act and the HUD regulations impose a substantial burden on the College's religious exercise, and do so without being the least restrictive means of furthering a compelling government interest.

425. The Directive, and Defendants' enforcement of it, substantially burden the exercise of religion without being the least restrictive means of advancing a compelling government interest in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1.

426. The Court should therefore declare that the Directive, or in the alternative the Fair Housing Act and HUD's implementing regulations, are unlawful and enjoin their application under 42 U.S.C. § 2000bb-1(c) and *Larson* 337 U.S. at 689-91.

**CLAIM NINE**
**FREE EXERCISE OF RELIGION**
**(FIRST AND FIFTH AMENDMENTS)**

427. The College re-alleges and incorporates herein, as though fully set forth, paragraphs 1–273 of this complaint.

428. Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

429. Under the Fifth Amendment to the U.S. Constitution, "No person shall be * * * deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

430. The Directive, by targeting and censoring the College's private religious exercise and expression, violate the College's constitutional right to the free exercise of religion.

431. The College desires to express its religious beliefs through its provision of student housing and through its messages about its student housing.

432. The Directive substantially burdens the College's free exercise of religion by conditioning its ability to provide student housing or speak on foregoing its free exercise rights.

433. The Directive forces the College to choose between providing student housing and engaging in religious speech and being censored and subjected to liability, or foregoing the free exercise of religion to be able to provide student housing and speak without censorship or liability.

434. The Directive imposes special disabilities on the College due to its religion and its intent to engage in private religious expression.

435. The Directive chills the College's freedom of religious expression and exercise, both of which are fundamental rights guaranteed to the College by the First Amendment.

436. These special disabilities placed on the College are neither neutral nor of general applicability.

437. Upon information and belief, the Directive specifically and primarily burdens religious conduct, making it not neutral and generally applicable.

438. Upon information and belief, the Directive favors some religious beliefs over others, making it not neutral and generally applicable.

439. Upon information and belief, the Directive was enacted specifically because of religious conduct and exercise, making it not neutral and generally applicable.

440. Upon information and belief, Defendants permit exceptions to their nondiscrimination requirements for numerous secular and non-secular reasons, while denying faith-based colleges an exception for religious reasons.

441. Upon information and belief, Defendants' laws and policies have not been evenly enforced, demonstrating that Defendants' application of the Directive is not neutral or generally applicable.

442. The Directive is not neutral because it may be enforced in a manner that targets religious speech and permits federal officials or courts to arbitrarily decide what speech is permitted and what speech is not permitted.

443. The Directive is likewise not generally applicable because it grants federal officials unbridled discretion to censor the College's religious expression while permitting other colleges or housing providers to express their messages.

444. Defendants' inconsistent application of the Act burdens the College's First Amendment rights.

445. Even were the Directive neutral, as interpreted by Defendants, it fails to accommodate the College's religious beliefs, which burdens the College's First Amendment rights.

446. By promulgating a Directive imposing liability on colleges with religious objections to sex before marriage or to transgender theory, Defendants have targeted the College's religious beliefs and practices and shown hostility toward them.

447. Defendants have no compelling or legitimate reason that would justify the Directive, and the Directive is not narrowly tailored to advance any such interest.

448. The Directive, and Defendants' enforcement of it, violates the College's hybrid free speech and religious exercise rights under the First Amendment and is

63

subject to strict scrutiny, as well as the College's hybrid freedom of association and religious exercise rights.

449. The Directive, and Defendants' enforcement of it, imposes impermissible burdens on the exercise of religion in violation of the First Amendment of the U.S. Constitution.

450. The Directive, both facially and as-applied, violates the Free Exercise Clause of the First Amendment to the United States Constitution.

451. The Fair Housing Act and its implementing regulations do not prohibit discrimination on the basis of sexual orientation or gender identity, and therefore do not support any interest on which Defendants may rely to justify the burden the Directive imposes on the College.

452. In the alternative, to the extent that the Fair Housing Act itself or HUD's implementing regulations are deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the Directive, the Act and the HUD regulations impose an impermissible burden on the College's religious exercise, its hybrid exercise of free speech and religion, and its hybrid exercise of freedom of association and religion, and do so without satisfying the necessary constitutional requirements.

453. This Court may review and enjoin *ultra vires* or unconstitutional agency action. *Larson*, 337 U.S. at 689-91.

454. The Court should therefore declare that the Directive, or in the alternative the Fair Housing Act and HUD's implementing regulations, are unconstitutional and enjoin their application.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and provide Plaintiff with the following relief:

A. With respect to the Directive:

64

1. That this Court vacate and set aside the Directive;

2. That this Court issue a temporary restraining order, preliminary and permanent injunction against enforcement of the Directive by Defendants, their officials, agents, employees, and all persons in active concert or participation with them;

3. That this Court render declaratory judgment that the Directive violates the Administrative Procedure Act, the Regulatory Flexibility Act, the Fair Housing Act, and the Appointments Clause; as applied to Plaintiff, the Religious Freedom Restoration Act; and, as applied to Plaintiff and all similarly-situated educational institutions or religious entities, the First and Fifth Amendments of the U.S. Constitution, the constitutional principles of federalism, the Spending Clause, the Tenth Amendment, and Congress's enumerated powers, and

4. That this Court render declaratory judgment that the Fair Housing Act and HUD's implementing regulations do not prohibit discrimination on the basis of sexual orientation and gender identity, including by any acts that tend to prohibit private religious educational institutions in their student housing from having single-sex student housing and limits on facility access based on biological sex not gender identity, or from having and publishing such policies governing student residence halls.

B. In the alternative, to the extent the Fair Housing Act and HUD's implementing regulations are deemed to prohibit discrimination on the basis of sexual orientation and gender identity:

1. That this Court issue declaratory relief that, as applied to Plaintiff, it violates the Religious Freedom Restoration Act, and that, as applied to Plaintiff and all similarly-situated educational institutions or religious entities, it violates the First Amendment, and the Fifth Amendment, the constitutional principles of federalism, the Spending Clause, the Tenth Amendment, and Congress's enumerated powers;

2. That this Court issue declaratory relief that the Fair Housing Act and HUD's implementing regulations may not be construed to prohibit discrimination on the basis of sexual orientation and gender identity, including by any acts that tend to prohibit private religious educational institutions in their student housing from having single-sex student housing and limits on facility access based on biological sex not gender identity, or from having and publishing such policies governing student residence halls;

3. That this Court issue a temporary restraining order, preliminary, and permanent injunction against enforcement of any such interpretation or application of the Fair Housing Act and HUD's implementing regulations, including enforcement against private religious educational institutions by Defendants, their officials, agents, employees, and all persons in active concert or participation with them, and including any enforcement in any way inconsistent with the declaratory relief described in paragraphs B.1–2 of this request for relief;

C. That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy in

66

order that such declarations shall have the force and effect of final judgment;

D. That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

E. That this Court grant to the College reasonable costs and expenses of this action, including attorneys' fees in accordance with any applicable federal statute, including 28 U.S.C. § 2412;

F. That this Court grant the requested injunctive relief without a condition of bond or other security being required of the College; and

G. That this Court grant such other and further relief as this Court deems just and proper.

Respectfully submitted this 15th day of April, 2021.

GREGGORY R. WALTERS
IL Bar No. 6256826*
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
gwalters@ADFlegal.org

*Pro hac vice* application forthcoming

*s/ Julie Marie Blake*
MATTHEW S. BOWMAN*
DC BAR No. 993261
JULIE MARIE BLAKE
MO Bar No. 69643
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
mbowman@ADFlegal.org
jblake@ADFlegal.org

*Attorneys for Plaintiff*

67

## DECLARATION UNDER PENALTY OF PERJURY

I, Jerry C. Davis, a citizen of the United States and a resident of the State of Missouri, and as the President of Plaintiff The School of the Ozarks, Inc., d/b/a College of the Ozarks, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this 14th day of April, 2021, at Point Lookout, Missouri.

Jerry C. Davis
President of The School of the Ozarks, Inc., d/b/a College of the Ozarks, on behalf of College of the Ozarks

[Signature filed electronically with original maintained by counsel, pursuant to CM/ECF Civil and Criminal Administrative Procedures Manual and Users Guide, Western District of Missouri (Revised January 2018)]

## EXHIBIT LIST

Exhibit A.    U.S. Department of Housing & Urban Development, Directive, Implementation of Executive Order 13,988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021)

Exhibit B.    Executive Order No. 13988, Preventing and Combatting Discrimination on the Basis of Gender Identity or Sexual Orientation (Jan. 20, 2021)

Exhibit C.    College of the Ozarks Viewbook

Exhibit D.    College of the Ozarks Excerpts from Student Handbook (Fall 2020)

Exhibit E.    U.S. Department of Housing & Urban Development, FHEO Notice FHEO-2020001 (Jan. 28, 2020)

Exhibit F.    U.S. Department of Housing & Urban Development, FHIP Education and Outreach Initiative (EOI) – Tester Training

Exhibit G.    U.S. Department of Housing & Urban Development, Contact FHIP Organizations, Missouri

Exhibit H.    U.S. Department of Housing & Urban Development, Fair Housing Assistance Program (FHAP) Agencies (March 31, 2021)

Exhibit I.    U.S. Department of Housing & Urban Development, Fair Housing Assistance Program (FHAP)

Exhibit J.    U.S. Department of Housing & Urban Development Exchange, About Grantees, HUD Awards and Allocations (April 9, 2021)

Exhibit K.    U.S. Department of Housing & Urban Development, HUD to enforce Fair Housing Act to Prohibit Discrimination on the Basis of Sexual Orientation and Gender Identity (Feb. 11, 2021)

Exhibit L.    U.S. Department of Housing & Urban Development, "Addendum to the Memorandum of Understanding with the U.S. Department of Housing & Urban Development Fair Housing Assistance Program, Statement of Consistency with *Bostock v. Clayton County, GA,* 590 U.S. ___ (2020)" (sent Feb. 2021)

Exhibit M.    White House, A Proclamation on National Fair Housing Month, 2021 (April 11, 2021)

Exhibit N.    Department of Education Office for Civil Rights, Letter to City of Hartford, et al. (Feb. 23, 2021)

69

Exhibit O.  Department of Education Office for Civil Rights, Letter to City of Hartford, et. al (Aug. 31, 2020)

Exhibit P.  Memorandum from Pamela Karlan, Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (March 26, 2021)