# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

**THE SCHOOL OF THE OZARKS, INC., d/b/a COLLEGE OF THE OZARKS**,

*Plaintiff,*

v.

**JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States; **U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**; **MARCIA L. FUDGE**, in her official capacity as Secretary of the U.S. Department of Housing and Urban Development; **JEANINE M. WORDEN**, in her official capacity as Acting Assistant Secretary for Fair Housing & Equal Opportunity of the U.S. Department of Housing and Urban Development,

*Defendants.*

Civil Case No.: 6:21-cv-3089

## PLAINTIFF'S SUGGESTIONS IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD........................................................................................... 4

ARGUMENT ...................................................................................................... 5

   I.  The directive is arbitrary and capricious because the government ignored its effect on religious colleges. ................................................................ 6

   II. The directive was issued without observance of the notice and comment procedure required by law.................................................................... 11

   III.The directive is contrary to law and constitutional right, because it violates the Appointments Clause and lacks statutory authority.................... 12

      A.    The directive violated the Appointments Clause. .............................. 13

      B.    The Fair Housing Act's prohibition on sex discrimination does not encompass sexual orientation or gender identity. ........................................ 15

      C.    A narrow interpretation is compelled by the Constitution's clear-notice canon. ................................................................................... 20

          1.    The Constitution requires clear notice of federal laws displacing state regulation or imposing grant conditions......................................... 20

          2.    The Fair Housing Act is subject to the clear-notice rule. ............... 22

          3.    The clear-notice rule requires the court to resolve any ambiguity in the FHA's requirements in favor of a narrow interpretation. ............... 23

   IV.The directive violates the freedom of speech. ............................................... 24

      A.    The federal government may not discriminate among speech by content or viewpoint. ...................................................................................... 24

      B.    The directive restricts speech based on its content and viewpoint..... 26

      C.    The directive's speech restrictions fail judicial scrutiny. ................... 28

      D.    The directive is unlawful as to religious educational institutions beyond the parties. ................................................................................... 29

   V.  The other injunction factors favor relief........................................................ 30

CONCLUSION................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ............................................................ 21

*American Bancorporation, Inc. v. Board of Governors of Federal Reserve System,*
509 F.2d 29 (8th Cir. 1974) ...................................................... 6

*American Hospital Association v. Bowen,*
834 F.2d 1037 (D.C. Cir. 1987) ................................................. 8

*Arlington Central School District Board of Education v. Murphy,*
548 U.S. 291 (2006) ............................................................ 22

*Association of American Rail Roads. v. U.S. Department of Transportation,*
821 F.3d 19 (D.C. Cir. 2016) .................................................. 14

*Atascadero State Hospital v. Scanlon,*
473 U.S. 234 (1985) ............................................................ 21

*Auer v. Robbins,*
519 U.S. 452 (1997) ............................................................ 24

*Azar v. Allina Health Services,*
139 S. Ct. 1804 (2019) .......................................................... 6

*Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,*
458 U.S. 176 (1982) ............................................................ 22

*Bond v. United States,*
564 U.S. 211 (2011) ............................................................ 20

*Bond v. United States,*
572 U.S. 844 (2014) ................................................... 21, 22, 23

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ..................................................... 10, 16

*Brown Express, Inc. v. United States,*
607 F.2d 695 (5th Cir. 1979) .................................................... 7

*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources,*
532 U.S. 598 (2001) ............................................................ 23

*Buckley v. Valeo,*
424 U.S. 1 (1976) .............................................................. 13

*Capitol Square Review & Advisory Board v. Pinette,*
    515 U.S. 753 (1995) ................................................................................ 26

*Carcieri v. Salazar,*
    555 U.S. 379 (2009) ................................................................................ 21

*Clark v. Martinez,*
    543 U.S. 371 (2005) ................................................................................ 21

*Dataphase Systems, Inc. v. C.L. Systems, Inc.,*
    640 F.2d 109 (8th Cir. 1981) ...................................................................... 5

*Davis Next Friend LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ................................................................................ 22

*Deerfield Medical Center v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) .................................................................... 31

*Dellmuth v. Muth,*
    491 U.S. 223 (1989) ................................................................................ 22

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................ 11

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020) ..................................................................... 8, 9, 10

*Drake v. Honeywell, Inc.,*
    797 F.2d 603 (8th Cir. 1986) ..................................................................... 6

*Edmond v. United States,*
    520 U.S. 651 (1997) .......................................................................... 13, 14

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................ 30

*Fair Housing Center of Washtenaw County, Inc. v. Town & Country Apartments,*
    No. 07-10262, 2009 WL 497402 (E.D. Mich. Feb. 26, 2009) ..................................... 17

*Garcia v. San Antonio Metropolitan Transit Authority,*
    469 U.S. 528 (1985) ................................................................................ 20

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .......................................................................... 21, 22

*Gregory v. South Carolina Department of Transportation,*
    289 F. Supp. 2d 721 (D.S.C. 2003) ............................................................... 22

iv

*Havens Realty Corporation v. Coleman,*
455 U.S. 363 (1982) .................................................. 23

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) ........................................... 25, 28

*INS v. Chadha,*
462 U.S. 919 (1983) ................................................. 16

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010) ................................................. 29

*King v. Burwell,*
576 U.S. 473 (2015) ......................................... 13, 19, 24

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ............................................ 24

*La Union del Pueblo Entero v. FEMA,*
141 F. Supp. 3d 681 (S.D. Tex. 2015) ....................... 7

*Larson v. Domestic & Foreign Commerce Corporation,*
337 U.S. 682 (1949) ................................................. 12

*Lath v. OakBrook Condominium Owners' Association,*
No. 16-CV-463-LM, 2017 WL 1051001 (D. N.H. Mar. 20, 2017) ........... 17

*Loretto v. Teleprompter Manhattan CATV Corporation,*
458 U.S. 419 (1982) ................................................. 22

*Lucia v. S.E.C.,*
138 S. Ct. 2044 (2018) ............................................ 15

*Martin v. Gerlinski,*
133 F.3d 1076 (8th Cir. 1998) .................................... 6

*Matal v. Tam,*
137 S. Ct. 1744 (2017) ........................................... 25, 28

*McCullen v. Coakley,*
573 U.S. 464 (2014) ................................................. 29

*Meriwether v. Hartop,*
No. 20-3289, 2021 WL 1149377 (6th Cir. Mar. 26, 2021) ...................... 26

*Michigan v. EPA,*
576 U.S. 743 (2015) ................................................. 9

*Miller v. 270 Empire Realty LLC,*
2012 WL 1933798 (E.D.N.Y. 2012) ........................................................................ 17

*Minnesota Citizens Concerned for Life, Inc. v. Swanson,*
692 F.3d 864  (8th Cir. 2012) ................................................................................. 30

*National Association of Home Health Agencies v. Schweiker,*
690 F.2d 932 (D.C. Cir. 1982) ................................................................................. 7

*National Insitute. of Family & Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018) ............................................................................................ 25

*Neithamer v. Brenneman Property Services, Inc.,*
81 F. Supp. 2d (D.D.C. 1999) ................................................................................. 17

*New Prime Inc. v. Oliveira,*
139 S. Ct. 532 (2019) .............................................................................................. 15

*Ordelli v. Mark Farrell & Associates,*
2013 WL 1100811 (D. Or. 2013) ............................................................................ 17

*Pennhurst State School & Hospital v. Halderman,*
451 U.S. 1 (1981) .......................................................................................... 20, 21

*Port Authority Trans-Hudson Corporation v. Feeney,*
495 U.S. 299 (1990) ................................................................................................ 21

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ................................................................................................ 26

*Reagan National Advertising of Austin, Inc. v. City of Austin,*
972 F.3d 696 (5th Cir. 2020) .................................................................................. 28

*Reed v. Town of Gilbert,*
135 S. Ct. 2218 (2015) ..................................................................................... 25, 28

*Riley v. National Federation of the Blind of North Carolina,*
487 U.S. 781 (1988) ................................................................................................ 25

*Rosenberger v. Rectors & Visitors of University of Virginia,*
515 U.S. 819 (1995) ................................................................................................ 25

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) .................................................................................................. 10

*Smith v. Avanti,*
249 F. Supp. 3d 1194 (D. Colo. 2017) .................................................................... 17

Case 6:21-cv-03089-RK   Document 2-1   Filed 04/15/21   Page 6 of 41

*Smith v. Mission Associates Limited Partnership,*
  225 F. Supp. 2d 1293 (D. Kan. 2002) ...................................................... 17

*Sossamon v. Texas,*
  563 U.S. 277 (2011) ...................................................................... 21

*South Dakota v. Ubbelohde,*
  330 F.3d 1014 (8th Cir. 2003) .............................................................. 6, 7

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ...................................................................... 31

*Swinton v. Fazekas,*
  No. 06-CV-6139T, 2008 WL 723914 (W.D.N.Y. Mar. 14, 2008) ............................ 17

*Texas Alliance for Retired Americans v. Hughs,*
  976 F.3d 564 (5th Cir. 2020) .............................................................. 32

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.,*
  576 U.S. 519 (2015) ...................................................................... 23

*Texas v. United States,*
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ...................................................... 32

*Thomas v. Osegueda,*
  No. 2:15-CV-0042-WMA, 2015 WL 3751994 (N.D. Ala. June 16, 2015) ............... 17

*Thomas v. Wright,*
  No. 2:14–cv–01604–RDP, 2014 WL 6983302 (N.D. Ala. Dec. 10, 2014) ......... 16, 17

*Timber Automation, LLC v. FiberPro, LLC,*
  2020 WL 5878211 (W.D. Ark. Oct. 2, 2020) ............................................... 2

*United States v. Bass,*
  404 U.S. 336 (1971) ...................................................................... 24

*United States v. University of Nebraska at Kearney,*
  940 F. Supp. 2d 974 (D. Neb. 2013) ...................................................... 3

*United States v. Virginia,*
  518 U.S. 515 (1996) ...................................................................... 17

*Wandering Dago, Inc. v. Destito,*
  879 F.3d 20 (2d Cir. 2018).................................................................. 25

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442 (2008) ...................................................................... 29

Case 6:21-cv-03089-RK   Document 2-1   Filed 04/15/21   Page 7 of 41

*Watkins Inc. v. Lewis,*
  346 F.3d 841 (8th Cir. 2003) ................................................................. 5

*Wetzel v. Glen St. Andrew Living Community, LLC,*
  901 F.3d 856 (7th Cir. 2018) ............................................................... 17

*Whitman v. American Trucking Associations, Inc.,*
  531 U.S. 457 (2001) ............................................................................. 18

*Wittmer v. Phillips 66 Co.,*
  915 F.3d 328 (5th Cir. 2019) ............................................................... 18

**Statutes**

20 U.S.C. § 1686 .................................................................................... 18

42 U.S.C. § 1437 .................................................................................... 22

42 U.S.C. § 3602 ...................................................................................... 3

42 U.S.C. § 3604 ................................................................................. 3, 26

42 U.S.C. § 3610 ...................................................................................... 3

42 U.S.C. § 3614 ................................................................................ 11, 12

42 U.S.C. § 3615 .................................................................................... 22

42 U.S.C. § 3618 .................................................................................... 22

42 U.S.C. § 3631 ...................................................................................... 3

42 U.S.C. § 5301 .................................................................................... 22

5 U.S.C. § 551 .......................................................................................... 6

5 U.S.C. § 553 .................................................................................... 11, 12

5 U.S.C. § 704 .......................................................................................... 8

5 U.S.C. § 706 ....................................................................... 6, 11, 12, 24

**Other Authorities**

American Psychiatric Association, Diagnostic and Statistical Manual of Mental
  Disorders 451 (5th ed. 2013) .............................................................. 16

Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109
  (2010) ................................................................................................... 20

Consolidated Delegation of Authority for the Office of Fair Housing and Equal
  Opportunity, 76 Fed. Reg. 73,984 (Jan. 29, 2011) .............................. 15

Case 6:21-cv-03089-RK   Document 2-1   Filed 04/15/21   Page 8 of 41

Equal Access in Accordance With an Individual's Gender Identity in Community Planning and Development Programs, 81 Fed. Reg. 64,763 (Sept. 21, 2016) ....... 19

Evolution of Role of the Federal Government in Housing and Community Development, Subcomm. on Housing and Community Development of the Comm. on Banking, Currency and Housing, 94th Cong. (Oct. 1975) ................................. 18

Executive Order No. 13988, 86 Fed. Reg. 7023 (Jan. 20, 2021).................................... 4

Executive Order No. 14021, 86 Fed. Reg. 13803 (Mar 8, 2021) ................................ 20

Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021).................................................................................................... 4, 8

The American Heritage Dictionary of the English Language (1st ed. 1969) ........... 16

**Regulations**

24 C.F.R. § 100.20 ................................................................................................... 3

24 C.F.R. § 100.50 .............................................................................................. 3, 26

24 C.F.R. § 103.215 ................................................................................................. 3

24 C.F.R. § 103.9 .................................................................................................... 3

24 C.F.R. § 11.1 .................................................................................................... 12

24 C.F.R. § 11.8 .................................................................................................... 12

24 C.F.R. § 180.671 ................................................................................................ 3

42 U.S.C. § 3611 ..................................................................................................... 3

45 C.F.R. § 86.32 .................................................................................................. 18

**Constitutional Provisions**

U.S. Const. art. II.................................................................................................. 13

# INTRODUCTION

This case is about whether the federal government can punish private religious colleges with crippling fines and even jail time if they do not let male students occupy female student dorm rooms and use their communal showers.

Upon taking office, President Biden ordered the federal government to change the rules governing the Fair Housing Act (FHA) based on the theory that its ban on sex discrimination encompasses gender identity and sexual orientation. Just three weeks later, the U.S. Department of Housing and Urban Development (HUD) issued a directive imposing this rule change nationwide. Because this includes private religious colleges, the rule change forces them to let males occupy female dorms and even qualify for roommate selection if those males claim a female gender identity. Because the FHA bans statements and notices that are deemed discriminatory, the new directive also censors colleges from even telling students about the college's policies, including that they can only apply for dorms that fit their biological sex.

This hasty directive is unlawful on at least four grounds. *First*, the rule change is arbitrary and capricious because it failed to even consider, much less address, the important interests of private religious colleges in single-sex student housing, or consider alternatives. *Second*, the directive is a final and binding rule change, but it followed none of the notice-and-comment requirements in the Administrative Procedure Act and other laws. *Third*, the directive is contrary to law because it was issued by officials not confirmed by the Senate in violation of the U.S. Constitution's Appointments Clause, and because the FHA does not encompass sexual orientation and gender identity and provides no clear notice that it does so. *Fourth*, the directive violates the First Amendment by restricting speech based on content and viewpoint.

The College has an urgent need for a temporary restraining order and preliminary injunction. The College houses 1,300 students in single-sex dorms that the federal government now considers illegal, and it makes constant statements to existing and

1

incoming students about current and future housing. The directive interferes with the College's speech, burdening its exercise of its moral and religious principles, and intruding upon its students' privacy. Without emergency relief, the College must eliminate its current housing policies, cease talking to students about its policies, and stop planning for fall semester housing, all in violation of its longstanding religious beliefs, or else suffer massive fines and investigatory burdens by continuing to provide housing based on biological sex. The College thus asks this Court to enjoin the directive in order to maintain the legal status quo while this suit proceeds.

## BACKGROUND

The factual and legal background is summarized in the verified complaint. ECF No. 1 ("Compl."). As a signed affidavit, the verified complaint is a source of evidence supporting the motion. *Timber Automation, LLC v. FiberPro, LLC*, 2020 WL 5878211, at *8 n.4(W.D. Ark. Oct. 2, 2020). This section provides a short summary.

The College of the Ozarks is a Christian undergraduate institution in Taney County, Missouri founded in 1906. Compl. ¶ 30. It houses about 1,300 students in residence halls owned by the College. Compl. ¶ 75. As a Christian college, it gives all students the opportunity to have a debt-free education by not charging tuition. Compl. ¶ 35. A student at the College need not be of a particular religion, sexual orientation, or gender identity to study or live at the College, so long as the student agrees to abide by the College's religiously informed code of conduct. Compl. ¶¶ 42-44, 54-67. Under the College's policies and code of conduct, a student's sex is the student's biological sex determined at birth, and students agree to refrain from sexual conduct outside a marriage between one man and one woman. Compl. ¶¶ 70-72.

Under the College's code of conduct, residence halls are single-sex—by which the College means biological sex, not gender identity. Compl. ¶¶ 80-91. In student housing, the College limits access to halls, communal showers and bathrooms by biological sex. *Id*. The College communicates these residence hall policies on an

ongoing basis to existing students, as well as to aspiring students arranging housing for the next academic year. Compl. ¶¶ 92-111.

The Fair Housing Act was enacted in 1968 to prohibit housing discrimination on the basis of race, religion, or national origin, and was amended in 1974 to prohibit discrimination on the basis of sex. *See* 42 U.S.C. § 3604(a) & (b); 24 C.F.R. § 100.50(b)(1)–(3). The FHA and its implementing regulations restrict the speech of covered entities, prohibiting any "statement[s]" and "notice[s]" expressing a policy or rule of prohibited discrimination. 42 U.S.C. § 3604(c), 24 C.F.R. § 100.50(b)(4)–(5). Neither the FHA not its regulations address sexual orientation or gender identity.

The FHA applies to "dwelling[s]" throughout the nation, whether or not their owners receive federal funds. 42 U.S.C. § 3602(b); 24 C.F.R. § 100.20. Courts have thus applied these laws to private college student housing. *See United States v. Univ. of Nebraska at Kearney*, 940 F. Supp. 2d 974, 983 (D. Neb. 2013). Anyone can file a complaint and trigger a government investigation into an alleged FHA violation— and anyone can bring a private lawsuit, even "testers," who are funded by HUD to test for compliance with the law but have no personal interest in obtaining housing. 42 U.S.C. §§ 3610(a)(1)(A)(i), 3613, 3614; 24 C.F.R. §§ 103.9 et seq.

Penalties for violating the FHA and its implementing regulations include significant civil fines and investigatory demands. *See, e.g.*, 42 U.S.C. § 3611–3614; 24 C.F.R. § 103.215, 180.671, 180.705. The FHA and its regulations provide for unlimited compensatory and punitive damages, as well as fines of $21,410 for a first violation, $53,524 for a second violation, and $107,050 for a third or continuing violation. 24 C.F.R. § 180.671. The FHA also provides for criminal penalties, including prison time, if an incident involves the use of force. 42 U.S.C. § 3631.

On the day that he took office, President Biden issued an Executive Order specifying that the Fair Housing Act, among other statutes, prohibits discrimination on the basis of sexual orientation and gender identity, and he ordered agencies to

3

implement the policy. Exec. Order No. 13988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021). ECF No. 1, Exh. B ("Executive Order"). Three weeks later, the U.S. Department of Housing and Urban Development issued what it called a "directive" entitled "Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act" (Feb. 11, 2021). ECF No.1, Exh. A ("directive"). The directive declares that the department will "fully enforce" the FHA and its implementing regulations to prohibit sexual orientation and gender identity; it requires the department's Office of Fair Housing and Equal Opportunity, state and local enforcement agencies, and private organizations to enforce the edict; and it promises that all those entities will engage in the "eradication" of distinctions of sexual orientation and gender identity. Compl. ¶¶ 1, 187-207. No advance public notice or an opportunity for comment was issued before promulgating the directive. Compl. ¶¶ 2, 222. On April 12, 2021, to commemorate National Fair Housing Month, President Biden called the directive a "rule change" made "to ensure that the law finally guards against discrimination targeting LGBTQ+ Americans." Compl. ¶¶ 212-13.

The directive thus requires the College to reverse its housing policies for 1,300 students. Compl. ¶¶ 229-46 Unless the Directive is enjoined, it makes the College cease statements of its policies, preventing it from ongoing plans and communications for student housing for the fall consistent with its religious beliefs. Compl. ¶ 5, 8, 106, 229-246. This jeopardizes the College's ability to function, causes emotional harm to the College's female and male students who rely on the College's housing policies, and dissuades Christian students from attending the College. Compl. ¶ 250.

## LEGAL STANDARD

Four factors govern whether to grant a preliminary injunction: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the

relief would cause to other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

## ARGUMENT

The College has a substantial likelihood of success on the merits because the federal government's actions are unlawful for at least four reasons.

*First*, the directive is an arbitrary and capricious rule change because the government failed to consider the impact on private religious colleges, or alternatives.

*Second*, the government issued the directive without notice and an opportunity for comment, which the Administrative Procedure Act and the FHA both require.

*Third*, the directive is contrary to law. It violated the Appointments Clause because rather than having a Senate-confirmed official issue the rule change, the government sought to legislate by executive fiat through an acting assistant secretary's signature. Moreover, the FHA's sex discrimination provision does not address sexual orientation or gender identity. The Constitution's clear-notice canon bars the government's newfound view of this Act, precisely because Congress and the States must expressly decide major issues such as eliminating single-sex dorms.

*Fourth*, the directive violates the First Amendment's Free Speech Clause. It censors speech implementing or supporting religious colleges' housing policies but allows—and even requires—speech implementing and favoring its own preferred housing policies. The directive thus restricts speech based on both its content and its viewpoint; it compels speech; and it is overbroad because it sweeps in large amounts of speech by countless colleges and universities that provide student housing separated by biological sex.

# I. The directive is arbitrary and capricious because the government ignored its effect on religious colleges.

The directive and its enforcement are arbitrary, capricious, and an abuse of discretion. Under the Administrative Procedure Act (APA), a reviewing court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

## A. The directive is a rule and final agency action under the APA.

First, the directive is a "rule" subject to APA review. It meets the APA's definition of a rule in 5 U.S.C. § 551(4), because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." The directive generally applies the sexual orientation and gender identity standard under the FHA nationwide; it expresses its future effect to eliminate this discrimination; and so it states that it implements, interprets, and prescribes law and policy prohibiting sexual orientation and gender identity discrimination.

The directive is a substantive or legislative rule, not a non-binding interpretive rule or mere statement of policy. Courts consider agency actions to be legislative rules subject to the APA's notice and comment requirement based on several factors concerning the action's content, purpose, and likely effect. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). Courts consider, for example, the agency's own characterization of the action, *Drake v. Honeywell, Inc.*, 797 F.2d 603, 607–08 (8th Cir. 1986); whether the action "purports to create substantive requirements," *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1028 (8th Cir. 2003); whether the action announces guidelines applicable to a wide range of situations, *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998); whether the change is complex, pervasive, drastic, retroactive, confusing, or controversial, *Am. Bancorporation, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 509 F.2d 29, 33 (8th Cir. 1974); and whether the

6

document intends to bind the agency or regulated entities through the document's language and context, such as speaking "of what 'is' done or 'will' be done." *Ubbelohde*, 330 F.3d at 1028. Even where an agency action involves the interpretation of a statute, if the agency does not merely inform the public of its own non-binding interpretation, but "effects a change in the method used . . . in granting substantive rights . . . it is a new rule and cannot be interpretative" under the APA. *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (holding that a "notice" was a rule requiring prior public notice and comment); *see also La Union del Pueblo Entero v. FEMA*, 141 F. Supp. 3d 681, 710 (S.D. Tex. 2015).

On all counts, the directive is a legislative and substantive rule. Compl. ¶¶ 3, 276, 287, 354. Starting with the agency's own characterization, the President and HUD officials consistently and repeatedly call the document a rule. HUD repeatedly characterizes the document as a "directive," both in the directive itself and its accompanying press release. Compl. ¶¶ 188, 190. President Biden calls it a "rule change." Compl. ¶¶ 212-13. They are both correct. The directive creates rights and announces substantive requirements. It states that nondiscrimination on sexual orientation and gender identity under the FHA, which it is imposing, concerns rights and obligations. Compl. ¶¶ 1, 187-208. President Biden calls this a rule "change" that "finally" guards against discrimination and "improved upon" the FHA. Compl. ¶¶ 212-13. That is, the rights and obligations that the directive imposes are new.

The directive is binding, not advisory. The directive imposes in no uncertain terms a new general and substantive legal standard. The government communicated the directive to entities nationwide who are bound by the FHA, through their press release and public statements, and in contractual memoranda to state and local government and private funding recipients obligated to comply with the FHA. Compl. ¶¶ 1, 187-213; *see Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (holding that a rule affecting the process home health agencies

used to secure Medicare reimbursement was substantive, not procedural). The government expressed the directive in definitive and universal terms: saying it covers "all" FHA applications, what covered entities are "required" to do under it, that it "demands urgent action," and that it will be "fully" enforced. Compl. ¶¶ 187-207; ECF No. 1, Exh. A. The directive leaves no discretion to agency enforcement officials—they cannot, for example, refrain from enforcing the FHA as if it does not really prohibit sexual orientation and gender identity discrimination. Instead, they "will" "fully enforce" this ban, to obtain the "eradication" of this discrimination. Compl. ¶¶ 191-92, 201. The directive thus "encodes a substantive value judgment [and] puts a stamp of approval or disapproval on a given type of behavior." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987).

For the same reasons, these definitive statements make the directive a "final agency action" reviewable by this Court under 5 U.S.C. § 704. It is neither penultimate nor is it part of the pre-decisional deliberative process. It accomplishes a change that imposes a conclusive legal standard.

Thus the directive is subject to arbitrary and capricious review under the APA.

### B. The directive is arbitrary and capricious.

Though the scope of arbitrary-and-capricious review is "narrow," a court will overturn an agency action that did not consider whether "there was 'legitimate reliance' on the" prior administration's rules, that did not consider legitimate alternative policies, or that lacked a suitable rationale. *Dep't of Homeland Sec. v. Regents of the University of Cal.*, 140 S. Ct. 1891, 1910–13 (2020). When "an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (citation omitted). An agency thus must separately consider each component of a rule change and articulate a reasoned decision, considering alternatives and legitimate reliance interests. *Id.* at 1912–15.

8

Here, the government failed to consider important aspects of the issue at all, much less adequately. Compl. ¶ 262. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Neither the directive nor the Executive Order says anything about the longstanding practice of student housing separated by biological sex. Yet, as the College's situation shows, imposing gender identity nondiscrimination on such dwellings stands to cause chaos for student housing across the nation, threatening religious colleges with ruinous fines or even jail time if they do not open up single-sex dormitories, shower rooms, and roommate assignments to federal prohibitions. Compl. ¶¶ 223-73.

This failure is partly the function of the extreme haste in which the President imposed the FHA mandate on HUD just hours after his inauguration, and with which HUD responded in three weeks with a nationwide rule change with no public comment process. Compl. ¶¶ 2, 181-87, 222. Educational housing concerns would have been raised, and hopefully considered had notice and comment been followed. Compl. ¶¶ 268, 326-37. But the directive engages in no discussion at all, much less reasoned decision-making, of its impact on private religious colleges. It also ignores colleges' reliance interests, where for decades the FHA never had a gender identity discrimination ban, and therefore never required schools to allow males into female private spaces. Compl. ¶¶ 268, 327-31. As discussed in part III.A below, long established policies since the FHA and Title IX were enacted have allowed schools to arrange student housing based on biological sex *and not gender identity*. But the directive mandates the opposite with no discussion of the ramifications.

The government's failure to consider this impact is particularly conspicuous because HUD has recognized that imposing gender identity nondiscrimination on single sex housing at least implicates privacy rights and religious freedom. Compl. ¶ 256. Here, considering these policy concerns "was the agency's job, but the agency failed to do it." *See Regents*, 140 S. Ct. at 1914.

9

The government also failed to consider any alternative policies that respected schools' liberty, privacy, and reliance interests. Compl. ¶¶ 331-32. Yet consideration of alternatives is also required. *See Regents*, 140 S. Ct. at 1912. Federal officials failed, in particular, to consider (1) maintaining the status quo; (2) delaying compliance dates; (3) applying the policy prospectively; (4) grandfathering existing categories of single-sex housing; (5) exempting religious institutions; or (6) crafting privacy exemptions. *See id.* at 1913–15; Compl. ¶¶ 331-32.

The directive is also arbitrary and capricious because the government lacked a suitable rationale for this abrupt change, and instead placed dispositive weight on an erroneous legal interpretation. Compl. ¶¶ 324-25, 333-34. The Executive Order and directive rely only on an interpretation that the FHA's sex discrimination ban encompasses sexual orientation and gender identity. That interpretation is erroneous, immaterial, and potentially pretextual, as discussed in part III.A below. The Executive Order and directive claim to be required by *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), but in that case the Supreme Court explicitly declared it was *not* issuing a holding on other civil rights laws, but only on certain aspects of Title VII employment discrimination. *Id.* at 1753. Because it depends on an erroneous view of the law, it is arbitrary and capricious for this reason as well.

The directive is arbitrary and capricious for a further reason: agency action must rest on a rationale that is more than an allegation that one part of the previous policy was unlawful. *See Regents*, 140 S. Ct. at 1909–10; Compl. ¶¶ 333-34.[1] But here the directive fails to do so, simply expressing disagreement with the previous regime based on its erroneous view of the FHA and *Bostock*. What is more, the stated rationale for the directive seems to be impermissibly contrived for the President's

---

[1] The government may not seek to add post hoc rationalizations now. *Regents*, 140 S. Ct. at 1909-10. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

political convenience. An agency's rationale is insufficiently supported if it is issued simply to placate the President's political base rather than to proceed based on a reasoned analysis of law and policy. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

In no way does the scant rationale for the directive, ignoring the interests of private colleges altogether, sustain a transformational and binding change to student housing among religious educational institutions. The directive should be enjoined under the APA for being arbitrary and capricious.

## II. The directive was issued without observance of the notice and comment procedure required by law.

This Court must "hold unlawful and set aside" any agency action issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The directive failed to follow required procedures when it skipped public notice and comment.

The directive is exactly the kind of binding rule Congress insisted must be issued only after public notice and an opportunity to comment. The public deserved a chance to raise important concerns the directive ignored about its massive effect on private colleges. But the government disregarded this procedural requirement.

The APA requires that an agency (1) provide notice to the public of any proposed rulemaking, typically by publishing notice in the Federal Register; (2) let interested parties submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received, which the department then must consider and respond to; and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553. The APA also requires that a rule not be made effective until at least 30 days after publication. 5 U.S.C. § 553(d). The FHA itself also requires notice-and-comment for implementing rules. 42 U.S.C. § 3614a.

As noted above in section I.A., the directive is a legislative rule subject to the APA, and so it is subject to the notice and comment requirements of 5 U.S.C. § 553. As a legislative rule it is not exempt from those requirements as an interpretive rule or a general statement of policy under § 553(b)(3)(A). Nor, on its face, is the directive a rule of agency organization, procedure, or practice under the same exceptions, since it regulates outside entities, and does not merely set forth internal agency procedures. The directive is also not subject to the "good cause" exception to the notice and comment requirement: the government did not even claim it was finding good cause to disregard advance notice and comment under § 553(b)(3)(B), and the directive makes no such case. The directive also violated the APA requirement that a rule delay its effective date 30 days under § 553(d). Finally, for the same reasons, the directive is contrary to law because it failed the FHA's own notice and comment requirement before issuing any implementing rules. 42 U.S.C. § 3614a.

On top of these clear requirements of notice and comment for a rule change such as the directive, HUD regulations also require any *guidance* document to be issued only after public notice and comment. 24 C.F.R. § 11.1(b); 24 C.F.R. § 11.8. The government followed none of the notice and comment requirements that may apply.

## III. The directive is contrary to law and constitutional right, because it violates the Appointments Clause and lacks statutory authority.

Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "contrary to constitutional right, power, privilege, or immunity," "or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency acting ultra vires is also subject to prospective injunctive relief. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 693 (1949).

The directive is unauthorized for two reasons. First, the directive was issued by officials not properly appointed under the Appointments Clause of the Constitution.

Second, the FHA does not prohibit sexual orientation and gender identity discrimination, and so interpreting the FHA to apply in this way violates the clear statement rule applicable to statutes regulating areas of state jurisdiction.

## A. The directive violated the Appointments Clause.

The directive's issuance was contrary to constitutional power because it violated the Appointments Clause. That clause requires a Senate-confirmed official to make significant actions, like the directive and its enforcement. Under the Appointments Clause, advice and consent of the Senate is required for "Officers of the United States" (principal officers), except "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed" through advice and consent. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

Issuing a final binding rule or a significant guidance document involves a major exercise of executive authority—indeed, as shown below, here the question is so significant that Congress cannot be found to have delegated such a decision, *see King*, 576 U.S. at 474. If such power exists, it thus could be exercised only by a principal officer—one who has been nominated by the President and confirmed by the Senate, not an inferior officer supervised by principal officers. *See Edmond v. United States*, 520 U.S. 651, 663 (1997). The Appointments Clause is "designed to preserve political accountability relative to important Government assignments," making "it evident that 'inferior officers' are officers whose work is directed and supervised" by officers appointed by advice and consent. *Id.*

The directive requires issuance by a principal officer, not merely an inferior officer. Just as arbitrators must be principal officers to take "final agency action[s]" and "promulgat[e] metrics and standards" without "any procedure by which the

Case 6:21-cv-03089-RK   Document 2-1   Filed 04/15/21   Page 22 of 41

arbitrator's decision is reviewable" by a superior, *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 39 (D.C. Cir. 2016), the issuance of binding directives on major questions cannot occur through inferior officers (and even less can they be issued through mere career employees). Moreover, "inferior officers" must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.

In issuing the directive, the federal government violated the Appointments Clause at every step. First, Defendant Worden, who signed the directive, was not appointed by advice and consent. Defendant Worden was an Acting Assistant Secretary, and otherwise a career civil servant. She could not sign a major legislative rule change. The department may suggest that Congress authorized this appointment under the Federal Vacancies Reform Act of 1998, through which career officials are automatically assigned acting positions based on seniority, but that act cannot make Defendant Worden's role comply with the Appointments Clause, because she sought to exercise authorities, such as signing this rule, that can be undertaken only by principal officers. When the constitution requires an official to be appointed through advice and consent in order to perform a major function, no statute can purport to allow such an official to exercise that authority through a different appointment.

Second, not only was Defendant Worden not a principal officer, Defendant Worden also was not an inferior officer under the Appointments Clause. She had no supervision by a principal officer as *Edmund* requires, and therefore cannot be considered an inferior officer. Secretary Fudge was not yet confirmed—indeed, no HUD official had been confirmed by the Senate at the time of HUD's hasty action in this case. The Acting Secretary at the time of the directive, Matthew E. Ammon, was likewise not installed through advice and consent. As a result, Defendant Worden could not have issued the directive as an inferior officer (nor as a career employee), because she lacked any supervision by a duly confirmed principal officer.

Third, the position held by Defendant Worden—Assistant Secretary for Fair Housing & Equal Opportunity—is a role that can be filled only by a principal officer, not an inferior officer. An Appointments Clause inquiry can look, not only at the individual authority being challenged, but "the extent of power an individual wields in carrying out his assigned functions" overall. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051, (2018) (invalidating decisions of administrative law judges because they were not installed through the Appointments Clause). Besides the signing of this directive, the position exercises many significant executive branch duties. These include (among others) the power and authority of the Secretary of HUD over the FHA, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Age Discrimination Act of 1975, the Federal Housing Enterprises Financial Safety and Soundness Act, and their implementing regulations.[2] The directive thus must be set aside because it was issued by an improperly appointed official.

## B. The Fair Housing Act's prohibition on sex discrimination does not encompass sexual orientation or gender identity.

The directive is contrary to law because the Fair Housing Act does not prohibit schools from separating student housing based on biological sex.

In any question of statutory interpretation, the court begins with the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute," that is, their original public meaning. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quotation marks and citations omitted). "After all, if judges could freely invest old statutory terms with new meanings, we would risk amending

---

[2] See Consolidated Delegation of Authority for the Office of Fair Housing and Equal Opportunity, 76 Fed. Reg. 73,984 (Jan. 29, 2011).

legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)).

The directive exceeds the government's authority for three reasons: (1) the FHA does not prohibit sexual orientation and gender identity discrimination; (2) the FHA does not prohibit schools from separating housing based on biological sex; and (3) the directive forces schools to stop separating housing by biological sex and to instead separate it by gender identity and sexual orientation contrary to biological sex.

First, the plain and ordinary meaning of the Fair Housing Act text shows that the FHA "does not prohibit discrimination based on sexual orientation in the sale or rental of housing." *Thomas v. Wright*, No. 2:14–cv–01604–RDP, 2014 WL 6983302, at *3 (N.D. Ala. Dec. 10, 2014). The FHA never mentions sexual orientation, gender identity, or transgender status. Instead, it refers to discrimination on the basis of biological sex. Congress added sex discrimination to the Fair Housing Act in 1974. In common, ordinary usage, the word "sex" in 1974 meant biologically male or female, based on reproductive organs.[3] Today, the American Psychiatric Association's most recent diagnostic manual, the DSM-5, likewise affirms that "sex" "refer[s] to the biological indicators of male and female." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013).

Despite claims to the contrary in the Executive Order and the directive, *Bostock* does not provide to the contrary. In fact, in *Bostock*, the Supreme Court rejected the claim "that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Bostock*, 140 S. Ct. at 1753. As the Supreme Court warned, "none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any

---

[3] Sex, Webster's New World Dictionary of the American Language (College ed. 1962) ("either of the two divisions of organisms distinguished as male or female"); Sex, The American Heritage Dictionary of the English Language (1st ed. 1969) ("[t]he property or quality by which organisms are classified according to their reproductive functions").

such question today." *Id.* And, even under Title VII, the Court did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* The Court also mentioned that it is "deeply concerned with preserving" the constitutional and statutory rights of religious institutions. *Id.* at 1753–54. For decades, lower courts across the country rejected the assertion that the FHA prohibits sexual orientation or gender identity discrimination. *See, e.g.*, *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1201 (D. Colo. 2017) (rejecting argument that the sex stereotyping theory supports an FHA claim based on "status as a transgender" or "sexual orientation or identity").[4] *Bostock* was aware of this precedent and did not disturb it. Nor was the directive able to cite any recent judicial decisions that held the contrary. In short, nothing in *Bostock* required or justified the directive.[5]

Second, no one understood the FHA's prohibition on sex discrimination to prohibit private religious colleges, or indeed any schools, from separating housing based on biological sex (here, both male and female dorms). The Supreme Court has affirmed the need to continue separating sex-specific privacy facilities when integrating women into the Virginia Military Institute. *United States v. Virginia*, 518 U.S. 515, 556–58 (1996). This would not be possible if the FHA prohibits schools from

---

[4] Many courts have rejected sexual orientation claims brought under the FHA. *Lath v. OakBrook Condominium Owners' Ass'n*, No. 16-CV-463-LM, 2017 WL 1051001, at *4 n.5 (D. N.H. Mar. 20, 2017); *Thomas v. Osegueda*, No. 2:15-CV-0042-WMA, 2015 WL 3751994, at *4 (N.D. Ala. June 16, 2015); *Thomas v. Wright*, No. 2:14-CV-01604-RDP, 2014 WL 6983302, at *3 (N.D. Ala. Dec. 10, 2014); *Ordelli v. Mark Farrell & Assocs.*, 2013 WL 1100811, at *2 (D. Or. 2013); *Miller v. 270 Empire Realty LLC*, 2012 WL 1933798, at *5 (E.D.N.Y. 2012); *Fair Housing Ctr. of Washtenaw Cty., Inc. v. Town & Country Apts.*, No. 07-10262, 2009 WL 497402, *3, n.1 (E.D. Mich. Feb. 26, 2009); *Swinton v. Fazekas*, No. 06-CV-6139T, 2008 WL 723914, *5 (W.D.N.Y. Mar. 14, 2008); *Smith v. Mission Assocs. Ltd. P'ship*, 225 F. Supp. 2d 1293, 1299 (D. Kan. 2002); *Neithamer v. Brenneman Property Services, Inc.*, 81 F. Supp. 2d 1, 4 (D.D.C. 1999).

[5] Even when parties conceded that the FHA prohibits sexual orientation in *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856, 862 (7th Cir. 2018), the court warned that between the FHA and Title VII "there are some potentially important differences between the relationship that exists between an employer and an employee, in which one is the agent of the other, and that between a landlord and a tenant, in which the tenant is largely independent of the landlord," and consequently the court "refrain[ed] from reflexively adopting the Title VII standard" into all applications beyond "comparable situations." *Id.* at 863.

17

separating student housing by biological sex. The 1974 amendment to the FHA prohibiting sex discrimination was made in the context of decades of congressional funding of private college housing through HUD.[6] Moreover, in Title IX of the Education Amendments of 1972, Congress prohibited sex discrimination in educational programs receiving federal financial assistance, but stated that "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. As a result, longstanding Title IX regulations specifically declare that "[a] recipient may provide separate housing on the basis of sex"—meaning, by "sex," *biological sex* not gender identity. 45 C.F.R. § 86.32. Indeed, HUD itself has long stated the FHA allows universities to separate student housing according to sex, citing those Title IX provisions.[7] In adding sex discrimination to the FHA in 1974, Congress cannot be deemed to have overturned the longstanding practice that colleges separate student housing by (biological) sex—Congress does not hide "elephants in mouseholes." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 336 (5th Cir. 2019) (Ho, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

The third point in this argument is simply to observe that the directive treads on this major question: it overturns the longstanding interpretation of the FHA that single-sex educational student housing is allowed. The directive *prohibits* single "sex" student housing: colleges must now place a student in an opposite-sex residence hall

---

[6] See Tables 5 & 5a, pg. 228, Evolution of Role of the Federal Government in Housing and Community Development, Subcomm. on Housing and Community Development of the Comm. on Banking, Currency and Housing, 94th Cong. (Oct. 1975) (filed with Pub. L. 93-383 on Aug. 22, 1974), *available on Westlaw under* U.S. Government Accountability Office (GAO) Legislative History, Pub. L. 93-383—part 1.

[7] HUD Occupancy Handbook, Chapter 3: Eligibility for Assistance and Occupancy, sec. 3-22.B.1 (citing 45 C.F.R. §§ 86.32 and 86.33), available at https://www.hud.gov/sites/documents/DOC_35645.PDF (last visited April 15, 2021).

(or, indeed, another student's dorm room) based on the student's "gender identity," *not* their biological sex. Indeed, colleges must do so specifically where the student's gender identity contradicts their biological sex. The directive considers it to be prohibited gender identity discrimination, which it seeks to "eradicate," to place such a student in a dorm based on his or her biological sex. This rule also eliminates the religious-based practice of having a code of conduct in housing based on reserving sexual relations for a marriage between a biological male and a biological female, because the directive considers that distinction sexual orientation discrimination.

This sea change in housing law was not within the government's discretion under the FHA. It is "a question of deep 'economic and political significance'" that Congress did not "expressly" assign to the executive branch. *King*, 576 U.S. at 474 . The directive is therefore an unlawful, ultra vires action exceeding the government's statutory authority and must be set aside.

Outside the directive, the government has shown that when it imposes a gender identity nondiscrimination theory to a single-sex program, the mandate supersedes placements based on biological sex. In temporary shelters not subject to the FHA, including those for victims of domestic violence, the HUD Secretary issued rules in 2016 imposing a gender identity nondiscrimination mandate, and explained that consequently the shelters must place men into women-only facilities if the men identify as women.[8] Likewise, under Title IX, in another Executive Order, President Biden applied his view that the statute bans gender identity discrimination to "school sports," which Title IX explicitly allows (and indeed requires) to be single-sex programs. Executive Order No. 14021, Guaranteeing an Educational Environment

---

[8] "Equal Access in Accordance With an Individual's Gender Identity in Community Planning and Development Programs," 81 Fed. Reg. 64,763, 64,766, (Sept. 21, 2016) ("in a facility providing temporary, short term shelter that is not covered by the Fair Housing Act and which is legally permitted to operate as a single-sex facility, the individual's own self-identified gender identity will govern").

Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, 86 Fed. Reg. 13803 (Mar 8, 2021). On February 23, 2021, citing the original Executive Order, President Biden's Departments of Education and Justice explicitly withdrew the previous administration's position that Title IX does not allow schools to let biological men compete in women's sports. ECF No. 1, Exh. N & O. And, on March 26, 2021, the Department of Justice's Civil Rights Division issued a memo under the Executive Order claiming that Title IX protects transgender students from discrimination on the basis of gender identity, and specifically in the context of single-sex restrooms. ECF No. 1, Exh. P.

**C. A narrow interpretation is compelled by the Constitution's clear-notice canon.**

The court should also set aside the directive under the clear notice rule.

**1. The Constitution requires clear notice of federal laws displacing state regulation or imposing grant conditions.**

For all laws displacing state regulation or imposing grant conditions, the federal Constitution limits the States and the public's obligations to those requirements "unambiguously" set forth on the face of the statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Under what former-Professor Barrett called a "time-honored" substantive canon of statutory interpretation,[9] the States' representatives in Congress must deliberate and resolve the specific terms at issue before imposing national policy on the States. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985). These structural principles protect not only the states but "the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011); *see also New York v. United States*, 505 U.S. 144, 181 (1992).

---

[9] Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 143–150, 173 (2010).

This canon applies to three major types of federal statutes. *First*, the Supreme Court has long required that the court be "absolutely certain," *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991), before it will find that Congress displaced the States in any particular case. Congress thus "must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 460 (citation omitted). This canon resolves ambiguity in the substantive scope of a statute that preempts state regulation. *Bond v. United States*, 572 U.S. 844, 859 (2014). *Second*, Congress must state its intent "expressly and unequivocally...in the text of the relevant statute" to abrogate sovereign immunity or add State liability. *Sossamon v. Texas*, 563 U.S. 277, 290–91 (2011); *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). *Third*, to ensure that the federal government does not use federal funds to coerce States into carrying out federal policy, courts must take on another "crucial inquiry": "whether Congress spoke so clearly that [the court] can fairly say that the State could make an informed choice." *Pennhurst*, 451 U.S. at 25. The federal government may not "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* "[I]f Congress intends to impose a condition on the grant of federal moneys," it "must do so unambiguously." *Id.* at 17.

In each case, this canon imposes "a particularly strict standard." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990) (citations omitted). The statutory text must be clear at the time of enactment. *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009). If an act is subject to "competing plausible interpretations," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), the statute must be construed "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237–328 (1998) (quotation omitted). Congress may not put "upon the States a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication in the courts." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S.

176, 190 n.11 (1982); *Arlington Cent. Sch. Dist. Bd. of Edu. v. Murphy*, 548 U.S. 291, 296 (2006); *Gregory*, 501 U.S. at 460–70; *Dellmuth v. Muth*, 491 U.S. 223, 232 (1989).

### 2. The Fair Housing Act is subject to the clear-notice rule.

For three reasons, under this canon, the Fair Housing Act must set forth state and public obligations unambiguously and with clear notice. *First*, the FHA intrudes on an "area[] of traditional state responsibility," *Bond*, 572 U.S. at 2089, namely the control of housing and of schools. The FHA displaces traditional state police powers over housing, including educational housing: it preempts "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice." 42 U.S.C. § 3615. The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982). And education is "perhaps the most important function of state and local governments" and private parties. *Honig v. Doe*, 484 U.S. 305, 309 (1988) (internal quotation marks omitted).

*Second*, the FHA is subject to a clear-statement analysis as well for any abrogation or waiver of sovereign immunity from suit or damages. *E.g.*, *Gregory v. S.C. Dep't of Transp.*, 289 F. Supp. 2d 721, 727 (D.S.C. 2003), aff'd, 114 F. App'x 87 (4th Cir. 2004).

*Third*, the FHA is a Spending Clause statute, and so its scope goes no further than the "clear terms" of the statute itself. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999); *see, e.g.*, 42 U.S.C. § 3618 (authorizing appropriated funds); 42 U.S.C. § 1437a; 42 U.S.C. § 5301 et seq; 42 U.S.C. § 5308; 42 U.S.C. § 12901 et seq (various spending programs conditioned on FHA compliance); Compl. ¶¶ 178-80. The directive specifically targets the Fair Housing Assistance Program, funds given to states to enforce fair housing laws. Compl. ¶¶ 168-69, 198-

202, 205, 207-11. The FHA's non-discrimination provisions thus not only displace traditional state regulation but also are made part of a Spending Clause program.

The Supreme Court's Fair Housing Act cases are consistent with this clear notice requirement. For instance, when the Supreme Court decided between competing interpretations of the FHA's attorney fee provision, the Court selected the only foreseeable interpretation compelled by the FHA's text. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 605 (2001). The Court likewise found the FHA's text and structure clear and compelling when the FHA created disparate impact liability. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 5354 (2015). The Court also required "the creation of an explicit cause of action" to sue. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).

### 3. The clear-notice rule requires the court to resolve any ambiguity in the FHA's requirements in favor of a narrow interpretation.

Applying this clear-statement canon to the Fair Housing Act, the federal government cannot impose the directive's novel duties on the States and the public. For all the reasons explained in part III.A. above, the Fair Housing Act and its implementing regulations have always been understood and applied to not to encompass sexual orientation or gender identity, and to allow private college student housing based on biological sex. There is no plausible argument that the FHA in 1974 *unmistakably* required what the directive mandates. It is thus enough that the FHA did not provide clear, unmistakable notice that it would require schools to permit students to access dormitories based on their gender identity regardless of biological sex, so that HUD could force states to impose such requirements through the Fair Housing Assistance Program. Courts thus should not interpret any expansive statutory language "in a way that intrudes on the police power of the States." *Bond*, 572 U.S. at 860. *Bostock* did not consider the potential effect of a clear-notice rule

when it interpreted Title VII, and so not only did the court explicitly refrain from extending its holding to other statutes, it did not preclude a clear notice argument about those statutes.

Because Congress did not "in fact face[], and intend[] to bring into issue," the directive's particular disruption of state and private authority, its impositions violate the clear notice rule. *United States v. Bass*, 404 U.S. 336, 349 (1971). Even the federal government recognizes the lack of clear notice here, because the directive informs its own employees that the FHA must be applied retroactively for the last year. Compl. ¶ 200. Likewise HUD had to inform the states and other enforcement agencies, ordering them to sign new grant memoranda of understanding and to change their state law's text or interpretations to get on board with the new directive. Compl. ¶¶ 208-11.

For these reasons, the directive should also receive no deference under *Auer v. Robbins*, 519 U.S. 452 (1997). Any deference only applies in the event of ambiguity. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019). Here, any alleged discretion to impose the directive's new mandate is excluded both by the clear notice rule and by the major questions doctrine under *King*, 576 U.S. at 474.

## IV.   The directive violates the freedom of speech.

Finally, the directive is an overbroad restriction of protected speech under the First Amendment, and therefore contrary to constitutional right under 5 U.S.C. § 706. The directive imposes a content-based and a viewpoint-based speech restriction, and it cannot be justified as applied to religious educational institutions.

### A. The federal government may not discriminate among speech by content or viewpoint.

Under the Free Speech Clause, the government may not restrict speech because of its content or viewpoint. A policy or action is "content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed,"

24

*Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), or "alters the content of the speech," *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 163. This is a "stringent standard." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

Viewpoint discrimination against speech is presumptively unconstitutional. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject"—"when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Viewpoint discrimination is thus an egregious form of content discrimination." *Id.* And the Supreme Court's cases "use the term 'viewpoint' discrimination in a broad sense." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (plurality opinion).

Even when there is a commercial aspect to speech, that speech does not "retain[ ] its commercial character when it is inextricably intertwined with otherwise fully protected speech," *Riley*, 487 U.S. at 796. Content- or viewpoint-based restrictions are "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228.

Even a restriction on commercial speech cannot be viewpoint-based. *Matal*, 137 S. Ct. at 1767–69 (five justices agreeing that lower scrutiny did not apply to viewpoint-based restrictions on commercial speech); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018) (interpreting *Matal* this way); *accord R.A.V. v. City of St. Paul*,

505 U.S. 377, 389 (1992) ("State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.").

**B. The directive restricts speech based on its content and viewpoint.**

By imposing the FHA and its regulations to regulate the College's "statement[s]" and "notice[s]" about its religiously infused housing policies, 42 U.S.C. § 3604(c), 24 C.F.R. § 100.50(b)(4)–(5), the directive regulates speech based on its content and viewpoint. Compl. ¶¶ 4, 127, 133, 150-54, 228-46, 365-89.

The College's "private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Moreover, "the First Amendment interests are especially strong here" because these housing policies, including compelled pronouns, relates to the College's core religious and moral beliefs. *Meriwether v. Hartop*, No. 20-3289, 2021 WL 1149377, at *11 (6th Cir. Mar. 26, 2021).

The directive restricts the College's protected speech based on its content. Compl. ¶¶ 228-46, 374-83. The FHA and its regulations do not govern the College's speech on all topics, but only its speech concerning particular content: speech "with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). HUD's regulations restrict the College's ability to "[m]ake, print, or publish," or "[r]epresent to any person" speech deemed discriminatory. 24 C.F.R. § 100.50(b)(4)–(5). By definition this is a limitation on speech based on its content.

The directive also restricts speech based on its viewpoint. Compl. ¶¶ 228-46, 374-83. The FHA and its regulations allow the College to engage in speech of this exact same content—about what the directive deems "discrimination" on the basis of

gender identity—as long as the College says it does *not* so discriminate, rather than saying it does. In other words, the directive's use of the FHA and HUD regulations means that the College can tell students they will be placed in dorms using their gender identity, but the College cannot tell students they will be placed in dorms based on their biological sex not their gender identity. And, given that the school's policies are statutorily and constitutionally protected, its speech implementing and supporting its policies implement protected activities.

The directive also prohibits the College from communicating many other points: from stating that its shower and bathroom policies in residence halls are based on biological sex; from using pronouns that match residents' biological sex rather than their gender identity through its harassment provisions; from posting its religiously infused student housing policies on its website; from distributing these housing policies to students and prospective students in person and in applications; and from making all the necessary communications to place students in dorms next semester based on distinctions of biological sex not gender identity. Compl. ¶¶ 236-46. These limits are, again, by definition one-sided, viewpoint-based restrictions of speech.

But the directive does even more: it also censors colleges from even telling students that the college does not support the directive. Compl. ¶¶ 236-40, 433. Under the FHA, a housing provider may not say either that the provider's housing policy makes a dwelling unavailable on a prohibited basis, or that the housing provider prefers to limit the housing on a prohibited basis. So, under the directive, the College cannot say that College has, or prefers to have, single-sex housing based on biological sex. Given that the FHA prohibits expressing any preference for providing housing on a prohibited basis, the College acts at its peril by even saying that it opposes and does not wish to implement the federal directive's policies, even out of religious reasons. But, at the same time, the federal officials allow statements that eliminate single-sex student housing—and the directive allows colleges to express support for

ending that purported discrimination. In short, the directive takes one side in a policy debate and stifles opposition to itself: colleges can say that they have—and they support—the new administration's discrimination policies, but colleges cannot say that in their housing they do not have or do not prefer the President's policies.

**C. The directive's speech restrictions fail judicial scrutiny.**

This viewpoint-based censorship is unconstitutional. *Iancu*, 139 S. Ct. at 2299 . "Viewpoint discrimination doom[s]" a speech regulation because it "violate[s] the 'bedrock First Amendment principle' that the government cannot discriminate against 'ideas that offend.'" *Id.* (quoting *Matal*, 137 S. Ct. at 1751).

As a viewpoint and content based restriction subject to (at least) strict scrutiny, the directive violates the First Amendment. Such a restriction places the burden on the government to show that its directive "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 171. But there is no compelling government interest to require colleges not to say they separate student housing by biological sex, or otherwise to prohibit the College from adopting, announcing, or supporting its religious-informed housing policies. As explained above in part III.A, the FHA does not prohibit discrimination on the basis of sexual orientation or gender identity, and therefore neither it nor its HUD regulations support any governmental interest to sustain the directive's mandates on speech. Indeed, Title IX explicitly allows education institutions to separate student housing based on biological sex, so the government cannot claim there is a compelling interest to prohibit what Congress explicitly allowed. Nor is it plausible for the government to maintain that what was always allowed in educational student housing is now suddenly not only prohibited, but prohibited as a compelling interest, that is, an interest "of the highest order." *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 710 (5th Cir. 2020) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)). Religious colleges have constitutional and statutory rights to

arrange student housing by biological sex, including under the Religious Freedom Restoration Act, and so the directive censors speech that implements and announces lawful conduct.

The government has not employed "the least restrictive means" of achieving any governmental interest. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Nothing requires students to attend the College, rather than attend a myriad of institutions eager to comply with the directive in their student housing. A less restrictive means of advancing the interest would therefore allow the College and other educational institutions to do what they have always done—arrange *and communicate* student housing arrangements using distinctions based on biological sex, not gender identity or sexual orientation—while acknowledging that other educational institutions might be more susceptible to regulation.

## D. The directive is unlawful as to religious educational institutions beyond the parties.

As an unlawful speech restriction, the directive is also facially invalid because it encompasses so much protected speech. A speech restriction must be struck down on its face as overbroad when "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n.6 (2008). And, because this federal enforcement is unlawful on its face as to religious or education institutions, this Court should enter facial relief that would "reach beyond the particular circumstances." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

The directive applies to a substantial amount of protected speech. Not just the college, but hundreds of private universities and colleges (as well as co-ed boarding schools for high school and grade school), communicate their policies of separating student housing based on biological sex not gender identity or sexual orientation no

matter the context.[10] Those communications all involve protected speech. The practice of student housing based on biological sex is widespread, even if not universal, and it is longstanding. This Court need not decide that the directive is unconstitutional in all applications to find it encompasses a substantial amount of protected speech beyond the speech of the College specifically. For these reasons, under the Free Speech claim this Court should enter a partial facial, or quasi-facial injunction against the directive to the extent it imposes speech restrictions on any religiously affiliated educational institution similarly-situated to the College in that it provides student housing based on biological sex not gender identity. As noted above, to preserve the status quo from the radical transformation brought about by the directive, the court should also issue an order enjoining the directive as a whole under the APA because it is arbitrary and capricious, without observance of procedure, and contrary to law and constitutional power.

## V. The other injunction factors favor relief.

The College is not only substantially likely to prevail on the merits, it also meets the other factors required for issuing injunctive relief. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted).

The College's loss of its freedoms, with resulting harm to its educational mission and its students' privacy, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The federal government has no interest in enforcing unlawful directives, and they suffer no harm if they are prohibited from breaking the law. Nor does any public interest in allowing legitimate governmental activities "extend so far as to allow arbitrary and capricious

---

[10] According to the Department of Education, as of 2018 there were 879 self-identified religiously affiliated degree-granting post-secondary institutions. Table 303.90, "Fall enrollment and number of degree-granting postsecondary institutions, by control and religious affiliation of institution: Selected years, 1980 through 2018" *available at* https://nces.ed.gov/programs/digest/d16/tables/dt16_303.90.asp (last visited April 15, 2021).

actions that interfere with the exercise of fundamental rights." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338–39 (5th Cir. 1981).

The College is applying its student housing policies based on biological sex right now. Compl. ¶¶ 91-111, 246. Changing those policies would not only alter a century of longstanding practice, but would betray the College's religious commitments, its students who attended because of those commitments, and the College's very reason for existing to promote its Biblical beliefs. Compl. ¶¶ 30-32, 56-60, 70, 254, 262. Moreover the College engaging in communications with students right now for housing for the fall semester, based on the College's student housing policies is precluded by the directive. Compl. ¶ 5, 8, 106, 229-46. Indeed, the College never ceases communicating its student housing policies simply by posting its views on sexuality and gender identity online, by stating that dorms, showers, and bathrooms are male or female, and by using students housing occupants' pronouns based on their biological sex. Compl. ¶¶ 91-111, 246. Complying with the directive would throw the College into an uproar, and continuing to not comply without an injunction would bring down the full weight of the government's financial and investigatory mandates. Compl. ¶¶ 247-73. Although a plaintiff need not wait to be prosecuted before filing suit, and it need not confess that it is willing to violate a law before challenging it, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014), here the College leaves no doubt: it arranges student housing based on biological sex which the directive, illegally and erroneously, prohibits. The directive also forces irreparable financial injuries on the College. Compl. ¶¶ 248-53, 262-64. Under the directive the College faces the choice of assuming potentially crippling financial liability, incurring out-of-pocket costs to adapt housing to comply with new rules, or ceasing providing student housing, any of which will irreparably harm the College because it cannot recover those costs from the federal government. *See Texas v. United States*, 328 F. Supp. 3d

662, 737 (S.D. Tex. 2018). The College needs an injunction to prevent the government from keeping its unlawful promise to "eradicate" the College's speech and policies.

The balance of harms and the public interest both favor an injunction. The directive's mandates are novel, and preserving decades of the status quo under the FHA is in the public's interest. Courts routinely "recognize the value of preserving the status quo." *Texas All. for Retired Americans v. Hughs*, 976 F.3d 564, 567 (5th Cir. 2020). And the government cannot plausibly claim that the balance of harms or public interest warrant eliminating student housing policies at private religious colleges where those policies have been in place since 1974 and for decades before.

## CONCLUSION

For these reasons, the College respectfully asks this Court to grant its motion for temporary restraining order and preliminary injunction without bond.


Respectfully submitted this 15th day of April, 2021.

<div style="display:flex">

GREGGORY R. WALTERS
IL Bar No. 6256826*
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
gwalters@ADFlegal.org


*Pro hac vice* application forthcoming

*s/ Julie Marie Blake*
MATTHEW S. BOWMAN*
DC BAR NO. 993261
JULIE MARIE BLAKE
MO Bar No. 69643
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
mbowman@ADFlegal.org
jblake@ADFlegal.org

</div>

*Attorneys for Plaintiff*