**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

THE SCHOOL OF THE OZARKS, INC., d/b/a   )
College of the Ozarks,                         )
                                     )
          Plaintiff              )
                                     )    Civil Action No. 21-cv-3089
         v.                     )
                                     )
JOSEPH R. BIDEN JR., President, *et al.*,   )
                                     )
          Defendants          )

**DEFENDANTS' SUGGESTIONS IN OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT............................................................................................. 1

BACKGROUND ............................................................................................................. 5

    I.       Statutory Background ........................................................................ 5

    II.      Regulatory Background ..................................................................... 7

            A.    Since 2010, HUD has accepted and investigated Fair Housing Act complaints alleging sex discrimination involving sexual orientation and gender identity............................................................................... 8

            B.    The *Bostock* decision held that discrimination on the basis of sexual orientation and gender identity is sex discrimination under Title VII. ....... 9

            C.    The Memorandum restates HUD's longstanding intake procedures and frames them in light of *Bostock*. ............................................................. 10

    III.     This Litigation.........................................................................................11

ARGUMENT ................................................................................................................ 12

    I.       Applicable Legal Standards ............................................................. 12

    II.      Because the College cannot meet the jurisdictional requirements of standing and ripeness, preliminary relief should be denied, and this action should be dismissed. ................................................................................................. 13

            A.    The jurisdictional requirements of standing and ripeness........................ 13

            B.    The College cannot establish standing in this case because it has not suffered any present injury from the Memorandum or any threatened Fair Housing Act enforcement action............................................................. 14

            C.    For similar reasons, the case is unripe. .................................................... 18

             D.    The Court lacks jurisdiction over any claims against the President because the College is not challenging Presidential action and the separation of powers bars relief against the President.................................................... 21

            E.    The reasons that undermine the College's claims of immediate injury also undermine its claims of irreparable harm. ................................................ 22

            F.    If the Court concludes that it lacks subject matter jurisdiction, it should dismiss this action even though the defendants have not filed a motion. . 23

    III.     Plaintiff is not likely to succeed on the merits. ................................... 24

            A.    The Memorandum is not subject to judicial review under the APA and also did not require notice and comment because it does not carry any legal effect. ....................................................................................................... 24

B.    Acting Assistant Secretary Worden had constitutional authority to issue the Memorandum. .................................................................................................. 28

C.    The Memorandum is not contrary to the Fair Housing Act. ..................... 34

D.    The Memorandum is not arbitrary and capricious. ................................... 37

E.    This case does not present concerns related to State sovereignty that would warrant application of a "clear statement" requirement in the interpretation of the Fair Housing Act. ............................................................................ 39

F.    The Memorandum does not violate the College's freedom of speech. ...... 41

IV.   The other factors in the preliminary injunction analysis weigh against relief. ...... 44

V.    There is no basis for nationwide relief. ................................................................ 45

CONCLUSION .................................................................................................................... 47

# TABLE OF AUTHORITIES

**CASES**

*Alfa Int'l Seafood v. Ross*,
264 F. Supp. 3d 23 (D.D.C. 2017) ....................................................................... 31

*Allen v. Wright*,
468 U.S. 737 (1984) ............................................................................................. 13

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
738 F.3d 387 (D.C. Cir. 2013) ............................................................................ 25

*Amigo Gift Ass'n v. Exec. Props., Ltd.*,
588 F. Supp. 654 (W.D. Mo. 1984) ..................................................................... 45

*Ass'n of Am. R.Rs. v. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016) .............................................................................. 31

*Bank of Am. Corp. v. City of Miami*,
137 S. Ct. 1296 (2017) ........................................................................................ 40

*Boating Indus. Ass'ns v. Marshall*,
601 F.2d 1376 (9th Cir. 1979) ............................................................................ 16

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .................................................................................. passim

*Buckley v. Valeo*,
424 U.S. 1 (1976) (per curiam) ..................................................................... 28, 31

*Calderon v. Ashmus*,
523 U.S. 740 (1998) ............................................................................................ 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................ 45

*Calzone v. Hawley*,
866 F.3d 866 (8th Cir. 2017) ........................................................................ 14, 21

*Campbell v. Robb*,
162 F. App'x 460 (6th Cir. 2006) ................................................................. 42, 43

*City of Kansas City v. Hous. & Econ. Dev. Fin. Corp.*,
No. 05-00368-CV-W-GAF, 2009 WL 4042886 (W.D. Mo. Nov. 23, 2009) ........ 12

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................... 13, 17

*Cornish v. Blakey*,
336 F.3d 749 (8th Cir. 2003) .............................................................................. 15

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ............................................................................................ 13

*Dalton v. Specter*,
　　511 U.S. 462 (1994) ................................................................................... 27

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
　　140 S. Ct. 1891 (2020) .......................................................................... 37, 38

*Doe v. Reed*,
　　561 U.S. 186 (2010) ................................................................................... 46

*Doran v. Salem Inn, Inc.*,
　　422 U.S. 922 (1975) ................................................................................... 46

*Edmond v. United States*,
　　520 U.S. 651 (1997) ............................................................... 28, 31, 33, 34

*Estes v. U.S. Dep't of Treasury*,
　　219 F. Supp. 3d 17 (D.D.C. 2016) ............................................................ 34

*Franklin v. Massachusetts*,
　　505 U.S. 788 (1992) ............................................................................. 21, 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
　　561 U.S. 477 (2010) ................................................................................... 31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
　　528 U.S. 167 (2000) ................................................................................... 13

*Gill v. Whitford*,
　　138 S. Ct. 1916 (2018) ............................................................................... 45

*Gregory v. Ashcroft*,
　　501 U.S. 452 (1991) ................................................................................... 39

*Grunewald v. Jarvis*,
　　776 F.3d 893 (D.C. Cir. 2015) ................................................................... 38

*Guedes v. ATF*,
　　356 F. Supp. 3d 109 (D.D.C. 2018) ..................................................... 32, 33

*Harris v. Itzhaki*,
　　183 F.3d 1043 (9th Cir. 1999) ................................................................... 43

*Heckler v. Chaney*,
　　470 U.S. 821 (1985) ................................................................................... 26

*Holt v. Hobbs*,
　　574 U.S. 352 (2015) ................................................................................... 40

*Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer*,
　　943 F.2d 644 (6th Cir. 1991) ..................................................................... 42

*In re Grand Jury Investigation*,
　　916 F.3d 1047 (D.C. Cir. 2019) ........................................................... 30, 33

iv

*Indep. Fed'n of Flight Attendants v. TWA, Inc.*,
    655 F.2d 155 (8th Cir. 1981) ................................................................. 23

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) ................................................................. 27

*Iowa Right to Life Comm., Inc. v. Tooker*,
    717 F.3d 576 (8th Cir. 2013) ................................................................. 18

*Keyser v. Hitz*,
    133 U.S. 138 (1890) ............................................................................... 30

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ........................................................................... 37

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................... 13

*Lee v. Oregon*,
    107 F.3d 1382 (9th Cir. 1997) ............................................................... 24

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ..................................................................... 28, 33

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................................... 19

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................. 44

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................... 14

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ................................................................. 21

*Mobil Oil Expl. & Producing Se., Inc. v. United Distribution Cos.*,
    498 U.S. 211 (1991) ............................................................................... 38

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................... 13

*Nat'l Park Hosp. Ass'n v Dep't of the Interior*,
    538 U.S. 803 (2003) ............................................................................... 19

*Nat'l Right to Life Pol. Action Comm. v. Connor*,
    323 F.3d 684 (8th Cir. 2003) ................................................................. 19

*Nebraska v. U.S. EPA*,
    812 F.3d 662 (8th Cir. 2016) ................................................................. 37

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................... 44

*NLRB v. Sw. Gen., Inc.*,
    137 S. Ct. 929 (2017) .................................................................................. 28, 32

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................................. 25

*Novus Franchising, Inc. v. Dawson*,
    725 F.3d 885 (8th Cir. 2013) ............................................................................ 22

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................................................... 19

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*,
    413 U.S. 376 (1973) ........................................................................................... 42

*Pub. Water Supply Dist. No. 10 v. City of Peculiar*,
    345 F.3d 570 (8th Cir. 2003) ............................................................... 14, 19, 20

*Ragin v. N.Y. Times Co.*,
    923 F.2d 995 (2d Cir. 1991) ............................................................................. 42

*Roudachevski v. All-Am. Care Ctrs., Inc.*,
    648 F.3d 701 (8th Cir. 2011) ...................................................................... 22, 23

*Russell v. Burris*,
    146 F.3d 563 (8th Cir. 1998) ............................................................................ 21

*Ryan v. United States*,
    136 U.S. 68 (1890) ...................................................................................... 30, 34

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
    696 F.3d 771 (8th Cir. 2012) ............................................................................ 22

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ........................................................................................... 13

*Sisseton-Wahpeton Oyate v. U.S. Corps of Eng'rs*,
    888 F.3d 906 (8th Cir. 2018) ...................................................................... 25, 26

*Sossamon v. Texas*,
    563 U.S. 277 (2011) ..................................................................................... 39, 40

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
    298 F. Supp. 3d 136 (D.D.C. 2018) ................................................................. 29

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................................. 13

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ........................................................................................... 18

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ................................................................................. 5, 40

Case 6:21-cv-03089-RK   Document 19   Filed 05/06/21   Page 7 of 58

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972) ................................................................................ 5

*Trump v. New York*,
    141 S. Ct. 530 (2020) ................................................................. 14, 15, 18

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ..................................................................... 24, 25

*U.S. ex rel. Jackson v. Racey*,
    112 F.3d 512 (4th Cir. 1997) (unpublished table decision) ................... 43

*United States v. Eaton*,
    169 U.S. 331 (1896) ................................................................... 32, 33, 34

*United States v. Haning*,
    No. 4:18-CR-139-RWS-NAB, 2019 WL 9834329 (E.D. Mo. Aug. 20, 2019) ..... 32

*United States v. Hunter*,
    459 F.2d 205 (4th Cir. 1972) ........................................................... 42, 43

*United States v. Peters*,
    6:17-CR-55-REW-HAI-2, 2018 WL 6313534 (E.D. Ky. Dec. 3, 2018) .............. 32

*United States v. Santos-Caporal*,
    No. 1:18-CR-171-AGF-ACL, 2019 WL 468795 (E.D. Mo. Jan. 9, 2019) .......... 32

*United States v. Smith*,
    962 F.3d 755 (4th Cir. 2020) ........................................................... 32, 33

*United States v. Smith*,
    No. 1:18-CR-00015-MR-WCM, 2018 WL 6834712 (W.D.N.C. Dec. 28, 2018). 32

*United States v. Valencia*,
    No. 5:17-CR-882-DAE(1)(2), 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018) .... 32

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................................. 42

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ............................................................................. 23

*Wachovia Bank v. Schmidt*,
    546 U.S. 303 (2006) ............................................................................. 24

*Walsh v. Friendship Vill. of S. Cnty.*,
    No. 19-1395, 2020 WL 5361010 (8th Cir. July 2, 2020) ...................11, 16, 23, 36

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................... 13, 17

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ....................................................................... 42, 46

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 12, 22, 44

*Withrow v. Larkin*,
  421 U.S. 35 (1975) ........................................................................................ 46

*Zanders v. Swanson*,
  573 F.3d 591 (8th Cir. 2009) ........................................................................ 18

**CONSTITUTIONAL PROVISIONS**

Appointments Clause, U.S. Const. art. II, § 2, cl. 2 .................................... passim

U.S. Const. amend. I ..................................................................................... passim

U.S. Const. art. III ........................................................................................ 2, 45

**FEDERAL STATUTES**

28 U.S.C. § 508(a) ............................................................................................ 29

42 U.S.C. § 3532(a) .............................................................................. 29, 33, 34

42 U.S.C. § 3533(a) .................................................................................... 29, 33

42 U.S.C. § 3535(d) ......................................................................................... 29

Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ............................... passim

Fair Housing Act, 42 U.S.C. §§ 3601–3619 ........................................................ passim

    42 U.S.C. § 3601 ......................................................................................... 5

    42 U.S.C. § 3604 ................................................................................... passim

    42 U.S.C. § 3608 ......................................................................................... 7

    42 U.S.C. § 3610 ...................................................................................... 5, 6

    42 U.S.C. § 3611(c) .................................................................................... 20

    42 U.S.C. § 3612 ......................................................................................... 6

    42 U.S.C. § 3613 ...................................................................................... 6, 22

    42 U.S.C. § 3614 ......................................................................................... 6

    42 U.S.C. § 3614a ........................................................................................ 7

    42 U.S.C. § 3615 ........................................................................................ 40

    42 U.S.C. § 3616a ......................................................................................... 5

    42 U.S.C. § 3631 ........................................................................................ 20

Federal Vacancies Reform Act (FVRA), 5 U.S.C. §§ 3345–3349d................................. 28

    5 U.S.C. § 3345(a)(3)................................................................. 29, 30, 32

Regulatory Flexibility Act, 5 U.S.C. §§ 601–612........................................ 12

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4........ 12, 24, 35, 41

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ............ 6, 7, 11

    20 U.S.C. § 1681................................................................................. 7

    20 U.S.C. § 1686................................................................................. 7

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ...................... passim

**EXECUTIVE ORDERS**

Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021)............................................ 10

**FEDERAL REGULATIONS**

24 C.F.R. § 3.205 ....................................................................... 7, 41

24 C.F.R. § 3.405(b)(1) ............................................................... 7, 41

24 C.F.R. § 11.1(b).......................................................................... 27

24 C.F.R. § 11.2(d).......................................................................... 27

24 C.F.R. § 11.8 .............................................................................. 27

**FEDERAL RULES**

Fed. R. Civ. P. 12(h)(3) .................................................................... 23

Fed. R. Civ. P. 65(d)(1) .................................................................... 47

**OTHER AUTHORITIES**

76 Fed. Reg. 73,984 (Nov. 29, 2011)....................................................... 7, 29, 30

77 Fed. Reg. 5662 (Feb. 3, 2012) ................................................................ 8

81 Fed. Reg. 63,054 (Sept. 14, 2016) .......................................................... 8

81 Fed. Reg. 64,763 (Sept. 21, 2016) .......................................................... 8

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (3d ed. 2013)............................................................................... 12

Letter from Candice Jackson, Acting Assistant Sec'y for Civ. Rts., U.S. Dep't of Educ., to Jerry C. Davis, President, Coll. of the Ozarks (Jan. 2, 2018) ................................ 7

Press Release, U.S. Dep't of Hous. & Urban Dev., HUD Issues Guidance on LGBT Housing Discrimination Complaints (July 1, 2010) ............................................... 8

Press Release, U.S. Dep't of Hous. & Urban Dev., Obama Administration to Ensure Inclusion of LGBT Community in HUD Programs (Oct. 21, 2009) ..................... 8

Proclamation No. 10,177, National Fair Housing Month, 2021, 86 Fed. Reg. 19,775 (Apr. 11, 2021) ........................................................................................................... 27

U.S. Census Bureau, https://data.census.gov/cedsci/profile?q=United%20States&g=0100000US ....... 43

U.S. Dep't of Hous. & Urban Dev., Application to the Fair Housing Act of the Supreme Court's decision in *Bostock v. Clayton County, GA* (Feb. 9, 2021) ..................... 10

U.S. Dep't of Hous. & Urban Dev., Assessing Allegations of Discrimination Because of Sexual Orientation and/or Gender Identity under the Fair Housing Act and HUD's Equal Access Rule, at 1–2 (Dec. 23, 2016) ............................................................. 9

U.S. Dep't of Hous. & Urban Dev., Contact FHIP Organizations .................................... 17

U.S. Dep't of Hous. & Urban Dev., Fair Housing Assistance Program (FHAP) Agencies ................................................................................................................................. 17

U.S. Dep't of Hous. & Urban Dev., Fair Housing Initiatives Program (FHIP) ................. 5

U.S. Dep't of Hous. & Urban Dev., Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021) ................................... passim

U.S. Dep't of Hous. & Urban Dev., State of Fair Housing Annual Report to Congress, FY 2018–FY 2019 (2020) ............................................................................................ 43

Case 6:21-cv-03089-RK   Document 19   Filed 05/06/21   Page 11 of 58

## PRELIMINARY STATEMENT

For more than a decade, the U.S. Department of Housing and Urban Development (HUD) has recognized that the prohibition of sex discrimination under the Fair Housing Act, 42 U.S.C. §§ 3601–3619, reaches at least some claims of discrimination involving sexual orientation and gender identity. As early as 2010, HUD issued guidance reflecting that recognition and instructing its Office of Fair Housing and Equal Opportunity (FHEO) to accept for intake and investigate any claims of discrimination based on sexual orientation or gender identity.

Last Term, the Supreme Court issued a decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that bolstered and expanded upon HUD's prior understanding that the Fair Housing Act reaches these forms of discrimination. *Bostock* held, based on a "straightforward application," *id.* at 1743, of substantially identical language in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), that Title VII prohibits employment discrimination on the basis of sexual orientation and gender identity. Accordingly, in February 2021, HUD recognized that the reasoning of *Bostock*—"it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," 140 S. Ct. at 1741—applies equally to sex discrimination under the Fair Housing Act. HUD therefore issued a memorandum (the "Memorandum") to FHEO, state and local enforcement agencies, and fair housing grantees, instructing them to "accept for filing and investigate all complaints of sex discrimination, including discrimination because of gender identity or sexual orientation" and to "administer and fully enforce the Fair Housing Act to prohibit discrimination because of sexual orientation and gender identity" in accordance with the *Bostock* decision.[1] The Memorandum thus ensures that the intake policies of HUD and its enforcement partners are consistent with *Bostock*.

Plaintiff College of the Ozarks ("College") alleges that the Memorandum adopts a new interpretation of sex discrimination under the Fair Housing Act that prohibits the College's

---

[1] U.S. Dep't of Hous. & Urban Dev., Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021), https://www.hud.gov/sites/dfiles/PA /documents/HUD_Memo_EO13988.pdf.

"religiously infused" housing policies. Pl.'s Suggestions in Supp. of Mot. for a TRO and a Prelim. Inj. at 26, ECF No. 2. The College seeks to preliminarily and permanently enjoin the Memorandum and the application of *Bostock*'s interpretation of "sex" that it contains. But the College's challenge is misplaced, as the Memorandum has no legal consequences for housing providers of its own accord and cannot be relied upon in any action to enforce the Fair Housing Act. Rather, the Memorandum simply reaffirms HUD's longstanding intake policies—to accept and investigate Fair Housing Act complaints that allege discrimination on the basis of sexual orientation or gender identity—and connects those policies to the Supreme Court's reasoning in *Bostock.* For this reason and many others, the College's motion should be denied.

*First*, this dispute is not justiciable because there is no Article III controversy. While the College would like to make this case "about whether the federal government can punish private religious colleges with crippling fines and even jail time if they do not let male students occupy female student dorm rooms or use their communal showers," Pl.'s Suggestions at 1, the College fails to plausibly demonstrate such a dispute. The Memorandum, as discussed, restates HUD's long-established intake instructions to accept and investigate Fair Housing Act complaints that describe sex discrimination involving sexual orientation or gender identity. The Memorandum does not carry the force of law and does not purport to determine *any* entity's liability under the Fair Housing Act in specific settings, much less in settings where other considerations, such as religious liberty and constitutional protections, may be at play. The College does not allege that HUD has threatened it or any other religious college with enforcement action (civil or criminal) under the Fair Housing Act for alleged sex discrimination in housing policies, religiously based or otherwise. Indeed, HUD has never issued a charge of discrimination regarding practices covered by Title IX against an entity that (like the College) has been granted a religious exemption from the applicable requirements of Title IX, and the College offers no reason to think HUD will deviate from its prior enforcement practices here.

Nor can the College satisfy the Article III requirements of causation and redressability. Any potential future liability of the College for violating the Fair Housing Act would flow directly from the statute itself, as well as applicable case law, including *Bostock*, not the

Memorandum. And enjoining HUD from "applying" the Memorandum by accepting and investigating complaints would not foreclose the possibility that the College could be held liable for any Fair Housing Act violations. Without the Memorandum, individuals would remain free to bring such claims through private actions and courts would remain free to adjudicate them under the statute and *Bostock*, without any HUD involvement at all. Thus, eliminating the Memorandum gets the College nothing, and the College's claims fail for lack of redressability. While the College might desire an advisory opinion preemptively announcing that it cannot be liable for housing discrimination, such an opinion would not protect the College from liability under the Fair Housing Act, and is not within the jurisdiction of this Court to provide.

*Second*, for similar reasons, the College cannot show any imminent irreparable harm, as is necessary to sustain its claim for emergency relief. As discussed, the Memorandum primarily restates HUD's intake procedures; it does not determine any entity's liability. Moreover, eleven years have passed since HUD first stated that it would accept and investigate all complaints meeting jurisdictional requirements brought under the Fair Housing Act alleging sex discrimination against LGBT persons. During that period, neither the College nor any other religious college has been the subject of any Fair Housing Act charge of discrimination on those bases. There is no reason to expect that any such claim would be filed against the College while this litigation is pending, but even if such a claim were filed, no irreparable harm would follow from the Memorandum. HUD would simply determine whether to accept the complaint and, if so, investigate it, and the College would have ample opportunity to defend itself and seek judicial review on all the legal bases it presents here. No imminent enforcement threat justifies the highly unusual request for an advisory opinion regarding the proper disposition of a hypothetical complaint.

*Third*, the College is not likely to succeed on the merits of its legal theories. The Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706, does not authorize judicial review because the Memorandum is a general statement of policy, not final agency action, and has no binding legal effect. For the same reason, notice and comment was not required. The Memorandum does not violate the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; it was

3

issued by a validly designated acting official exercising authority lawfully delegated by the Secretary. The Memorandum also is not contrary to law or arbitrary and capricious. Rather, it is fully consistent with the Fair Housing Act's plain language, and the College's arguments to the contrary were expressly considered and rejected in *Bostock*. The College's "clear notice" theory likewise fails. Concerns about State sovereignty do not counsel a narrow reading of the Fair Housing Act because the College, a private institution, is not challenging any application of the Act that would threaten State sovereignty and arguably implicate any clear-statement rule. Moreover, for the same reasons the Supreme Court explained in *Bostock*, the scope of sex discrimination under the Fair Housing Act is unmistakably clear. The Memorandum also does not violate the First Amendment because it does not restrict speech and carries no force of law, much less does it purport to restrict the College from expressing its religious and political views or conveying any lawful housing policy. That the College can imagine hypothetical applications of the Fair Housing Act—not the Memorandum—that would require consideration of First Amendment issues is not a basis for calling into question the Memorandum, which does not address such hypotheticals one way or the other.

*Finally*, enjoining HUD from implementing the Memorandum would not be in the public interest or equitable. It would violate basic principles of judicial restraint and prejudice the potential rights of future complainants, whose particular experiences are unknown and who possess a statutory right to make their complaints with HUD and permit HUD (or its enforcement partners) to evaluate those claims in the first instance in a concrete factual setting, subject to administrative review, followed by judicial review. It would thus undermine the careful framework established by Congress under the Fair Housing Act to ensure that claims of discrimination are properly considered and fully enforced to the extent they may have merit, while also fully protecting the rights of housing providers to defend against those claims that are actually brought.

For all of these reasons, and those set forth below, the College's Motion should be denied.

# BACKGROUND

## I. Statutory Background

The Fair Housing Act, 42 U.S.C. §§ 3601–3619, was enacted "to provide, within constitutional limitations, for fair housing throughout the United States." *Id.* § 3601; *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2521 (2015) (observing that the Fair Housing Act was intended to "eradicate" discriminatory practices related to housing); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (recognizing the "broad and inclusive" language of the Act). To that end, the Fair Housing Act makes it unlawful, among other things, to:

> refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). The Fair Housing Act also makes it unlawful to "discriminate against any person . . . in the provision of services or facilities in connection" with the sale or rental of a dwelling "because of" a prohibited basis. *Id.* § 3604(b). And the Fair Housing Act makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on" those same prohibited bases. *Id.* § 3604(c).

To assist with enforcement efforts, Congress created the Fair Housing Initiatives Program (FHIP), which extends grants to qualified fair housing organizations to assist those who believe they have been victims of housing discrimination. *See generally id.* § 3616a. FHIP organizations also conduct investigations and testing and engage in educational and outreach activities.[2]

Enforcement of the Fair Housing Act may proceed in several ways. First, an individual may file an administrative complaint with HUD, or HUD itself may initiate such a complaint. *See* 42 U.S.C. § 3610(a)(1). If the complaint is within the jurisdiction of a state or local agency certified by HUD to process such complaints (commonly referred to as an "FHAP"

---

[2] *See* U.S. Dep't of Hous. & Urban Dev., Fair Housing Initiatives Program (FHIP), https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHIP.

organization),[3] HUD generally refers the complaint to the FHAP without further action. *See* 42 U.S.C. § 3610(f)(2). Otherwise, assuming the complaint satisfies jurisdictional requirements, HUD "shall" investigate the allegation after providing notice to the housing provider and, to the extent feasible, attempt to conciliate the claim of discrimination. *See id.* §§ 3610(a)(1)(B)(ii), (b)(1)–(5). Absent resolution through conciliation, if HUD concludes that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, it "shall" issue a charge of discrimination for further proceedings before an administrative law judge or in a civil action. *Id.* §§ 3610(g)(2)(A), 3612(a), (b). Second, an individual may commence a civil action directly in district court without awaiting assistance from, or pursuing relief through, HUD or a local public agency. *See generally id.* § 3613. Third, the Attorney General may commence civil lawsuits against certain types of "pattern or practice" claims, with or without a referral from HUD. *See id.* § 3614(a), (b).

These multiple avenues of enforcement mean that an individual may assert and prevail on a claim of housing discrimination without any action by HUD. Specifically, individuals may commence a civil action to seek judicial review of their claims "whether or not a complaint has been filed [with HUD] and without regard to the status of any such complaint." *Id.* § 3613(a)(2). The multi-faceted enforcement scheme also ensures that there are several opportunities for judicial review before any housing provider may be finally adjudged to have engaged in a discriminatory housing practice. For example, complaints initially processed by HUD that result in charges of discrimination may, upon election of any party (including the respondent), proceed in a civil action rather than through a hearing before an administrative law judge. *Id.* § 3612(a), (o). Decisions of an administrative law judge are likewise reviewable, first by the Secretary, followed by a Court of Appeals. *Id.* § 3612(i)(1).

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial

---

[3] *See* U.S. Dep't of Hous. & Urban Dev., Fair Housing Assistance Program (FHAP), https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHAP.

assistance, including in college and university housing. Title IX specifically provides that it does not "prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. Title IX also contains an exemption for educational institutions "controlled by a religious organization" to the extent the application of Title IX's nondiscrimination mandate "would not be consistent with the religious tenets of such organization." *Id.* § 1681(a)(3). The College has been granted such an exemption, including for its housing policies.[4] HUD has not previously filed a charge of discrimination under the Fair Housing Act against a university or college for a housing practice or policy that was specifically exempted by the Department of Education or Title IX. HUD has promulgated regulations recognizing these exemptions in its own programs. *See* 24 C.F.R. § 3.405(b)(1) (educational recipients of federal funding "may provide separate housing on the basis of sex"); *id.* § 3.205 (educational institutions "controlled by a religious organization" are exempt from the sex discrimination prohibitions under Title IX to the extent that application of such regulations "would not be consistent with the religious tenets of such organization").

## II.    Regulatory Background

Congress granted the Secretary of Housing and Urban Development the authority to administer and issue regulations interpreting the Fair Housing Act. *See* 42 U.S.C. §§ 3608, 3614a. The Secretary has delegated this authority to the Assistant Secretary for FHEO, who, with some exceptions not relevant here, is authorized to exercise all relevant powers and authority of the Secretary with respect to, among other civil rights statutes, the Fair Housing Act. *See* 76 Fed. Reg. 73,984 (Nov. 29, 2011).

---

[4] *See* Letter from Candice Jackson, Acting Assistant Sec'y for Civ. Rts., U.S. Dep't of Educ., to Jerry C. Davis, President, Coll. of the Ozarks (Jan. 2, 2018), https://www2.ed.gov /about/offices/list/ocr/docs/t9-rel-exempt/college-of-the-ozarks-response-01022018.pdf (acknowledging an exemption).

**A.    Since 2010, HUD has accepted and investigated Fair Housing Act complaints alleging sex discrimination involving sexual orientation and gender identity.**

For more than a decade, HUD has accepted and investigated Fair Housing Act complaints alleging sex discrimination involving sexual orientation and gender identity. In 2009, the agency "announced a series of proposals to ensure that HUD's core housing programs are open to all, regardless of sexual orientation or gender identity."[5] In 2010, HUD issued guidance "address[ing] housing discrimination based on sexual orientation and gender identity."[6] In that guidance, HUD stated that it would treat such discrimination "as gender discrimination under the Fair Housing Act" and, as appropriate, would "retain its jurisdiction over complaints filed by LGBT individuals or families" and "combat all aspects of gender discrimination." *Id.*

HUD's understanding that the Fair Housing Act reaches certain claims of discrimination based on sexual orientation or gender identity has also informed its notice-and-comment rulemaking processes in the fair housing context. In response to comments on a 2016 rule concerning harassment under the Fair Housing Act, HUD reaffirmed that claims of discrimination based on sexual orientation or gender identity could and should be investigated as potential sex discrimination. *See* 81 Fed. Reg. 63,054, 63,058–59 (Sept. 14, 2016).[7]

HUD also issued guidance in 2016 to FHEO regional directors stating that "[d]iscrimination because of real or perceived gender identity is sex discrimination under the Fair Housing Act" and instructing FHEO regional offices to accept for filing "all otherwise jurisdictional complaints" alleging discrimination because of real or perceived gender identity or

---

[5] Press Release, U.S. Dep't of Hous. & Urban Dev., Obama Administration to Ensure Inclusion of LGBT Community in HUD Programs (Oct. 21, 2009), https://archives.hud.gov /news/2009/pr09-206.cfm.

[6] *See* Press Release, U.S. Dep't of Hous. & Urban Dev., HUD Issues Guidance on LGBT Housing Discrimination Complaints (July 1, 2010), https://archives.hud.gov/news/2010/pr10-139 .cfm.

[7] HUD affirmed this interpretation in other notice-and-comment rules as well. *See* 77 Fed. Reg. 5662, 5663, 5671 (Feb. 3, 2012) (a "claim of discrimination based on nonconformity with gender stereotypes may be investigated and enforced under the Fair Housing Act as sex discrimination"); 81 Fed. Reg. 64,763, 64,766 (Sept. 21, 2016) ("reaffirming [HUD's] view that discrimination based on gender identity is sex discrimination" and that "[d]iscrimination because of gender identity is covered within the Fair Housing Act's prohibition of sex discrimination").

sexual orientation. U.S. Dep't of Hous. & Urban Dev., Assessing Allegations of Discrimination Because of Sexual Orientation and/or Gender Identity under the Fair Housing Act and HUD's Equal Access Rule, at 1–2 (Dec. 23, 2016) [*hereinafter* December 2016 Guidance] (attached as Exhibit A); *see also* Mem. at 2 (discussing *id.*). HUD has also filed a charge of sex discrimination on behalf of a transgender woman. *See HUD v. George Toone & In Toone Servs. LLC*, FHEO Nos. 06-12-1130-8; 06-12-1363-8, Office of Hearing and Appeals (Aug. 15, 2013).[8]

### B. The *Bostock* decision held that discrimination on the basis of sexual orientation and gender identity is sex discrimination under Title VII.

On June 15, 2020, the Supreme Court issued its decision in *Bostock*, holding that when an employer fires an individual based on sexual orientation or gender identity, that employer discriminates "because of sex" in violation of Title VII of the Civil Rights Act. *Bostock*, 140 S. Ct. at 1737. In so concluding, the Court accepted, for the sake of argument, the employers' contention that the word "sex" refers to "biological distinctions between male and female," rather than "norms concerning gender identity and sexual orientation," but found the parties' debate between the two meanings irrelevant to the interpretive question. *Id.* at 1739. When an employer that fires an individual based on sexual orientation or gender identity "fires that person for traits or actions it would not have questioned in members of a different sex[, s]ex plays a necessary and undisguisable role in the decision." *Id.* at 1737. The Court thus minced no words: "it is impossible to discriminate" based on sexual orientation or gender identity "without discriminating against that individual based on sex." *Id.* at 1741.

In reaching its conclusion, the Court considered and rejected a series of arguments regarding the plain meaning of the statutory text and congressional intent. The Court explained, for example, that the statute, by prohibiting discrimination against any "individual," makes plain that the "focus should be on individuals, not groups." *Id.* at 1740. Thus, "an employer who fires a woman . . . because she is insufficiently feminine and also fires a man . . . for being insufficiently masculine may treat men and women as groups more or less equally," but "in both cases the

---

[8] https://www.hud.gov/sites/documents/13HUDVTOONE.PDF.

employer fires an individual in part because of sex." *Id.* at 1741. Nor was it significant "that, when an employer treats one employee worse because of that individual's sex, other factors may [also] contribute to the decision," such as "the sex to which the individual is attracted or with which the individual identifies." *Id.* at 1742. The Court explained that "discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal" of discriminating based on sexual orientation or gender identity. *Id.* The Court thus concluded that the "ordinary public meaning of the statute's language" compelled its interpretation, *id.* at 1741, and arguments that Congress intended otherwise were unavailing.

## C. The Memorandum restates HUD's longstanding intake procedures and frames them in light of *Bostock*.

Upon taking office, President Biden issued Executive Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity and Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021). The Executive Order directed every federal agency to examine the Supreme Court's landmark decision in *Bostock*, review existing policies under federal anti-discrimination statutes, and consider whether additional steps should be taken to combat discrimination on the basis of sex, including sexual orientation and gender identity. *Id.* § 2. Thereafter, HUD published a legal analysis concluding that the Supreme Court's reasoning in *Bostock* applies equally to the Fair Housing Act. *See generally* U.S. Dep't of Hous. & Urban Dev., Application to the Fair Housing Act of the Supreme Court's decision in *Bostock v. Clayton County, GA* (Feb. 9, 2021).[9] That determination rested on the fact that "[t]he relevant text of Title VII [prohibiting sex discrimination] is nearly identical to that of the" Fair Housing Act, and the Court's observance that sexual orientation and transgender status "are inextricably bound up with sex . . . [so] to discriminate on those grounds requires [a person] to intentionally treat [individuals] differently because of their sex." *Id.* at 1.

On February 11, 2021, FHEO issued the Memorandum at issue in this case. The Memorandum examines the *Bostock* decision and explains that, based on the reasoning of

_____

[9] https://www.hud.gov/sites/dfiles/ENF/documents/Bostock%20Legal%20Memorandum%2002-09-2021.pdf.

*Bostock*, the Fair Housing Act's sex discrimination provisions "prohibit discrimination because of sexual orientation and gender identity." Mem. at 1. The Memorandum therefore instructs FHEO, FHAP organizations, and FHIP grantees "to administer and fully enforce" the Fair Housing Act by "accept[ing]" and "investigat[ing]" all otherwise jurisdictional "complaints of sex discrimination, including discrimination because of gender identity or sexual orientation." *Id.* at 1–2. Thus, the Memorandum aligns HUD's longstanding intake guidance with *Bostock*. In this regard, the Memorandum is also consistent with a recent order by the Eighth Circuit directing a district court to reconsider a Fair Housing Act decision in light of *Bostock*. *See Walsh v. Friendship Vill. of S. Cnty.*, No. 19-1395, 2020 WL 5361010, at *1 (8th Cir. July 2, 2020) (vacating lower court holding that the Fair Housing Act did not prohibit discrimination based on sexual orientation and "remand[ing] for further proceedings in light of *Bostock*"). However, the Memorandum does not require FHEO offices or FHAP agencies to reach a specific enforcement decision in any particular case. HUD and its enforcement partners must still investigate and consider the facts of each case, which may include (for example) a housing provider's assertion that a practice otherwise barred by the Fair Housing Act is permitted by protections for religious liberties.

### III. This Litigation

Sixty-three days after HUD issued the Memorandum, the College filed this case and moved for a temporary restraining order and preliminary injunction. The College states that its housing facilities are separated by sex, that it assigns students housing based exclusively on their sex assigned at birth, and that doing otherwise would violate its religious beliefs. As noted above, the College possesses a religious exemption from the Department of Education under Title IX, such that conduct within the scope of the exemption would not subject it to liability under that law. *See supra* note 4. Nonetheless, the College alleges that it interprets the Memorandum as subjecting it to "crippling fines and even jail time" under the Fair Housing Act "if [it does] not let male students occupy female student dorm rooms and use their communal showers." Pl.'s Suggestions at 1. The College does not identify any Fair Housing Act claim of discrimination

asserted against its housing practices in the past decade (since HUD initially adopted the intake procedures set forth in the Memorandum) or indeed since the Fair Housing Act was enacted.

The College's complaint names as defendants the President, HUD, and the Secretary of HUD and the Acting Assistant Secretary for FHEO in their official capacities. It asserts violations of numerous statutory and constitutional provisions, including the APA, the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4, the Appointments Clause, the First Amendment guarantees of free speech, free assembly, free association, and free exercise of religion, principles of federalism, the Spending Clause, and the Tenth Amendment. Verified Compl. ¶¶ 274–454, ECF No. 1. The College seeks declaratory and injunctive relief against the Memorandum and also against enforcement of the Fair Housing Act and HUD implementing regulations in situations involving discrimination based on sexual orientation or gender identity. Verified Compl. 64–67.

## ARGUMENT

### I. Applicable Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20.

A request for a temporary restraining order with notice to the opposing party is equivalent to a request for a preliminary injunction. "[T]he procedure that is followed does not differ functionally from that on an application for a preliminary injunction . . . ." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2951 (3d ed. 2013); *City of Kansas City v. Hous. & Econ. Dev. Fin. Corp.*, No. 05-00368-CV-W-GAF, 2009 WL 4042886, at *1 n.2 (W.D. Mo. Nov. 23, 2009). Indeed, the College's brief does not meaningfully differentiate its request for a temporary restraining order from its request for a preliminary injunction.

II.    **Because the College cannot meet the jurisdictional requirements of standing and ripeness, preliminary relief should be denied, and this action should be dismissed.**

A.    **The jurisdictional requirements of standing and ripeness**

A plaintiff seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court's exercise of jurisdiction is within the bounds of the Constitution and is authorized by statute. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994). A court must resolve all issues of subject matter jurisdiction before it proceeds to the merits of the plaintiff's claims. *See, e.g.*, *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Moreover, a "difficult question as to jurisdiction" makes it more difficult for the plaintiff to show a likelihood of success on the merits and therefore weighs against preliminary relief. *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

The jurisdictional requirement of "standing" is rooted in the constitutional separation of powers. It prevents courts from taking action to address matters better suited to legislative or executive action. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). A plaintiff in federal court must show "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975). Standing entails three elements:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These requirements are "especially rigorous" when a plaintiff asks the court to determine "whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

A plaintiff asserting more than one claim must show that it satisfies the requirements for standing with respect to each claim independently. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S.

332, 351–53 (2006). When a plaintiff asserts similar claims against multiple defendants, the plaintiff must meet the requirements of standing separately for each defendant. *See Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017).

A plaintiff in federal court also must show that its claim is ripe. A claim is not ripe if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Ripeness incorporates both a constitutional requirement and a prudential requirement. *Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 572 (8th Cir. 2003). The constitutional ripeness requirement overlaps with the "injury-in-fact" requirement of standing. *See Trump v. New York*, 141 S. Ct. at 535; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (recognizing that in some cases, "standing and ripeness boil down to the same question"). The prudential ripeness test calls for a court to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Pub. Water Supply Dist. No. 10*, 345 F.3d at 572–73.

### B. The College cannot establish standing in this case because it has not suffered any present injury from the Memorandum or any threatened Fair Housing Act enforcement action.

The College cannot establish standing in this case because it has not plausibly alleged that the Memorandum or any action by HUD harms or imminently threatens to harm it, nor has it demonstrated that the speculative harm it fears is caused by the Memorandum and redressable through this lawsuit.

The Memorandum does not itself impose any restriction, requirement, or penalty on private housing providers, such as the College, and does not have the legal authority to define or modify their rights or obligations under the Fair Housing Act. Rather, the Memorandum merely restates longstanding intake procedures for Fair Housing Act complaints by aggrieved persons and connects them to *Bostock.* The Memorandum does not specify how HUD will determine Fair Housing Act liability based on *Bostock* in any particular factual settings or in light of potential exemptions.

A general policy statement of this kind cannot support standing absent some more specific action resulting in "actual or imminent" injury to the plaintiff. For example, in *Trump v. New York*, 141 S. Ct. 530 (2020), the Supreme Court found that the plaintiffs failed the requirements of standing and ripeness in their attempt to bring a constitutional challenge to a Presidential Memorandum relating to the census that declared a policy of excluding "from the apportionment base aliens who are not in a lawful immigration status." *Id.* at 534. The Court found that the plaintiffs' theory of standing was "riddled with contingencies and speculation that impede judicial review." *Id.* at 535. Although the President had stated his policy in plain terms, it was not yet clear how the policy would be put into practice in the face of other "legal and practical constraints," *id.* at 536. Nor was it clear whether the Government's more specific implementation of the policy would inflict any harm on the plaintiffs.

*Cornish v. Blakey*, 336 F.3d 749 (8th Cir. 2003), likewise demonstrates that a plaintiff generally may not challenge a policy statement outside the context of a specific application of the policy. The plaintiff in *Cornish* sought to challenge an agency memorandum that established standards for determining when a drug-testing specimen should be rejected and instructed testing laboratories on how to report test results. The court held that the plaintiff lacked standing to challenge the memorandum in the abstract, and he did not have standing to challenge the memorandum until the agency had relied upon it as a basis for revoking his mechanic certificate. *See id.* at 752–53 ("Cornish was not even arguably injured by the 1998 DOT memorandum until the FAA relied upon it as a basis for revoking his mechanic certificate. . . . Absent the revocation order, Cornish lacks the injury in fact necessary for Article III standing."); *see also Calderon v. Ashmus*, 523 U.S. 740, 746–49 (1998) (holding that Article III forbids a suit that seeks an advance ruling on an abstract issue of law but does not present an actual controversy to the court). Likewise, in this case, the College lacks standing to challenge the Memorandum in the absence of any agency action directed at the College.

The Memorandum is only a general statement of policy that describes HUD's intake procedures in the context of how it will implement the *Bostock* holding and does not inflict or threaten any harm on the College. The Memorandum does not carry the force of law, and HUD

has not relied, and will not rely, on it as a basis for determining Fair Housing Act liability, much less how the statute would apply in the particular setting the College focuses on in its complaint. Thus, no conflict has emerged between the general statement of policy regarding intake made in HUD's Memorandum and any concrete interest of the College, and there is no reason to simply assume that such a conflict will emerge.

Indeed, HUD has had a policy of accepting and investigating complaints alleging discrimination based on sexual orientation and gender identity as forms of sex discrimination under the Fair Housing Act for more than a decade. *See supra* pp. 8–9 (Background section II.A). Yet the College has not explained how those intake procedures have harmed it over the years. The College does not allege that it—or any other religious college that has an exemption from the Department of Education under Title IX—has faced any Fair Housing Act complaint or lawsuit during that time regarding practices covered by Title IX. And there is no reason to believe the College will now face any greater risk of liability under the Fair Housing Act merely because HUD has reiterated its longstanding intake procedures through the Memorandum.

For similar reasons, the College cannot show that any risk of liability under the Fair Housing Act is either "fairly traceable" to the Memorandum or likely to be redressed by a favorable decision in this lawsuit. Indeed, a court order invalidating the Memorandum would not decrease the risk that the College would face liability under the Fair Housing Act. *See Boating Indus. Ass'ns v. Marshall*, 601 F.2d 1376, 1382 (9th Cir. 1979) (explaining that "[t]he source of the plaintiff's injury" was the statute authorizing workers' compensation claims, not an agency notice that interpreted the statute, given that "[t]he revocation of [the notice] would not eliminate this risk" of enforcement). This is because the Memorandum does not have the force of law and merely restates HUD's longstanding intake procedures when examining complaints of discrimination involving sexual orientation or gender identity. Withdrawal of the Memorandum would not change the enforcement authority of HUD or the Department of Justice under the Fair Housing Act. Moreover, even in the absence of the Memorandum, complainants could still file complaints or bring suit under the Fair Housing Act based on *Bostock. See Walsh*, 2020 WL 5361010, at *1 (vacating and remanding in light of *Bostock* a district court ruling that sex

16

discrimination does not include discrimination based on sexual orientation under the Fair Housing Act).

The College also asserts that it is suffering a present injury because it believes that it will need to adjust its conduct to avoid running afoul of the Fair Housing Act. *See, e.g.*, Verified Compl. ¶¶ 247–273. But actions that a plaintiff takes to avoid future harm can support standing only if the plaintiff shows that it is seeking protection from harm that is "certainly impending." *See Clapper*, 568 U.S. at 417. Here, the plaintiff has not shown any immediate threat of an enforcement action from HUD. Any future injury that the College alleges is purely speculative.

The College alternatively seeks relief against HUD's enforcement of the Fair Housing Act and its regulations with respect to discrimination based on sexual orientation or gender identity, independent of the Memorandum. But as discussed above, the College has not pointed to any present or threatened HUD enforcement action under the Fair Housing Act or established that HUD is likely to find that the College's particular practices violate the Fair Housing Act. Without some present or imminent injury, the College lacks standing to challenge HUD's enforcement of the Fair Housing Act—and to the extent the College is concerned about private actions brought in federal court, that has nothing to do with HUD or the Memorandum.

The College also plainly lacks standing to bring any claims relating to the FHAP or FHIP. The College is not a participant in either program, nor does the College allege that it is or could be affected by these programs in any way. There are no government agencies participating in the FHAP in the State of Missouri, and there is no FHIP grantee operating in the College's area.[10] Nor does the College suggest that this case fits into any exception to the rule that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499.

---

[10] *See* U.S. Dep't of Hous. & Urban Dev., Fair Housing Assistance Program (FHAP) Agencies, https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHAP /agencies (last visited May 6, 2021); U.S. Dep't of Hous. & Urban Dev., Contact FHIP Organizations, https://www.hud.gov/program_offices/fair_housing_equal_opp/contact_fhip (last visited May 6, 2021).

The College also wrongly relies on *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), which explained that a plaintiff can sometimes meet the injury requirement of standing by establishing "circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159. But to do so, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The College does not meet this standard because it has not shown a credible threat of prosecution. The College does not claim that HUD has threatened any action against it specifically, nor has it identified other institutions that have been threatened with enforcement action for similar conduct. *See Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 584–87 (8th Cir. 2013) (finding that the plaintiff lacked standing to bring a First Amendment challenge to the statutory definitions of "political action committee" and "permanent organization" in part because "Iowa has not threatened to classify IRTL as a PAC or permanent organization," and thus the plaintiff could not show a credible threat of prosecution); *Zanders v. Swanson*, 573 F.3d 591, 593–95 (8th Cir. 2009) (holding that plaintiffs seeking to bring First Amendment claims could not show a credible threat of prosecution because, even allowing that the challenged statute conceivably could be used to bring improper prosecutions, the plaintiffs failed to allege facts suggesting "that peace officers *in fact* initiate retaliatory prosecution" under the statute).

### C.     For similar reasons, the case is unripe.

For many of the same reasons, the College does not satisfy the requirements of ripeness. As discussed above, the constitutional ripeness requirement overlaps with the "injury-in-fact" requirement of standing. The College has not identified any present injury from the Memorandum and therefore cannot establish either standing or ripeness. *See Trump v. New York*, 141 S. Ct. at 534–37.

The College also cannot satisfy the prudential ripeness requirement. The College is not challenging any concrete application of the Memorandum or the Fair Housing Act, so the issues are not fit for judicial decision. And the Memorandum does not itself impose any immediate

legal consequences on the College, so withholding judicial review would not impose any hardship on the College. *See Nat'l Park Hosp. Ass'n v Dep't of the Interior*, 538 U.S. 803, 808–12 (2003) (holding that the plaintiffs' challenge to an agency's general statement of policy was not ripe, in part because the statement did not impose any legal consequences on the plaintiffs); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–37 (1998) (the plaintiff's challenge to a broad plan for management of a national forest was not ripe because even though the plan was a required first step toward approval of future logging, it did not itself authorize logging or otherwise inflict "practical harm" on the plaintiff); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").

The Eighth Circuit has dismissed cases as unripe in similar circumstances, including cases presenting First Amendment claims. In *National Right to Life Political Action Committee v. Connor*, 323 F.3d 684 (8th Cir. 2003), for example, two organizations challenged statutory registration and disclosure requirements under the First Amendment. The Eighth Circuit held that the challenges were unripe. There was no clear indication that the organizations would face adverse consequences if they failed to meet some of the challenged requirements, and it was unclear whether the State would enforce other provisions against the plaintiffs at all. *See id.* at 693–94. "Without additional factual development," the court concluded, "we cannot be sure there is even a dispute here to resolve." *Id.*

The Eighth Circuit's decision in *Public Water Supply District No. 10 v. City of Peculiar*, 345 F.3d 570 (8th Cir. 2003), also weighs against a finding of ripeness in this case. The plaintiff in *Public Water Supply District No. 10* sued to stop the city government from seeking its dissolution. The court found that the dispute was not ripe, noting that the city had not petitioned for dissolution, and it was not clear that it ever would. Moreover, if a petition were ever filed, the water supply district would have a full opportunity to raise its claims in that proceeding.

Accordingly, the court held that the plaintiff would not suffer any hardship if the court denied immediate review. *See id.* at 573.

So too here, further factual development plainly would be needed before any judicial intervention would be appropriate. Without a concrete set of facts before it, the Court is not in a position to evaluate the specific conduct the College is asking the Court to allow. The Court has not heard from the hypothetical student whom the College posits might one day object to its residence policy, and thus the Court is not in a position to give fair consideration to that person's interests. And since no dispute has yet arisen, the College and the hypothetical complainant have not explored whether they can reach some mutually agreeable accommodation without a court's intervention. There is no reason to dismiss the possibility of such an accommodation out of hand—the College already provides exceptions to its housing policies for veterans and for students living with their parents with significant financial needs, *see* Verified Compl. Ex. D at 7. It also presumably considers ad hoc requests for accommodations based on disabilities or medical needs.

Withholding court consideration also will impose no hardship on the College. There is no concrete reason to expect that any private party—let alone HUD's Secretary—will file a complaint with HUD under the Fair Housing Act in the near future. If a claim were ever filed, HUD would, as the Fair Housing Act requires, determine whether the complaint met jurisdictional requirements, and if so, investigate the case, and the College would be able to present its arguments and protect its interests in those proceedings before any charge of discrimination were issued. *Cf. Pub. Water Supply Dist. No. 10*, 345 F.3d at 573.

The College erroneously suggests that it faces hardship because the Fair Housing Act provides for criminal liability in certain circumstances, *see* Verified Compl. ¶¶ 166, 177; Pl.'s Suggestions at 1–3. But the criminal provisions the College points to relate to particularly egregious conduct, such as willfully failing to comply with lawful process, willfully falsifying or destroying evidence, or willfully injuring or intimidating a person occupying a dwelling. *See* 42 U.S.C. §§ 3611(c), 3631. The College, of course, has not alleged that it plans to engage in that kind of conduct. And if it did have such plans, the Court should be loath to immunize the College

without knowing the particular facts. *Cf. Russell v. Burris*, 146 F.3d 563, 566–67 (8th Cir. 1998) (holding that the plaintiffs could not establish standing based on a threat of criminal prosecution because they did not allege an intent to engage in proscribed conduct).

### D. The Court lacks jurisdiction over any claims against the President because the College is not challenging Presidential action and the separation of powers bars relief against the President.

Even if the Court were to conclude that the College's claims against the HUD defendants meet the requirements of standing and ripeness (which they do not), the Court lacks jurisdiction over the College's claims against the President, because the College is not challenging any Presidential action and the separation of powers bars relief against the President.

A plaintiff must separately establish standing for its claims against each defendant, *see Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017), and here the College has not alleged standing regarding the President. HUD, not the President, administers the Fair Housing Act and issued the challenged Memorandum. Any supposed injury associated with the Memorandum or HUD's enforcement of the Fair Housing Act is not "fairly traceable" to the President. Accordingly, the College cannot establish standing for its claims against the President.

Moreover, the separation of powers generally prevents a federal court from issuing an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties . . . ."); *accord Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *id.* at 826–29 (Scalia, J., concurring in part and concurring in the judgment). The same principles forbid declaratory relief against the President. *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). As Justice Scalia noted in *Franklin*, an action of the President may be challenged "in a suit seeking to enjoin the officers who attempt to enforce the President's directive," but not in a suit against the President himself. *Id.* at 828.

**E.    The reasons that undermine the College's claims of immediate injury also undermine its claims of irreparable harm.**

The College's failure to point to any immediate harm it has suffered from HUD's actions not only prevents it from meeting the requirements of standing and ripeness, but also forecloses any showing of the irreparable harm needed to justify a preliminary injunction.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). "Speculative harm" or a "possibility of irreparable harm" is not enough. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is also improper when it would not actually prevent the harm the plaintiff fears. In *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701 (8th Cir. 2011), the Eighth Circuit rejected several assertions of harm for this reason. *See id.* at 706 (holding that a preliminary injunction was not warranted in part because it would not prevent or undo the plaintiff's claimed harm in the form of "disruption to the physician-patient relationship," "possible liability suits, charges of patient abandonment, and reputational damages").

Based on these principles, the College fails to allege irreparable harm warranting a temporary restraining order or preliminary injunction. HUD has accepted and investigated complaints of discrimination based on sexual orientation or gender identity under the Fair Housing Act for at least eleven years, and in that time, it has neither taken nor threatened action against the College. There is no reason to believe the College is in any greater peril now because of the Memorandum. To the extent the College believes it faces greater peril now, that is because of *Bostock*, not any action that HUD has taken.

Furthermore, preliminary relief would not even temporarily eliminate any threat of a challenge to the College's practices. The Memorandum carries no force of law and does not increase the College's risk of liability under the Fair Housing Act. Moreover, the Fair Housing Act authorizes private persons to bring housing discrimination claims directly in State or federal court without involvement by HUD, 42 U.S.C. § 3613, so issuing relief against HUD would not

prevent an individual from bringing a claim of discrimination against the College and invoking the *Bostock* decision. *See Walsh*, 2020 WL 5361010, at *1 (vacating and remanding in light of *Bostock* a district court ruling in a private action that sex discrimination does not include discrimination based on sexual orientation under the Fair Housing Act); *Roudachevski*, 648 F.3d at 706 (holding that an injunction was not warranted because it would not eliminate the risk of "possible liability suits" or disruption of patient relationships).

The College erroneously asserts that it needs immediate court intervention so that it can develop policies and plans for the next school year. *See* Pl.'s Suggestions at 1–2. But for the reasons just identified, even permanent relief would not provide the College the certainty it seeks in light of the potential for private lawsuits. Moreover, latent legal uncertainty is not the kind of "certain" and "great" harm that can justify the extraordinary remedy of preliminary relief; if it were, courts would be inundated with requests for such relief. And a ruling on a motion for preliminary relief would not provide any permanent guidance or assurance that the College could count on to guide its future planning. A temporary restraining order or preliminary injunction is an interim measure to preserve the status quo during the litigation—hence the terms "temporary" and "preliminary." Rulings on requests for preliminary relief are tentative and subject to revision and do not finally determine the parties' rights and obligations. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. . . . [I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."); *Indep. Fed'n of Flight Attendants v. TWA, Inc.*, 655 F.2d 155, 159 (8th Cir. 1981) (noting that rulings on requests for preliminary relief are "tentative and provisional").

### F.   If the Court concludes that it lacks subject matter jurisdiction, it should dismiss this action even though the defendants have not filed a motion.

In light of the Court's order denying the defendants' motion for a consolidated briefing schedule, Order, ECF No. 14, the defendants have not filed a motion to dismiss with this brief. Nevertheless, if, after hearing from both sides, the Court concludes that it lacks subject matter jurisdiction, it should dismiss the action. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at

any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). While the College's complaint raises additional claims for which the College has not sought preliminary relief, those other claims are based on the same theories of injury and seek the same relief as the claims at issue here. Accordingly, none of those other claims alters the analysis of standing or ripeness.[11]

## III. Plaintiff is not likely to succeed on the merits.

### A. The Memorandum is not subject to judicial review under the APA and also did not require notice and comment because it does not carry any legal effect.

The Memorandum, as a general statement of policy, does not have any legal effect of its own with respect to the disposition on the merits of any Fair Housing Act complaint. Instead, it describes HUD's longstanding intake procedures and connects them to the Supreme Court's reasoning in *Bostock*. In particular, it reminds FHEO and FHAP officials to accept and investigate complaints alleging sex discrimination because of gender identity or sexual orientation, which was already required of them under the December 2016 Guidance and the plain text of the Fair Housing Act after *Bostock*. Because the Memorandum does not have any independent legal effect, it does not qualify as "final agency action," 5 U.S.C. § 704, and therefore is not reviewable under the APA. For the same reason, it also is not subject to the notice and comment requirements of the APA.

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). "[T]wo conditions . . . generally must be satisfied for agency action to be 'final' under the APA. 'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from

---

[11] The Religious Freedom Restoration Act, for example, authorizes judicial relief only when the plaintiff satisfies ordinary standards of standing and ripeness. 42 U.S.C. § 2000bb-1(c); *see Lee v. Oregon*, 107 F.3d 1382, 1391–92 (9th Cir. 1997) (dismissing RFRA claims as unripe because there was no present dispute implicating the challenged measure and, if one were to arise, the claimants could later raise RFRA as a defense in a civil enforcement proceeding).

which legal consequences will flow.'" *Hawkes Co.*, 136 S. Ct. at 1813 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). A challenge under the APA also must be directed at a discrete, identifiable agency action the agency has taken or failed to take. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004). The APA does not permit a "broad programmatic attack" on a general course of conduct. *Id.* at 64.

Agency policy statements that do not determine rights or obligations are not final agency action and therefore are not subject to judicial review under the APA. *See Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (recognizing that "statements of policy generally do not qualify" as reviewable final agency action "because they are not finally determinative of . . . issues or rights"). General statements of policy also are exempt from the provisions of the APA that require an agency to provide notice and an opportunity for comment before issuing a legislative rule, as well as the provisions requiring publication of a rule at least 30 days before its effective date. *See* 5 U.S.C. § 553(b)(3)(A) (specifying that notice and comment requirements are inapplicable to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"); *id.* § 553(d)(2) (similarly exempting "interpretative rules and statements of policy" from the 30-day publication requirement); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015).

The Memorandum does not determine "legal rights or obligations" or give rise to "legal consequences." The legal obligations discussed in the Memorandum stem only from the Fair Housing Act itself and *Bostock*'s authoritative construction of comparable statutory language. The Memorandum merely recognizes those obligations, without changing those obligations. *See Sisseton-Wahpeton Oyate v. U.S. Corps of Eng'rs*, 888 F.3d 906, 914–15 (8th Cir. 2018) (holding that a letter issued by the Army Corps of Engineers was not final agency action because it did not "affect the legal rights" of any person). Thus, if a complainant were to challenge the College's housing practices as discriminatory under the Fair Housing Act, neither HUD nor any administrative law judge could rely on the Memorandum as authority for a charge of discrimination or a finding that the Fair Housing Act had been violated; the relevant authorities are the statute itself and case law on point, most notably *Bostock*.

To the extent the College claims that the Memorandum is a legislative rule because HUD "communicated [it] to entities nationwide who are bound by the [Fair Housing Act]," Pl.'s Suggestions at 7, that argument fails too. The Memorandum simply instructs FHEO regional offices and FHAP agencies to accept and investigate complaints alleging certain types of sex discrimination, as they were already required to do, but now it connects those intake procedures to the *Bostock* decision. Indeed, HUD affirmed that same intake practice in the December 2016 Guidance, some four years before *Bostock*. *See* December 2016 Guidance at 1 ("complaints alleging discrimination because of real or perceived gender identity shall be accepted for filing on the basis of sex"); *id.* at 2 ("complaints involving allegations of discriminatory conduct because of sexual orientation shall be accepted for filing on the basis of sex"). Thus, while the College is correct that enforcement officials "cannot, for example, refrain from enforcing the [Fair Housing Act] as if it does not really prohibit sexual orientation and gender identity discrimination," Pl.'s Suggestions at 8, that constraint flows from the Fair Housing Act itself and *Bostock*, not the Memorandum. *See* 42 U.S.C. § 3610(a)(1)(B)(iv) (upon the filing of a complaint of housing discrimination, HUD "shall" investigate the complaint); *id.* § 3610(f)(2) (providing that HUD may take action on a complaint referred to a FHAP agency if the FHAP agency fails to do so). And to the extent the Memorandum instructs FHEO and its enforcement partners "to review, within 30 days, all records of allegations of discrimination . . . received since January 20, 2020," Mem. at 3, and ensure that they were handled in a manner consistent with the statute, that is a matter of agency enforcement discretion that is not subject to judicial review. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985) (agency's approach to enforcement "involves a complicated balancing of a number of factors which are peculiarly within its expertise" and generally not reviewable by courts).

Nor does the Memorandum mark a dramatic shift from prior guidance. The agency accepted and investigated complaints alleging discrimination based on sexual orientation and gender discrimination as forms of sex discrimination under the Fair Housing Act prior to the Memorandum. *See supra* pp. 8–9 (Background section II.A); *cf. Sisseton-Wahpeton Oyate*, 888

F.3d at 915 (noting that the agency letter did not change existing policy).[12] The Memorandum restates these procedures and connects them to the Supreme Court's pronouncements in *Bostock*. To the extent that the College believes that *Bostock* makes such accepted and investigated complaints more likely to result in a finding of discrimination on the merits, its quarrel is with *Bostock*, not the Memorandum.

The use of the term "directive" in the Memorandum and a HUD press release does not alter this analysis. An agency's own characterization of an action is sometimes relevant in examining whether the action imposes legal consequences on regulated parties. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 872 (8th Cir. 2013). But here, HUD characterized the Memorandum as a "Memorandum" for FHEO, FHAP agencies, and FHIP grantees, Mem. at 1. The only "directive" issued was for those entities "to fully enforce the Fair Housing Act's prohibitions against discrimination because of sex," Mem. at 3, as they are statutorily authorized to do. The Memorandum did not establish any new legal duty, and thus does not carry legal consequences and does not amount to final agency action. Further, the President's reference to a "rule change" in his April 11, 2021, Proclamation, Proclamation No. 10,177, National Fair Housing Month, 2021, 86 Fed. Reg. 19,775 (Apr. 11, 2021), does not suggest the Memorandum has substantive legal effect. The College's argument vastly overestimates the significance of two words in a largely ceremonial Proclamation.

The College finally argues that HUD regulations published at 24 C.F.R. § 11.1(b) and .8 require notice and comment for issuance of "guidance," Pl.'s Suggestions at 12, but the College is misreading these regulations. They provide only that it is HUD's "policy" to provide for notice and comment when issuing certain types of "significant guidance documents" that meet criteria enumerated at 24 C.F.R § 11.2(d). The Memorandum does not fit the § 11.2(d) criteria, and the regulation does not provide for HUD's "policy" to be enforceable in court.

---

[12] Even if they were not dismissed for lack of jurisdiction, *see supra* pp. 21–22 (Argument section II.D), any claims under the APA directed at the President would fail to state a claim. The Supreme Court has made clear that the President is not an "agency" under the APA and therefore cannot be sued under the APA. *Dalton v. Specter*, 511 U.S. 462, 468–70 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).

**B.** **Acting Assistant Secretary Worden had constitutional authority to issue the Memorandum.**

The College also is wrong to contend that the Memorandum's "issuance was contrary to constitutional power because it violated the Appointments Clause." Pl.'s Suggestions at 13. The Memorandum was issued by the Acting Assistant Secretary of FHEO, who was properly appointed and operating under a valid delegation of authority, and as set forth below, the Appointments Clause has no application here.

*1. The Appointments Clause and the Federal Vacancies Reform Act*

The Appointments Clause of the Constitution prescribes the method of appointment for all "Officers of the United States" whose appointments are not otherwise provided for in the Constitution. *See Buckley v. Valeo*, 424 U.S. 1, 125–26, 132 (1976) (per curiam). "Officers" are those persons who hold a "continuing and permanent" federal position and exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citation omitted). The President, with the advice and consent of the Senate, nominates principal officers; Congress may vest the power to select "inferior Officers," however, "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Inferior officers are those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). Though supervised, inferior officers are still capable of exercising "significant authority." *Lucia*, 138 S. Ct. at 2051.

Neither the Appointments Clause nor any other provision of the Constitution expressly addresses whether and in what circumstances an individual may serve temporarily in an acting capacity for an officer. Since the Founding, however, Congress has provided for the temporary designation of acting officers to exercise the duties of a vacant office requiring Senate confirmation. *See NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 934 (2017). In 1998, Congress enacted the Federal Vacancies Reform Act (FVRA), 5 U.S.C. §§ 3345–3349d, which applies generally to

most vacancies in Senate-confirmed offices.[13] The FVRA provides three options for designating an acting official to perform the duties of a vacant office that is subject to Senate confirmation. As relevant here, the President may designate an officer or employee within the same agency to "perform the functions and duties" of the vacant office, provided that she satisfies certain specified tenure and salary requirements. 5 U.S.C. § 3345(a)(3). Acting service is commonplace in the Government, ensuring that agencies can continue to exercise their essential functions even when Senate-confirmed offices are vacant. *See, e.g.*, *Stand Up for Cal.! v. U.S. Dep't of Interior*, 298 F. Supp. 3d 136, 137 (D.D.C. 2018) (discussing "acute" problem "during presidential transitions, when thousands of senior political appointees exit the government").

> 2. *The Memorandum was issued by a properly appointed official pursuant to a valid delegation of authority.*

The Secretary is the head of HUD, and Congress has expressly provided that HUD "shall be administered under the supervision and direction of the Secretary." 42 U.S.C. § 3532(a). Congress also created, among other officers, seven Assistant Secretaries, to be appointed by the President with the advice and consent of the Senate. *Id.* § 3533(a)(1). The Assistant Secretaries "shall perform such functions, powers, and duties as the Secretary shall prescribe from time to time." *Id.* Further, the Secretary "may delegate any of his functions, powers, and duties to such officers and employees of the Department as he may designate," and may authorize "successive redelegations" of those authorities. *Id.* § 3535(d). Pursuant to these provisions, the Secretary has delegated certain authorities to the Assistant Secretary for FHEO, including the duty to "[e]xercise the power and authority of the Secretary with respect to the Fair Housing Act, except for the powers delegated to the General Counsel and to the Office of Administrative Law Judges." 76 Fed. Reg. at 73,984.

The Secretary's authority under the Fair Housing Act was properly exercised here. On January 19, 2021, Ana Maria Farias, the Senate-confirmed Assistant Secretary for FHEO

---

[13] Congress also has enacted numerous agency-specific vacancy statutes that apply to vacancies in specific Senate-confirmed offices. *See, e.g.*, 28 U.S.C. § 508(a) (vacancy in office of Attorney General).

resigned from her office. The following day, President Biden designated HUD official Jeanine Worden to serve as Acting Assistant Secretary pursuant to his authority under the FVRA, 5 U.S.C. § 3345(a)(3). *See* Ex. B.[14] Ms. Worden issued the Memorandum on February 11, 2021, when she was lawfully serving as the Acting Assistant Secretary for FHEO pursuant to a valid FVRA designation, 5 U.S.C. § 3345(a)(3). As an acting officer, Ms. Worden was "vested with the same authority that could be exercised by" the Assistant Secretary. *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019); *see also Ryan v. United States*, 136 U.S. 68, 81 (1890); *Keyser v. Hitz*, 133 U.S. 138, 145–46 (1890). And as Acting Assistant Secretary, Ms. Worden has the authority to issue general statements of policy, like the Memorandum, as the Secretary has delegated her authority to administer the Fair Housing Act to the Assistant Secretary. *See* 5 U.S.C. § 3345(a)(3); 76 Fed. Reg. at 73,984.

### 3. The Appointments Clause has no bearing on the validity of the Memorandum.

The College disputes none of this. Instead, it raises three meritless arguments as to why, despite Ms. Worden's lawful designation as Acting Assistant Secretary, the Appointments Clause precluded her ability to exercise that lawfully delegated authority.

*First*, the College wrongly argues that the signing of the Memorandum is an action that is so significant that it necessarily could "be undertaken only by principal officers." Pl.'s Suggestions at 14. Because Ms. Worden was not herself Senate-confirmed, the College claims she lacked constitutional authority to sign the Memorandum, *id.*, but this argument is flawed on both counts.

Though the Assistant Secretary is not a principal officer, the College cites nothing for the proposition that only principal officers can issue general statements of agency policy. *See* Pl.'s Suggestions at 14. By definition, all officers of the United States—principal and inferior—are

---

[14] On January 20, 2021, former Secretary of HUD Ben Carson resigned from his office. That same day, President Biden designated HUD official Matthew Ammon to serve as Acting Secretary pursuant to his authority under the FVRA, 5 U.S.C. § 3345(a)(3). *See* Ex. C. Mr. Ammon served temporarily in an acting capacity until the current Secretary, Marcia L. Fudge, was confirmed by the Senate on March 10, 2021.

constitutionally capable of exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, including even rulemaking authority, *id.* at 140–41; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010) (holding that members of Public Company Accounting Oversight Board, which had enforcement and rulemaking authority, were validly appointed inferior officers); *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 41 (D.D.C. 2017) ("The Supreme Court has held that, under the Constitution, only 'Officers,' both principal and inferior, have the power to issue rules . . . ." (citing *Buckley*, 424 U.S. at 141)). If inferior officers are capable of issuing final rules, then *a fortiori*, they can issue general statements of agency policy like the Memorandum, which, unlike legislative rules, do not impose legal consequences on regulated parties.

Inferior officers are distinguished from principal officers, not by the significance of their duties, but rather by whether there is some level of direction or supervision by a higher-ranking officer. *See Edmond*, 520 U.S. at 662–63. Plaintiff's focus on the purported significance of the Memorandum thus "confuses a question of supervision for one of authority." *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19, 38 (D.C. Cir. 2016). "The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather . . . the line between officer and nonofficer." *Edmond*, 520 U.S. at 662 (quoting *Buckley*, 424 U.S. at 126); *accord Ass'n of Am. R.Rs.*, 821 F.3d at 38.[15]

Further, although Ms. Worden herself was not Senate-confirmed to any office, *see* Pl.'s Suggestions at 14, that does not alter her authority to exercise the duties of the office of the Assistant Secretary in an acting capacity. "[L]ongstanding Supreme Court precedent as well as centuries of unbroken historical practice" recognize that an individual who temporarily performs the functions of a Senate-confirmed office in an acting capacity, even a principal office, need not

---

[15] Plaintiff's reliance on *Ass'n of American Railroads*, *see* Pl.'s Suggestions at 13–14, is misplaced. What made the officer there a principal officer was not his authority to take final agency action or issue rules, but his freedom from direction and supervision. *See Ass'n of Am. R.Rs.*, 821 F.3d at 39.

be appointed pursuant to Senate-confirmation. *United States v. Smith*, 962 F.3d 755, 763 (4th Cir. 2020). The Supreme Court recognized in *United States v. Eaton*, 169 U.S. 331 (1896), that a subordinate "charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions," is not "thereby transformed into the superior and permanent official" for purposes of the Appointments Clause, and may serve without Senate confirmation. *Id.* at 343–44. Consistent with *Eaton*, courts uniformly upheld the constitutionality of the FVRA designation of former Acting Attorney General Matthew G. Whitaker, even though he had not been confirmed by the Senate to any office. *See, e.g.*, *Smith*, 962 F.3d at 763–65; *Guedes v. ATF*, 356 F. Supp. 3d 109, 145–53 (D.D.C. 2018), *aff'd on other grounds*, 920 F.3d 1 (D.C. Cir. 2019); *United States v. Haning*, No. 4:18-CR-139-RWS-NAB, 2019 WL 9834329, at *6 (E.D. Mo. Aug. 20, 2019).[16] For its part, Congress "from the time of the founding to today . . . has continuously authorized the President to direct persons . . . who lack any constitutionally relevant Senate confirmation to perform the duties of a principal office temporarily on an acting basis," an understanding that is "further confirmed by the longstanding practice of the Executive Branch." *Guedes*, 356 F. Supp. 3d at 149–50 (detailing history of vacancy statutes and Executive Branch practice); *see also Sw. Gen.*, 137 S. Ct. at 935.[17]

Thus, because Ms. Worden was a lawfully designated *acting* officer under the FVRA, *see* 5 U.S.C. § 3345(a)(3) (authorizing designation of tenured agency employee as acting officer), the Appointments Clause does not require that she be Senate-confirmed to exercise the duties of the office of the Assistant Secretary for FHEO. And because the Assistant Secretary has the authority

---

[16] *See also United States v. Santos-Caporal*, No. 1:18-CR-171-AGF-ACL, 2019 WL 468795 (E.D. Mo. Jan. 9, 2019); *United States v. Smith*, No. 1:18-CR-00015-MR-WCM, 2018 WL 6834712 (W.D.N.C. Dec. 28, 2018), *aff'd*, 962 F.3d 755 (4th Cir. 2020); *United States v. Peters*, 6:17-CR-55-REW-HAI-2, 2018 WL 6313534 (E.D. Ky. Dec. 3, 2018); *United States v. Valencia*, No. 5:17-CR-882-DAE(1)(2), 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018).

[17] Indeed, if Plaintiff were correct that the Memorandum could only be issued by a principal officer—which it is not—then the Court should treat Ms. Worden's FVRA designation as a constitutional designation of an acting principal officer. *Cf. Guedes*, 356 F. Supp. 3d at 154–55 (construing Presidential "direct[ion]" under FVRA, 5 U.S.C. § 3345(a)(3), as constitutional "appointment" for purposes of Appointments Clause).

to issue general statements of agency policy, Ms. Worden was vested with that same authority when she signed the Memorandum. *See Grand Jury Investigation*, 916 F.3d at 1055.

*Second*, Plaintiff wrongly argues that the office of the Assistant Secretary for FHEO itself is a principal office because it "exercises many significant executive branch duties." Pl.'s Suggestions at 15. That too is incorrect. The distinguishing characteristic of inferior officers is that their "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. The Assistant Secretary is plainly directed and supervised by the office of the Secretary. *See, e.g.*, 42 U.S.C. § 3532(a) (HUD "shall be administered under the *supervision and direction* of the Secretary" (emphasis added)); *id.* § 3533(a) (Assistant Secretaries "shall perform such functions, powers, and duties as the Secretary shall prescribe from time to time"). Moreover, by definition, *any* officer of the United States necessarily exercises "significant authority." *Lucia*, 138 S. Ct. at 2051. Plaintiff's argument that the exercise of "significant executive branch duties" renders the Assistant Secretary a principal officer, Pl.'s Suggestions at 15, would thus erase the constitutionally recognized distinction between principal and inferior officers. And even if the Assistant Secretary were a principal officer, that still would not help the College's argument, because Ms. Worden was validly designated under the FVRA, and an individual temporarily designated to serve as an acting principal officer does not herself require Senate confirmation to exercise the duties of that office. *See Eaton*, 169 U.S. at 343–44; *Smith*, 962 F.3d at 763–65; *Guedes*, 356 F. Supp. 3d at 145–53.

*Third*, Plaintiff erroneously contends that Ms. Worden was not a lawfully appointed inferior officer when she signed the Memorandum because the vacancy in the office of the Secretary meant that she was not "supervis[ed] by a principal officer." Pl.'s Suggestions at 14. Again, Plaintiff's focus on whether Ms. Worden was herself a principal or inferior officer is mistaken because she was a lawfully designated *acting* officer under the FVRA. By law, she was "vested with the same authority that could be exercised by the" Assistant Secretary, *Grand Jury Investigation*, 916 F.3d at 1055, regardless of her own officer status, *see, e.g.*, *Eaton*, 169 U.S. at

33

343–44.[18] Moreover, Plaintiff is simply wrong that Ms. Worden was unsupervised in her role as Acting Assistant Secretary. As Plaintiff itself concedes, *see* Pl.'s Suggestions at 14, Mr. Ammon was lawfully serving as Acting Secretary at the time Ms. Worden signed the Memorandum. In that capacity, he had the authority to exercise all of the authority of the office of the Secretary— including the authority to supervise inferior officers and acting officers alike. *See, e.g.*, *Ryan*, 136 U.S. at 81; *see also* 42 U.S.C. § 3532(a).

Nor is it the case that a vacancy in a principal office transforms subordinate officers into unconstitutionally unsupervised inferior officers. In reviewing Appointments Clause challenges, "courts do not evaluate the degree of supervision or reversal authority actually exercised by superiors regarding the particular agency decision at issue, but rather the extent to which relevant statutes or regulations provide for such oversight as a *structural matter*." *Estes v. U.S. Dep't of Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016) (emphasis added). Here, HUD's structure makes clear that the Assistant Secretary is directed and supervised by the Secretary. *See supra* p. 33. Moreover, Plaintiff's theory is irreconcilable with *Eaton* and the cases involving former Acting Attorney General Whitaker. In those cases, the vacancies in the principal offices would have meant, under Plaintiff's theory, that the acting principal officers would also be unsupervised. But none of these cases suggests that the vacancy itself created an absence of supervision or that the purported lack of supervision raised any constitutional concerns. In sum, the Memorandum is not contrary to constitutional power.

### C. The Memorandum is not contrary to the Fair Housing Act.

The intake procedures set forth in the Memorandum are consistent with the law. Pl.'s Suggestions at 15. As an initial matter, to the extent the College contends that the Memorandum "overturns the longstanding interpretation of the Fair Housing Act that single-sex educational

---

[18] In fact, even an absence of supervision would not help Plaintiff. Assuming *arguendo* that the vacancy in the office of the Secretary left the office of the Assistant Secretary unconstitutionally unsupervised, then that would simply mean that the Assistant Secretary became a principal officer. *See Edmond*, 520 U.S. at 663 (distinction between principal and inferior officer rests on presence of direction and supervision). But if so, then under *Eaton*, Ms. Worden would simply be a validly designated acting principal officer. *See supra* p. 33.

housing is allowed," *id.* at 18, that is incorrect. The Memorandum merely states that HUD will accept and investigate complaints that allege discrimination under the Fair Housing Act on the basis of sexual orientation and gender identity. The Memorandum does not resolve or address how Fair Housing Act liability applies to any specific circumstances, including where other unique legal considerations come into play, such as educational housing, the interplay of Title IX with respect to educational institutions, or the interests protected by the Religious Freedom Restoration Act or the First Amendment. It certainly does not suggest any interpretation (let alone any change in interpretation) with respect to single-sex educational housing of religious institutions.

The College is equally wrong to contend that the Memorandum is contrary to law because "the FHA does not prohibit sexual orientation and gender identity discrimination," Pl.'s Suggestions at 18. Indeed, the College's arguments that the Fair Housing Act does not protect against gender identity and sexual orientation discrimination are precisely the ones the Court considered and rejected in *Bostock*. Just as in *Bostock*, it is immaterial that the "FHA never mentions sexual orientation, gender identity, or transgender status," Pl.'s Suggestions at 16, because it is "impossible to discriminate against a person" on those grounds "without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Likewise immaterial is the College's contention that the term "sex" refers "to the biological indicators of male and female." Pl.'s Suggestions at 16 (citation omitted). The Supreme Court in *Bostock* accepted a similar definition for the sake of argument, but it held that "nothing in our approach to these cases turns on" it, because the "question isn't just what 'sex' meant" when Title VII was enacted "but what Title VII says about it." 140 S. Ct. at 1739. The Fair Housing Act, like Title VII, prohibits housing providers "from taking certain actions '*because of sex*.'" *Id.* (emphasis added); *see* 42 U.S.C. § 3604(a), (b), (d) (prohibiting certain types of discrimination "because of . . . sex"); *see also id.* § 3604(c) (prohibiting statements that indicate any preference or discrimination in the sale or rental of housing "based on . . . sex"). That broad language "necessarily" and "unavoidably" encompasses sexual orientation and gender identity discrimination. *Bostock*, 140 S. Ct. at 1746, 1747.

Nor is it relevant whether "no one understood the FHA's prohibition on sex discrimination" to extend to gender identity and sexual orientation. Pl.'s Suggestions at 17. The employers in *Bostock* similarly asserted "that 'no one' in 1964 . . . would have anticipated today's result," 140 S. Ct. at 1750, and the Court rejected that argument. Beyond questioning whether it was "really true," *id.* at 1751, 1752, the Court explained that applying "Title VII's plain text only to applications some (yet-to-be determined) group expected in 1964" was inconsistent with the Court's civil rights jurisprudence and would require it to overturn "more than a little law." *Id.* at 1751–53 (noting that the law had been applied to numerous situations that "all were hotly contested for years"). Similarly, here, "the breadth of the statutory language prove[s] too difficult to deny," *id.* at 1752, and "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Id.* at 1737.

For the same reason, the "no-elephants-in-mouseholes canon" invoked by the College has "no relevance here." *Id.* at 1753; *see* Pl.'s Suggestions at 18 (invoking that canon). Like Title VII, the Fair Housing Act "is a major piece of federal civil rights legislation" that is "written in starkly broad terms," with a "key drafting choice[]" to "focus on discrimination against individuals and not merely between groups." *Bostock*, 140 S. Ct. 1753. As the Supreme Court explained in *Bostock*, "[t]his elephant has never hidden in a mousehole; it has been standing before us all along." *Id.*

The College also wrongly argues that the *Bostock* Court rejected the claim 'that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." Pl.'s Suggestions at 16. But the Supreme Court only "rejected" that claim as a reason to read Title VII other than as its plain text demands. Nothing in the decision suggests any basis to reach a different result under the Fair Housing Act, and certainly not on the basis of the arguments the College has advanced, which are identical to the ones rejected in *Bostock*. Indeed, the Eighth Circuit recently vacated and remanded a district court decision that had held that the Fair Housing Act did not prohibit discrimination on the basis of sexual orientation, in light of *Bostock*. *See Walsh*, 2020 WL 5361010, at *1. And just as in *Bostock*, the College's concerns about "how . . . doctrines protecting religious liberty [will] interact with" the plain meaning of

the Fair Housing Act are not a basis to read the Fair Housing Act differently. 140 S. Ct. at 1754. Questions about the interaction of various laws and which ones supersede others "are nothing new," *id.*, but their resolution must await a proper case or controversy, which is lacking here.

Finally, the College's invocation of the Supreme Court's decision in *King v. Burwell*, 135 S. Ct. 2480 (2015), is misplaced. In that case, the Supreme Court held that courts, not agencies, should resolve certain "question[s] of deep 'economic and political significance'" that Congress has not expressly assigned to the Executive Branch. *Id.* at 2489. Putting aside that, for the reasons discussed above, the Memorandum is not a "sea change in housing law," or any change at all, despite the College's contentions, Pl.'s Suggestions at 19, the argument fails because the question of Fair Housing Act liability has not been resolved by HUD but by Congress through the plain text of the Fair Housing Act and the Supreme Court's construction of comparable text in Title VII. Just as "[j]udges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations," neither is HUD. *Bostock*, 140 S. Ct. at 1754.

### D. The Memorandum is not arbitrary and capricious.

For many of the same reasons, the Memorandum is not arbitrary and capricious under § 706 of the APA, 5 U.S.C. § 706. Agency action is arbitrary and capricious only if "'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nebraska v. U.S. EPA*, 812 F.3d 662, 666 (8th Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

None of those factors applies here. The Memorandum simply recognizes, in light of the Supreme Court's reasoning in *Bostock*, that complaints alleging sexual orientation or gender identity discrimination under the plain text of the Fair Housing Act will be accepted and investigated as complaints "because of . . . sex." Unlike in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), on which the College relies, the

Memorandum did not immediately rescind social benefits to 4.3 million people on the basis of its legal interpretation, *see id.* at 1913–15. The Memorandum also is not a departure from HUD's past intake policies, much less a stark or "abrupt" shift. Pl.'s Suggestions at 10; *see supra* pp. 8–9 (Background section II.A). Indeed, four years before *Bostock*, HUD issued a similar Memorandum to FHEO regional offices instructing that "all otherwise jurisdictional complaints alleging discrimination because of real or perceived gender identity" or "sexual orientation shall be accepted for filing on the basis of sex." December 2016 Guidance at 1, 2. This case thus presents none of the reliance interests that were so central in *Regents*. Nor does the Memorandum serve as an authoritative source of law, much less does it go beyond what the plain text of the Fair Housing Act requires in light of *Bostock*. In *Regents*, by contrast, the agency's decision went further than could be explained solely by virtue of the judicial decision at issue, which addressed eligibility for certain benefits but "did 'not cast doubt'" on the legality of a different aspect of the program. *See Regents*, 140 S. Ct. at 1912. *Regents* is thus inapposite.

The College also erroneously argues that in issuing the Memorandum, HUD should have considered other legal authorities and considerations that may impact Fair Housing Act liability when the housing policies of private religious colleges are at play, such as privacy rights and religious freedom. Pl.'s Suggestions at 9. That contention again misconstrues the purpose of the Memorandum, which carries no force of law and was simply meant to reaffirm HUD's long-held complaint intake practices in light of *Bostock*. The Memorandum in no way precludes courts, HUD, FHEO, its enforcement partners, and administrative law judges from considering other competing interests when they may be legally relevant. But the fact that "doctrines protecting religious liberty interact with" the Fair Housing Act and "might supersede [its] commands in appropriate cases" does not change what the Fair Housing Act means. *Bostock*, 140 S. Ct. at 1754. Because those matters therefore do not affect the interpretive question, HUD was not arbitrary in declining to address them in the abstract. *See Mobil Oil Expl. & Producing Se. v. United Distribution Cos.*, 498 U.S. 211, 231 (1991) ("[A]n agency need not solve every problem before it in the same proceeding."); *Grunewald v. Jarvis*, 776 F.3d 893, 906 (D.C. Cir. 2015) (explaining that an agency is not required to tackle problems "from every angle at once").

38

### E. This case does not present concerns related to State sovereignty that would warrant application of a "clear statement" requirement in the interpretation of the Fair Housing Act.

The College's arguments that the terms of the Fair Housing Act are not sufficiently clear to regulate the operations of State governments, preempt State laws, impose grant conditions on States, or abrogate State sovereign immunity, *see* Pl.'s Suggestions at 20–24, are irrelevant in this case. Quite simply, the College is not a State, and application of the requirements of the Fair Housing Act to the College does not even arguably interfere with State sovereignty or self-governance.

The College cites a collection of cases that it contends reflect a broader principle that a statute should not be read to interfere with State sovereignty unless that consequence is particularly clear in the statute. But those cases do not support the College's position. In each of these cases, the court found reason to read a statute narrowly only with respect to specific applications that could threaten State sovereignty. None of the cases supports the extreme, unsupported proposition the College is advancing here—that if *some* applications of a statute could threaten State sovereignty, *every* application of the statute is suspect, including applications that do not implicate State sovereignty.

*Gregory v. Ashcroft*, 501 U.S. 452 (1991), for example, did not hold that all possible applications of the statute at issue were subject to a "clear statement" rule. In *Gregory*, the Supreme Court considered whether State judges appointed by the Governor were covered by the provisions of the Age Discrimination in Employment Act applicable to State government employment. The Court held that the potential for interference with State self-governance favored reading the statute as inapplicable to appointed judges. *See id.* at 470. But the Court did not suggest that the State government provisions of the ADEA should always be read as narrowly as possible. And it certainly did not suggest that all the provisions of the ADEA should be read narrowly.

*Sossamon v. Texas*, 563 U.S. 277 (2011), likewise does not support the College's radical theory. In *Sossamon*, the Court concluded that the terms of the Religious Land Use and Institutionalized Persons Act (RLUIPA) were not clear enough to establish that by accepting

federal funds a State would waive its sovereign immunity. But the Court did not hold that the statute therefore had to be read narrowly in all respects. Indeed, the Court noted that the parties agreed that the substantive provisions of the statute extended "broad protection of religious exercise." *Id.* at 287. The Supreme Court has not hesitated to give RLUIPA "expansive" and "capacious[]" application, *Holt v. Hobbs*, 574 U.S. 352, 358 (2015), even though it regulates two areas historically left to State control: land-use regulation and the treatment of institutionalized persons. *See Sossamon*, 563 U.S. at 281.

The College is a private organization, and enforcement of the Fair Housing Act against it would not implicate any issue of State sovereignty. The College also does not cite any Missouri State law that favors its position but has been preempted by the Fair Housing Act. Accordingly, federalism concerns do not call for application of a clear-statement rule in interpreting the Fair Housing Act.

Even if there were some reason to apply any "clear statement" rule, the terms of the Fair Housing Act are clear. The College's arguments to the contrary simply rehash arguments the Supreme Court already rejected in *Bostock*, where the Court found that its construction of Title VII "follows ineluctably from the statutory text." *Bostock*, 140 S. Ct. at 1750; *see supra* pp. 34–37 (Argument section III.C) (discussing *Bostock* in greater detail). The Fair Housing Act is also clear that its antidiscrimination provisions preempt any contrary State law. The terms of the Fair Housing Act leave no room for doubt that they override any State law that "purports to require or permit . . . discriminatory housing practice[s]." 42 U.S.C. § 3615.

The College is also wrong to suggest the Supreme Court's Fair Housing Act cases support reading the Fair Housing Act narrowly. The Court has consistently favored a broad reading of the statute. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs.*, 135 S. Ct. at 2521, 2525 (holding that the Fair Housing Act supports claims based on disparate impact, based in part on the statute's broad purpose of "eradicat[ing] discriminatory practices within a sector of our Nation's economy"); *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (noting that the Fair Housing Act extends the right to bring housing discrimination claims under the Fair

Housing Act to the outer limits of Article III of the Constitution, and citing prior cases holding the same).

F.    **The Memorandum does not violate the College's freedom of speech.**

Finally, the College is not likely to succeed on its contention that the Memorandum or the Fair Housing Act violates the freedom of speech. Pl.'s Suggestions at 24. The Memorandum does not say anything about speech, much less does it bar the statements of a religious school conveying "religiously infused housing policies." *Id.* at 26. As discussed, the Memorandum just reiterates HUD's longstanding complaint intake and investigation procedures in light of *Bostock*. Thus, this claim is really predicated on the College's assumption that (1) HUD would enforce the Fair Housing Act's prohibition of gender identity and sexual orientation discrimination against the College's housing policies notwithstanding any potentially applicable statutory or constitutional protections for speech or religious freedom, and (2), by extension, seek to prohibit or penalize the College's statements conveying its housing policies to students under 42 U.S.C. § 3604(c). As discussed above, however, that assumption is pure speculation. To date, HUD has not enforced the Fair Housing Act's prohibition on sex discrimination in the context of single-sex colleges and universities that meet Title IX's dormitory exemption, much less in the context of religious colleges or universities that meet Title IX's religious exemption. *Cf.* 24 C.F.R. § 3.405(b)(1) (educational recipients of federal funding in HUD programs "may provide separate housing on the basis of sex"); *id.* § 3.205 (exemption for educational institutions "controlled by a religious organization"). Indeed, the College concedes as much. *See* Pl.'s Suggestions at 18. And there is no basis to assume how HUD would address any other applicable laws protecting religious liberty, such as the Religious Freedom and Restoration Act, if invoked by the College.

Furthermore, the College's First Amendment claim, like its other theories, is actually directed not at the Memorandum but at the Fair Housing Act itself. The College contends that the interpretation described in the Memorandum would cause the Fair Housing Act's prohibition of discriminatory statements "with respect to the sale or rental of a dwelling," 42 U.S.C. § 3604(c), to violate the First Amendment. But there is no such constitutional infirmity: statements that indicate a discriminatory and unlawful preference in the sale or rental of housing are "not

41

protected . . . speech." *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991). Courts have therefore repeatedly upheld section 3604(c) against challenges under the First Amendment. *See, e.g.*, *id.* (any challenge to "Congress's power to prohibit speech that directly furthers discriminatory sales or rentals of housing" would be a "bold and fruitless exercise"); *Campbell v. Robb*, 162 F. App'x 460, 469–70 (6th Cir. 2006) ("because discrimination in housing is illegal," the speech prohibited by the Fair Housing Act "receives no First Amendment protection whatsoever" (citations omitted)); *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer*, 943 F.2d 644, 652 (6th Cir. 1991) (rejecting First Amendment challenge because "the prohibition against discriminatory advertising" is not directed at speech but at the "eradication of [illegal] discriminatory housing practices"); *United States v. Hunter*, 459 F.2d 205, 211–13 (4th Cir. 1972) (upholding section 3604(c) against facial First Amendment challenge); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376, 388–89 (1973) (holding that discriminatory advertisements for employment were entitled to no First Amendment protection because "[d]iscrimination in employment is not only commercial activity, it is illegal commercial activity"). This Court should do the same.

The College is also off the mark to contend that the interpretation in the Memorandum causes section 3604(c) to be unconstitutionally "overbroad." Pl.'s Suggestions at 24. That would be true only if a "substantial number" of applications of section 3604(c) were "unconstitutional judged in relation to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 n.6 (2008). The College cannot meet that standard. It attempts to do so by invoking a Department of Education table listing 879 post-secondary schools that have self-identified as "religiously affiliated." Pl.'s Suggestions at 30 n.10. But the College simply assumes from that statistic that all of these schools "separat[e] student housing based on biological sex," when nothing in the table supports that conclusion. Pl.'s Suggestions at 29–30 & n.10. Furthermore, as discussed above, HUD has not suggested that schools falling under Title IX's religious exemption or within the confines of RFRA could be liable for practices that may implicate religious liberty or statements reflecting those practices. *Cf. Wash. State Grange*, 552 U.S. at 449–50 ("In

determining whether a law is facially invalid, [courts] must be careful not to . . . speculate about 'hypothetical' or 'imaginary' cases.").

Even if section 3604(c) claims were ever brought in such circumstances—and the College has not established that they are—that would not make the provision overbroad relative to its plainly legitimate sweep. The Fair Housing Act applies broadly to housing nationwide, of which there were more than 139 million units in 2019.[19] And in that same fiscal year, FHEO and its enforcement partners investigated more than 7,500 complaints of housing discrimination.[20] Courts have thus easily rejected overbreadth claims of the sort the College claims as to section 3604(c). *See U.S. ex rel. Jackson v. Racey*, 112 F.3d 512 (4th Cir. 1997) (unpublished table decision) (rejecting overbreadth claim against section 3604(c) as "unfounded" in light of the potential for discriminatory statements and advertisements to "undermine the purposes of the Fair Housing Act"); *Campbell,* 162 F. App'x at 468 ("the vast majority of cases" under section 3604(c) will "not run afoul of the First Amendment").

Plaintiff's other theories regarding the reach of section 3604(c) are similarly untenable. The statute does not plausibly "censor[] colleges from even telling students that the college does not support the" interpretation that the Fair Housing Act bars discrimination based on gender identity and sexual orientation. Pl.'s Suggestions at 27. In the 53-year history of the statute, HUD has never contended that it applies to political speech or similar expression, and courts have found it obvious that the statute does not reach such speech. *See, e.g.*, *Hunter*, 459 F.2d at 211 n.6, 212 n.9; *cf. New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982) (noting that a statute should not be invalidated as overbroad if it can be construed in a way that avoids constitutional problems). Rather, a statement is prohibited under the Fair Housing Act only if it is made with respect to the sale or rental of a dwelling. *See* 42 U.S.C. § 3604(c); *Campbell*, 162 F. App'x at 467; *Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999). The College therefore does not act

---

[19] U.S. Census Bureau, https://data.census.gov/cedsci/profile?q=United%20States&g= 0100000US.

[20] *See* U.S. Dep't of Hous. & Urban Dev., State of Fair Housing Annual Report to Congress, FY 2018–FY 2019 (2020), at 9, https://www.hud.gov/sites/dfiles/FHEO/documents /21FHEO%20Report%20Final%20Press%201-15_LA.pdf.

43

Case 6:21-cv-03089-RK   Document 19   Filed 05/06/21   Page 54 of 58

"at its peril by even saying that it opposes" the interpretation that "sex" discrimination under the Fair Housing Act includes discrimination on the basis of gender identity and sexual orientation. Pl.'s Suggestions at 27.

## IV. The other factors in the preliminary injunction analysis weigh against relief.

As discussed above, the College cannot establish irreparable harm or a likelihood of success on the merits. It also cannot satisfy the other two factors of the preliminary injunction analysis, which require the plaintiff to demonstrate that "the balance of equities tilts in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The balance of the equities leans against temporary relief here. As discussed above, on one end of the scale, the College has not shown that an injunction is needed to prevent serious irreparable harm. It has not demonstrated that a preliminary injunction would meaningfully improve its situation, even in a minor way, while the parties await a final ruling on the merits. Preliminary relief would not guarantee protection against lawsuits alleging discrimination under the Fair Housing Act, nor would it provide the College with definitive guidance that it could rely on for future planning.

Meanwhile, on the other end of the scale, preliminary injunctive relief would impose harm on the Government and the public. Relief preventing HUD from enforcing Fair Housing Act in accord with *Bostock* would be a substantial harm in itself. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (finding that a State Government suffered irreparable harm when it was prevented from enforcing duly enacted statutes). It would also be unfair to students and other community members who might one day take issue with the College's policies. The Court should not impair their ability to seek relief from HUD without knowing the full facts of their cases and considering their interests. The conciliation provisions of the Fair Housing Act, *see supra* p. 6, reflect a judgment by Congress that, in a fair housing dispute, the public interest favors efforts to find accommodations acceptable to both the complainant and the housing provider. Here, a dispute has not even emerged yet, and the College

has not explored whether it can accommodate the hypothetical complainant in a way that comports with its religious interests.

A further factor to consider in the balance of equities is that HUD accepted and investigated administrative complaints of discrimination based on sexual orientation or gender identity long before it issued the challenged Memorandum. To the extent that the College seeks to disrupt that practice, the College is seeking to alter, rather than preserve, the status quo. That weighs against preliminary relief. *See Amigo Gift Ass'n v. Exec. Props., Ltd.*, 588 F. Supp. 654, 660 (W.D. Mo. 1984).

Because preliminary relief would not prevent harm to the plaintiffs and would harm the Government and other members of the public, the balance of equities and the public interest weigh against preliminary relief.

## V. There is no basis for nationwide relief.

For the reasons discussed above, the Court should deny preliminary relief. But if the Court grants any preliminary relief, it should be no broader than necessary to prevent irreparable harm to the College.

The separation of powers, as embodied in Article III of the Constitution, requires that judicial relief "be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And under traditional equitable principles, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Nationwide injunctions are generally improper because they raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Government. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., concurring in grant of stay). There is no reason why nationwide relief would be necessary to prevent injury to the College.

The College wrongly argues that a nationwide preliminary injunction is warranted because other religious schools would also benefit from relief. The College has not identified any of these schools; none of them have come before the Court themselves; and the Court has no

other information about the schools' activities or how they might affect the interests of other persons. Extending relief of any kind to these unnamed schools—and especially the extraordinary remedy of preliminary relief—would be improper. *See id.* at 600 (noting that judicial remedies "are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit," and "when a court goes further than that," ordering relief "with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies").

The cases the College cites in its brief, Pl.'s Suggestions at 29, do not support nationwide relief. The cited footnote in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), explains that in some circumstances, a court may grant relief to prevent application of a law to the plaintiff when the law is "facially overbroad" in a way that contravenes the First Amendment. *See id.* at 449 n.6. But the case does not discuss whether a court may extend an injunction to prevent application of a law to other persons not before the Court. And in *Doe v. Reed*, 561 U.S. 186 (2010), the Court held that the district court should not have granted any relief even to the plaintiffs, because the plaintiffs had failed to establish a valid claim. *See id.* at 202. The Court did not address whether it would ever be proper for a court to issue preliminary relief beyond the plaintiffs.

The proposed order submitted by the College is also improper in at least two other ways. First, it would have the court "find[]" and "declare[]" numerous matters. Proposed Order at 1. As discussed in section II.E above, it is improper for a court to issue final relief based on a motion for preliminary injunction. *See supra* p. 23; *Withrow v. Larkin*, 421 U.S. 35, 43 (1975) (holding that the district court should not have declared the challenged law unconstitutional based on a request for preliminary relief); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[P]rior to final judgment there is no established declaratory remedy comparable to a preliminary injunction . . . ."). Second, the proposed order employs vague language, for example, prohibiting "acts by Defendants that tend to . . . burden private religious educational institutions" in enforcement of their policies. Proposed Order at 4. It therefore fails to clearly specify the acts restrained as

required by Rule 65(d)(1) and extends far beyond the Memorandum that purportedly occasioned its need for extraordinary relief.

## CONCLUSION

For all of the reasons above, preliminary relief should be denied, and the case should be dismissed.

Date: May 6, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ JAMES C. LUH
JAMES C. LUH (N.Y. Bar)
SERENA M. ORLOFF (Cal. Bar. No. 260888)
CHETAN A. PATIL (D.C. Bar No. 999948)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington DC 20530
Tel: (202) 514-4938
E-mail: James.Luh@usdoj.gov

TERESA A. MOORE
Acting United States Attorney

CHARLES M. THOMAS, MO #28522
Assistant United States Attorney
United States Attorney's Office
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, MO 64106
Phone: (816) 426-3130
Facsimile: (816) 426-3165
Email: charles.thomas@usdoj.gov

Attorneys for Defendants